# Exhibit 1

skip to main content

Print

# CASE INFORMATION

## CV-23-978137 ERIC SEME vs. CALIBER HOME LOANS INC.

### Summary

| | |
|---|---|
| **Case Number:** | CV-23-978137 |
| **Case Title:** | ERIC SEME vs. CALIBER HOME LOANS INC. |
| **Case Designation:** | CONTRACT - REAL ESTATE |
| **Filing Date:** | 04/17/2023 |
| **Judge:** | ASHLEY KILBANE |
| **Magistrate** | N/A |
| **Mediator:** | N/A |
| **Room:** | 19C JUSTICE CENTER |
| **Next Action:** | CMC BY PHONE on 09/14/2023 at 10:00 AM |
| **File Location:** | PEND.FILE |
| **Last Status:** | ACTIVE |
| **Last Status Date:** | 04/17/2023 |
| **Last Disposition:** | NEWLY FILED |
| **Last Disposition Date:** | 04/17/2023 |
| **Prayer Amount:** | $100,000.00 |
| **Court of Appeals Case:** | N/A |
| **Original Case:** | N/A |
| **Refiled Case:** | N/A |

### Service

| Party Role | Name | Service Description | Sent Date | Response | Response Date |
|---|---|---|---|---|---|
| P(1) | ERIC SEME | E-FILING SERVICE EMAIL | 06/30/2023 | | |
| D(1) | CALIBER HOME LOANS INC. | SUMS COMPLAINT CERTIFIED MAIL | 04/19/2023 | NO RETURN AFTER 60 DAYS | 06/20/2023 |
| D(1) | CALIBER HOME LOANS INC. | SUMS AMENDED COMPLNT CERTIFIED MAIL | 07/07/2023 | COMPLETED | 07/10/2023 |
| D(1) | CALIBER HOME LOANS INC. | SUMS AMENDED COMPLNT CERTIFIED MAIL | 07/07/2023 | COMPLETED | 07/10/2023 |
| D(2) | NEWREZ LLC DBA SHELLPOINT MORTAGE SERVICING | SUMS AMENDED COMPLNT CERTIFIED MAIL | 07/07/2023 | COMPLETED | 07/10/2023 |
| D(2) | NEWREZ LLC DBA SHELLPOINT MORTAGE SERVICING | SUMS AMENDED COMPLNT CERTIFIED MAIL | 07/07/2023 | LEFT WITH AGENT - COMP ON OTHER | 07/10/2023 |

## Case Parties

| | | |
|---|---|---|
| **PLAINTIFF** **(1)** | ERIC SEME<br>10700 CLIFTON BLVD<br>CLEVELAND, OH 44102 | **ATTORNEY** WADE T. DOERR (0083430)<br>6550 SEVILLE DRIVE<br>SUITE B<br>CANFIELD, OH 44406-0000<br>Ph: 234-402-4055<br>Answer Filed: N/A |
| **DEFENDANT** **(1)** | CALIBER HOME LOANS INC.<br>% CT CORPORATION SYSTEM<br>4400 EASTON COMMONS WY, STE 125<br>COLUMBUS, OH 43219-0000 | |
| **DEFENDANT** **(2)** | NEWREZ LLC DBA SHELLPOINT<br>MORTAGE SERVICING<br>1100 VIRGINIA DR, STE 125<br>FORT WASHINGTON, PA 19034-0000 | |

## Docket Information

| Filing Date | Docket Party | Docket Type | Docket Description | View Image |
|---|---|---|---|---|
| 07/19/2023 | N/A | SR | USPS RECEIPT NO. 51037199 DELIVERED BY USPS 07/10/2023 NEWREZ LLC PROCESSED BY COC 07/19/2023. | |
| 07/19/2023 | N/A | SR | CERTIFIED MAIL RECEIPT NO. 51037198 RETURNED BY U.S. MAIL DEPARTMENT 07/10/2023 NEWREZ LLC MAIL RECEIVED AT ADDRESS 07/19/2023 TENDERED TO AGENT FOR FINAL DELIVERY | |
| 07/19/2023 | N/A | SR | USPS RECEIPT NO. 51037197 DELIVERED BY USPS 07/10/2023 CALIBER HOME LOANS INC. PROCESSED BY COC 07/19/2023. | |
| 07/19/2023 | N/A | SR | USPS RECEIPT NO. 51037196 DELIVERED BY USPS 07/10/2023 CALIBER HOME LOANS INC. PROCESSED BY COC 07/19/2023. | |
| 07/07/2023 | D2 | SR | SUMS AMENDED COMPLNT(51037199) SENT BY CERTIFIED MAIL. TO: NEWREZ LLC C/O CORPORATION SERVICE COMPANY 3366 RIVERSIDE DR., STE 103 UPPER ARLINGTON, OH 43221-0000 | 📄 |
| 07/07/2023 | D2 | SR | SUMS AMENDED COMPLNT(51037198) SENT BY CERTIFIED MAIL. TO: NEWREZ LLC 1100 VIRGINIA DR, STE 125 FORT WASHINGTON, PA 19034-0000 | 📄 |
| 07/07/2023 | D1 | SR | SUMS AMENDED COMPLNT(51037197) SENT BY CERTIFIED MAIL. TO: CALIBER HOME LOANS INC. 1525 S BELT LINE RD COPPELL, TX 75019-0000 | 📄 |
| 07/07/2023 | D1 | SR | SUMS AMENDED COMPLNT(51037196) SENT BY CERTIFIED MAIL. TO: CALIBER HOME LOANS INC. C/O CT CORPORATION SYSTEM 400 EASTON COMMON WAY, STE 125 COLUMBUS, OH 43219-0000 | 📄 |
| 07/06/2023 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 07/06/2023 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 07/06/2023 | D2 | CS | WRIT FEE | |
| 07/06/2023 | D2 | CS | WRIT FEE | |
| 07/06/2023 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 07/06/2023 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 07/06/2023 | D1 | CS | WRIT FEE | |
| 07/06/2023 | D1 | CS | WRIT FEE | |
| 07/06/2023 | N/A | JE | A REVIEW OF THE DOCKET REFLECTS THAT PLAINTIFF HAS NOT OBTAINED SERVICE ON DEFENDANTS. THEREFORE, THE CASE MANAGEMENT CONFERENCE BY PHONE SET FOR 07/12/2023 AT 2:15 PM IS HEREBY | 📄 |

| | | | CONTINUED AS FOLLOWS: CMC BY PHONE SET FOR 09/14/2023 AT 10:00 AM. THE COURT WILL CONDUCT A CASE MANAGEMENT CONFERENCE. DISCOVERY SCHEDULE, AMOUNT IN CONTROVERSY, EXCHANGE OF EXPERT REPORTS, DATES FOR SETTLEMENT CONFERENCE AND FOR FINAL PRETRIAL CONFERENCE, REFERRAL TO ARBITRATION, ETC., SHALL BE RESOLVED AND INCLUDED IN A BINDING DECREE AND ORDER FORMALIZED. ALL COUNSEL ATTENDING SHALL HAVE FULL AUTHORITY TO ENTER INTO A BINDING CASE MANAGEMENT ORDER. COUNSEL AND UNREPRESENTED PARTIES SHALL FOLLOW THE DISCOVERY PROCEDURES OUTLINED IN CIVIL RULE 26(F) IN PREPARATION FOR THE CASE MANAGEMENT CONFERENCE. PLAINTIFF'S COUNSEL SHALL INITIATE THE CONFERENCE CALL AND CONTACT THE COURT AT THE APPOINTED TIME AT 216-443-8618. NOTICE ISSUED | |
| 07/05/2023 | N/A | SC | CMC BY PHONE SCHEDULED FOR 07/12/2023 AT 02:15 PM IS CANCELLED. | |
| 06/30/2023 | P1 | SF | DEPOSIT AMOUNT PAID WADE T. DOERR | |
| 06/30/2023 | P1 | CO | AMENDED COMPLAINT $75 FIRST AMENDED COMPLAINT | 📄 |
| 06/20/2023 | D1 | SR | CERTIFIED MAIL NUMBER 50402866 ADDRESSED TO CALIBER HOME LOANS INC. (D1) NOT RETURNED BY THE U.S. POSTAL SERVICE AFTER 60 DAYS. NOTICE MAILED TO PLAINTIFF(S) ATTORNEY. | |
| 06/16/2023 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR CALIBER HOME LOANS INC. 06/16/2023 17:01:38 | |
| 06/16/2023 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR DOERR/WADE/T. 06/16/2023 17:01:38 | |
| 06/16/2023 | N/A | SC | CMC BY PHONE SET FOR 07/12/2023 AT 02:15 PM. PURSUANT TO LOCAL RULE 21, PART I, THE COURT WILL CONDUCT A CASE MANAGEMENT CONFERENCE. DISCOVERY SCHEDULE, AMOUNT IN CONTROVERSY, EXCHANGE OF EXPERT REPORTS, DATE FOR FINAL PRETRIAL CONFERENCE, REFERRAL TO ARBITRATION, ETC., SHALL BE RESOLVED AND INCLUDED IN A BINDING DECREE AND ORDER FORMALIZED. ALL COUNSEL ATTENDING SHALL HAVE FULL AUTHORITY TO ENTER INTO A BINDING CASE MANAGEMENT ORDER . PLAINTIFF'S COUNSEL SHALL INITIATE THE CONFERENCE CALL WITH ALL OTHER PARTIES AND CONTACT THE COURT AT THE APPOINTED TIME AT 216-443-8618. PARTIES SHALL BE PREPARED TO DISCUSS DISCOVERY PROGRESS AND SCHEDULING MATTERS, ETC. COUNSEL AND UNREPRESENTED PARTIES SHALL FOLLOW THE DISCOVERY PROCEDURES OUTLINED IN CIVIL RULE 26(F) IN PREPARATION FOR THE CASE MANAGEMENT CONFERENCE. | |
| 04/19/2023 | D1 | SR | SUMS COMPLAINT(50402866) SENT BY CERTIFIED MAIL. TO: CALIBER HOME LOANS INC. % CT CORPORATION SYSTEM 4400 EASTON COMMONS WY, STE 125 COLUMBUS, OH 43219-0000 | 📄 |
| 04/18/2023 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 04/18/2023 | D1 | CS | WRIT FEE | |
| 04/17/2023 | N/A | SF | JUDGE ASHLEY KILBANE ASSIGNED (RANDOM) | |
| 04/17/2023 | P1 | SF | LEGAL RESEARCH | |
| 04/17/2023 | P1 | SF | LEGAL NEWS | |
| 04/17/2023 | P1 | SF | LEGAL AID | |
| 04/17/2023 | P1 | SF | COURT SPECIAL PROJECTS FUND | |
| 04/17/2023 | P1 | SF | COMPUTER FEE | |
| 04/17/2023 | P1 | SF | CLERK'S FEE | |
| 04/17/2023 | P1 | SF | DEPOSIT AMOUNT PAID WADE T. DOERR | |
| 04/17/2023 | N/A | SF | CASE FILED: COMPLAINT, SERVICE REQUEST | 📄 |

## Costs

| Account | Amount |
| --- | --- |
| CLERK'S FEES | $98.81 |
| COMPUTER FEES | $20.00 |
| COURT SPECIAL PROJECTS FUND | $50.00 |

| | |
|---|---|
| LEGAL AID | $25.74 |
| LEGAL NEWS | $10.00 |
| LEGAL RESEARCH - CIVIL | $3.00 |
| TOTAL COST | $207.55 |

Only the official court records available from the Cuyahoga County Clerk of Courts, available in person, should be relied upon as accurate and current.

Website Questions or Comments.

Copyright © 2023 PROWARE. All Rights Reserved. 1.1.268

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

ERIC SEME
**Plaintiff**

V.

CALIBER HOME LOANS INC.
**Defendant**

**CASE NO.**  CV23978137

**JUDGE**  ASHLEY KILBANE

# SUMMONS  SUMA  CM

Notice ID:  51037196

| From: | ERIC SEME | P1 |
| | 10700 CLIFTON BLVD | |
| | CLEVELAND OH 44102 | |

| Atty.: | WADE T. DOERR |
| | 6550 SEVILLE DRIVE |
| | SUITE B |
| | CANFIELD, OH 44406-0000 |

| To: | CALIBER HOME LOANS INC. | D1 |
| | C/O CT CORPORATION SYSTEM | |
| | 400 EASTON COMMON WAY, STE 125 | |
| | COLUMBUS OH 43219-0000 | |

**NOTICE TO THE DEFENDANT:**

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Amended Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff for the relief requested in the **Amended Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

Date Sent: <u>07/06/2023</u>

By_____
**Deputy**

CMSN130

Date Produced: 07/17/2023

CERTIFIED MAIL SOLUTIONS INC.:

The following is the delivery information for Certified Mail™/RRE item number 9314 8001 1300 3548 4294 41. Our records indicate that this item was delivered on 07/10/2023 at 04:23 p.m. in COLUMBUS, OH 43224. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

ERIC SEME
**Plaintiff**

V.

CALIBER HOME LOANS INC.
**Defendant**

**CASE NO.** CV23978137

**JUDGE** ASHLEY KILBANE

# SUMMONS SUMA CM

Notice ID: 51037198

From: ERIC SEME                    P1
10700 CLIFTON BLVD
CLEVELAND OH 44102

Atty.: WADE T. DOERR
6550 SEVILLE DRIVE
SUITE B
CANFIELD, OH 44406-0000

To: NEWREZ LLC                     D2
DBA SHELLPOINT MORTAGE SERVICING
1100 VIRGINIA DR, STE 125
FORT WASHINGTON PA 19034-0000

**NOTICE TO THE DEFENDANT:**

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Amended Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff for the relief requested in the **Amended Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

Date Sent: <u>07/06/2023</u>

By_____
**Deputy**

CMSN130

**UNITED STATES**
**POSTAL SERVICE**

Date Produced: 07/17/2023

CERTIFIED MAIL SOLUTIONS INC.:

The following is the delivery information for Certified Mail™/RRE item number 9314 8001 1300 3548 4294 72. Our records indicate that this item was delivered on 07/10/2023 at 10:19 a.m. in FORT WASHINGTON, PA 19034. The scanned image of the recipient information is provided below.

Signature of Recipient :
(Authorized Agent)

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**April 17, 2023 14:21**

By: WADE T. DOERR 0083430

Confirmation Nbr. 2831884

ERIC SEME                                          CV 23 978137

     vs.

                                 **Judge:**  ASHLEY KILBANE

CALIBER HOME LOANS INC.

**Pages Filed:**  42

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| ERIC SEME<br>10700 Clifton Blvd.<br>Cleveland, OH 44102<br><br>       Plaintiff,<br><br>-vs-<br><br>CALIBER HOME LOANS, INC.<br>c/o CT Corporation System<br>4400 Easton Commons Way<br>Ste 125<br>Columbus, OH 43219<br>        Defendant. | CASE NO.<br><br><br>JUDGE<br><br>**COMPLAINT WITH JURY DEMAND**<br>INJUNCTIVE RELIEF AND MONEY<br>DAMAGES<br><br>  -  Breach of Loan Agreement<br>  -  Violation of Truth in Lending Act<br>  -  Violation of RESPA<br>  -  Violation of Ohio Consumer Sales<br>      Practices Act<br>  -  Tortious Interference with Contract |

**COMPLAINT – INJUNCTIVE RELIEF AND MONEY DAMAGES**

Plaintiff, Eric Seme ("Seme" or "Borrower"), by the undersigned counsel, files the following Complaint for Injunctive Relief and Money Damages, and state as follows:

PARTIES

1.     Plaintiff is an individual residing at 10700 Clifton Blvd., Cleveland, OH 44102.

2.     Defendant, Caliber Home Loans, Inc. ("Caliber" or "Lender"), is a loan servicing company conducting business in Ohio.

VENUE

3.     Venue is proper in Cuyahoga County because it is the location of the real property subject of this dispute and it is the county where the claim for relief arose. Civ. R. 3(C)(5) and (6).

1

FACTS AND BACKGROUND

4.     The foregoing paragraphs are incorporated herein.

5.     On October 11, 2018, Seme purchased a duplex to rehabilitate and renovate located at 10700-10702 Clifton Blvd., Cleveland, OH 44102 (the "Property") with a rehabilitation loan from Union Capital Mortgage Corporation (the "Loan"). Rehabilitation Loan Agreement attached as **Exhibit A**. Note attached as **Exhibit B**. Mortgage attached as **Exhibit C**.

6.     The renovation work was to be completed no later than April 11, 2019 by the terms of the Loan. Exhibit A.

7.     The Loan was in part to purchase the Property for the amount of $165,000.00 and also to fund rehabilitation construction on the Property in the amount of $101,322.38, by future disbursements pursuant to section 203(k) of the National Housing Act.

8.     As part of the Loan, Seme contracted with a Lender-approved contractor, Colvin Contracting, Inc., of Cleveland, Ohio ("Contractor" or "Colvin") to perform the rehabilitation improvements to the Property estimated at under $90,000.00. **Exhibit D**.

9.     Lender provided its form of improvement contract (the "Improvement Contract") between Seme and Colvin as part of the Loan application, and Lender was responsible for disbursing payments from the Loan proceeds to Seme and the Contractor upon completion of various stages of the work.

10.     On or about December 1, 2018, Caliber gave notice that it became the new loan servicer replacing Union Capital Mortgage Corporation.

11.     At that time, Seme was having difficulty getting Contractor to show up and do any work because Contractor was demanding early disbursements of funds before he would proceed, contrary to the terms of the Loan.

2

12.     Shortly prior to December 4, 2018, Lender advised Seme to approve release of some of the funds from Lender and to have a check issued payable to both Seme and the Contractor, but to withhold the check from Contractor if he did not complete the work relating to the payment.

13.     On or around December 11, 2018, Lender approved a draw for $24,315.03 payable to Seme and Contractor, that was never cashed due to the dispute between Seme and the Contractor.

14.     Seme followed Lender's instructions and withheld the check from Contractor demanding that he perform the itemized work before Seme would release payment because otherwise Seme was advised that he would not be legally protected if Caliber did not perform.

15.     Seme complained to the Contractor concerning the quality of the work and lack of progress where work had stalled after the demolition stage.

16.     In response to Seme's complaints, and due to Seme's refusal to pay over funds for work not yet completed, Contractor stopped work on the Property in January 2019 and he then filed a mechanic's lien on the Property on February 6, 2019. Seme responded by terminating the Improvement Contract.

17.     At the time Contractor quit the project, the Property was uninhabitable such that Seme was neither able to move in or rent out the Property as originally planned.

18.     In February and March of 2019, Seme's counsel contacted Caliber requesting that another contractor be approved or alternatively that Seme be permitted to pay off the Loan with alternative borrowed funds, giving notice of rescission of the Loan.

19.     Upon information and belief, Lender obtained an assignment of the mortgage on the Property on April 1, 2020.  **Exhibit E**.

3

20.     Through counsel, Seme demanded a true payoff from Caliber reflecting the undisbursed funds on or about April 15, 2020, and again gave notice that the Loan was to be rescinded and paid from alternative funds.

21.     In response, Caliber did not send a payoff, but instead ceased all communications with Seme and began sending mortgage statements to counsel.

22.     On or about July 9, 2020, Seme again requested a payoff through counsel but received no response.

23.     Meanwhile, the Lender would not approve a new contractor until the dispute with the existing Contractor was resolved, in violation of the self-help terms of the Loan, and Lender would not release any funds to Seme directly to complete the improvements on the Property.

24.     Lender also demanded monthly payments to service the Loan as if the balance was in excess of $250,000.00, despite never releasing the construction funds to Seme which undisbursed funds exceeded $90,000.00.

25.     Upon information and belief, Lender did not place the undisbursed funds in an interest-bearing escrow account conforming with the requirements of the Loan.  Exhibit A.

26.     After continued failure by Lender to provide a true payoff for the funds actually disbursed, or alternatively, to apply the undisbursed funds to the Loan and issue an accurate payoff, Seme's opportunity to borrow the funds to pay off the Loan lapsed.

27.     Since Lender would not release the undisbursed portion of the Loan designated for improvement of the Property, to mitigate his damages, Seme took out credit card loans to finish one side of the duplex enough to be able to reside there so that he could stop paying rent elsewhere, even though residing in the rough space was a personal hardship on Seme and his family.

4

28.     Seme filed a Notice to Commence Suit on March 16, 2021, prompting Contractor to sue on his mechanic's lien.

29.     The dispute between Colvin and Seme has been resolved, but Lender still holds undisbursed funds and will not provide Seme with either the funds spend on the renovation or a true payoff despite multiple requests from Seme and his counsel.

30.     During the litigation with Contractor, Lender advised Seme that it could not provide Seme with a true payoff and the only option that Seme had to resolve the Loan issues was to enter into a loan modification agreement that required Seme to repay all interest and fees and the undisbursed funds despite being unwilling or unable to disburse the funds to Seme for completion of the construction himself.

COUNT ONE
(Lender's Breach of Contract – Injunctive Relief)

31.     The foregoing paragraphs are incorporated herein.

32.     Since the purpose of the Loan and related Improvement Contract was frustrated and it cannot be performed within the time permitted under its terms, Plaintiff seeks entry of a judgment for injunctive relief ordering the Lender to provide a true payoff statement of the actual money disbursed, less late fees and penalties; and ordering Lender to accept payment for same over a three-year term or as otherwise permitted by law.

COUNT TWO
(Lender's Violations of TILA)

33.     The foregoing paragraphs are incorporated herein.

34.     Lender has violated the Truth in Lending Act ("TILA") at 15 USC 1601 et seq., by its conduct, including but not limited to:

5

    a.   Failing to accurately disclose the Borrower's rights under the Loan, including the right to rescind;

    b.   Failing to accurately calculate the APR and finance charges on the Loan, and the misapplication of the daily interest factor with respect to the Loan and the undisbursed funds;

    c.   Applying penalties in excess of limits after Contractor's breach and interference with the Loan;

    d.   Failing to provide a responsive resolution to Seme's construction difficulties caused by Contractor;

    e.   Charging erroneous interest in excess of allowable amounts.

35.     As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and in Seme's efforts to complete the rehabilitation process with other funds, and Seme has incurred substantial attorneys' fees recoverable pursuant to 15 USC 1640.

36.     Since a portion of the Loan is for construction and rehabilitation of the Property, Seme is entitled to rescind the Loan as a result of Lender's conduct and a refund of all finance changes pursuant to 15 USC 1635.

COUNT THREE
(Lender's Violations of RESPA)

37.     The foregoing paragraphs are incorporated herein.

38.     Lender has violated the Real Estate Sales Practices Act ("RESPA") at 12 U.S.C. section 2607 through its conduct, including but not limited to:

6

a.  Failing to provide an accurate payoff balance upon request in violation of 12 CFR 1026.36(c)(3) and 1024.35(b)(6);

b.  Charging interest and penalties on funds not provided to Borrower in violation 12 CFR 1024.35(b)(5);

c.  Failing to respond to loan servicing complaints pursuant to 12 CFR 1024.35; and

d.  Failing to maintain an interest-bearing escrow account for the undisbursed funds in excess of $90,000.00 and failing to provide statements regarding same pursuant to *inter alia*, 12 CFR 1024.17.

39.     As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and to complete the rehabilitation process with other funds and has incurred substantial attorneys' fees.

COUNT FOUR<br>(Lender's Violations of Ohio CSPA)

40.     The foregoing paragraphs are incorporated herein.

41.     Lender has violated the Ohio Consumer Sales Practices Act ("CSPA") at R.C. 1345.02(F) through its conduct, including but not limited to:

a.  Knowingly failing to comply with federal law concerning the Loan disclosures under TILA and RESPA;

b.  Knowingly providing a disclosure that included a material misrepresentation;

c.  Advising Seme to engage in conduct that resulted in the Contractor stopping work; and

d.  Requiring Seme to enter into a loan modification on terms it knew were substantially one-sided in favor of Lender.

7

42. As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and to complete the rehabilitation process with other funds and has incurred substantial attorneys' fees.

COUNT FIVE
(Tortious Interference with Contract)

43. The foregoing paragraphs are incorporated herein.

44. Plaintiff originally submitted a bid specification (the "Bid Spec") to Colvin and other 203k qualified contractors inviting offers for the rehabilitation construction of the Property.

45. Based on various responses, Plaintiff accepted Colvin's bid forming the contract for construction services.

46. Lender interfered in the contract formed when Seme accepted a qualified bid from Colvin when Lender insisted upon its own form of contract between Seme and Colvin that did not fully represent the intentions of the parties.

47. Lender's form contract was submitted with the Loan application for the rehabilitation construction of the Property. The form of contract changed the parties rights from the original accepted of the Bid Spec and made resolving the dispute more difficult for the parties.

48. Lender again interfered in Plaintiff's contract with Colvin during the building process by telling Borrower to order a distribution check payable to both Seme and Colvin before the related work was performed, and to simply withhold the check if Colvin did not perform the work according to the disbursement approval, which advice was in violation of the terms of the Loan.

8

49. Seme took Lender's advice, which aggravated the resolution of the dispute between Seme and Colvin, causing Colvin to walk off the job and file a mechanic's lien, and later to eventually sue Seme.

50. Seme was unable to get another contractor approved by Lender pending the dispute with Colvin, causing Seme to have to mitigate damages by doing the work himself and live in the unfinished Property at great personal expense, loss, and hardship to Seme.

51. Since Lender would neither release the funds to Seme for his self-help nor approve a new contractor, Seme took out unsecured credit and began to painstakingly renovate the property himself to a point where he could move into half of the duplex to mitigate his damages because he was otherwise paying rent to live elsewhere. Seme was still not able to rent out the other half of the Property as originally planned, resulting in substantial losses to Seme.

52. During the litigation with Colvin, Seme and Colvin attempted early mediation which may have been successful but for Lender offering to pay Colvin from the undisbursed portion of the Loan for the unfinished work in dispute. Seme would have had to pay Lender for these funds despite the fact that Seme did not receive the benefit of the work they represented, but the offer emboldened Colvin to press on with his claim at considerable expense to Seme.

53. The result was protracted litigation between Colvin and Seme, increasing the attorneys' fees, before the dispute ultimately was settled at Seme's expense.

54. Lender interfered with Seme's contract with Colvin on at least the three occasions referenced above, resulting in personal loss and expense to Seme, for which he is entitled to reimbursement.

WHEREFORE, Plaintiff prays for the following relief:

9

A. On Count One, judgment finding that Plaintiff is entitled to repay the money actually disbursed on the Loan without payment of penalties, interest, or fees and ordering Lender to provide a true statement of said balance owing and to accept payment therefore and satisfy the Loan and release the related mortgage upon payment thereof.

B. On Count Two, relief under TILA, granting Plaintiff recission of the Loan and permitting repayment of the portion of the Loan actually disbursed over three years without penalty or interest pursuant to 15 USC 1635.

C. On Count Two, relief under TILA, granting Plaintiff an award of actual damages in excess of $25,000 plus twice the amount of any finance charges plus noneconomic damages and attorneys' fees and all other damages allowable pursuant to 15 USC 1640.

D. On Count Three, relief under RESPA, granting Plaintiff an award of actual damages in excess of $25,000 plus twice the amount of any finance charges plus noneconomic damages and attorneys' fees, noneconomic damages, and all other damages allowable pursuant to, *inter alia*, 12 USC 2605.

E. On Count Four, relief under CSPA, granting Plaintiff a recission of the Loan and award of money damages in favor of Plaintiff against Defendant in the amount of Plaintiff's actual damages, plus attorneys' fees and all other allowable damages.

F. On Count Five, judgment for Plaintiff finding that Lender tortiously, intentionally, and with reckless disregard for Seme's losses, interfered in Seme's contract with Colvin, and awarding Seme his actual out-of-pocket losses paid to renovate the Property including interest, costs, and attorneys' fees relating to the Colvin dispute, plus lost rentals of the Property, prejudgment interest, plus damages paid to Colvin, noneconomic and punitive damages and reasonable attorneys' fees for this action.

10

G.  For such further relief that this court deems just at law or in equity.

JURY DEMAND

A jury is demanded with respect to all issues.

Respectfully submitted,

*/s/ Wade T. Doerr*

Wade T. Doerr (0083430)
Brouse McDowell LPA
6550 Seville Dr., Ste B
Canfield, OH 44406
Tel: (234) 402-4055
E-mail: wdoerr@brouse.com
*Counsel for Plaintiff, Eric Seme*

11

EXHIBIT A

LOAN #

# REHABILITATION LOAN AGREEMENT

This Agreement, including the provisions below is made this **11th** day of **October, 2018,** between the Borrower(s) **Eric Seme**

and the Mortgagee **Union Capital Mortgage Corporation an Ohio Corporation**

to establish the conditions under which the Mortgagee will advance the proceeds of a loan to be used to purchase and rehabilitate or refinance and rehabilitate the property described below. The property is located in the County of **Cuyahoga** State of **Ohio** and is described as: SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A". APN #: 001-17-033

1. The loan will be in the principal sum of **TWO HUNDRED FIFTY NINE THOUSAND FOUR HUNDRED FORTY SEVEN AND NO/100**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Dollars ( **$259,447.00** ) to be advanced by the Mortgagee to the Borrower as provided in this Agreement and will be secured by a mortgage or deed of trust ("Mortgage"), which will be a first lien on the property.

2. Payments required under the mortgage or deed of trust must be made by the Borrower on the date specified, even though the proposed rehabilitation or improvement may not be completed, or the property may not be suitable for occupancy, on the anticipated date.

3. The Mortgagee intends to request the Assistant Secretary for Housing – Federal Housing Commissioner or the Secretary's Designee ("Commissioner") –to insure the loan under the provisions of Section 203(k) of the National Housing Act; therefore, Borrower agrees to conform to, and to cause improvements to be constructed in conformance with, all requirements of the Commissioner.

4. The Mortgagee will place the portion of the principal amount of the mortgage allocated to the total rehabilitation cost ( **$101,322.33** ), plus any reserves put up by the Borrower or others in cash, in a secured interest bearing account, trust or escrow for the benefit of the Borrower (hereafter called "Rehabilitation Escrow Account"). Mortgagee shall release Rehabilitation Escrow Account funds by check, payable to the Borrower and/or the contractor, upon satisfactory completion of the rehabilitation in accordance with the Work Write-Up or Work Plan, as evidenced by a compliance inspection or other authorized method, and when the repairs and improvements meet all federal, state and local laws, codes and ordinances, including required permits and inspections.

   The Mortgagee or Commissioner may determine that additional compliance inspections are required throughout the rehabilitation period to ensure that the work is progressing in a satisfactory manner. Release of funds is not authorized on this type of inspection, and the Borrower is responsible for paying the inspection fee. The Mortgagee may require a property inspection if there have been no draw requests for more than 30 consecutive days.

5. If a Mortgage Payment Reserve is included in the Rehabilitation Escrow Account, the Mortgagee must make monthly mortgage payments directly from the Rehabilitation Escrow Account, provided the dwelling, or individual units for which the Mortgage Payment Reserve is established, cannot be occupied and the Final Release Notice has not been issued. Once the property, or individual unit, if applicable, is able to be occupied, application of the Mortgage Payment Reserves will cease. Mortgage Payment Reserves remaining in the Rehabilitation Escrow Account after the property is able to be occupied must be used to reduce the mortgage principal.

LOAN #:

6.  The interest accumulated in the Rehabilitation Escrow Account will be distributed as required by the 203(k) Borrower's Acknowledgement, form HUD 92700-A.

7.  The principal amount of the loan specified in paragraph 1 may contain a Contingency Reserve. The Contingency Reserve may be used to make other improvements to the property after it is determined that it is unlikely that any health or safety deficiency will be discovered. The Borrower or Consultant, if there is one, must submit form HUD-92577 to the Mortgagee detailing the additional improvements being requested. The Mortgagee will inform the Borrower in writing of the approval or rejection of the request within five business days.

If the Contingency Reserve is financed, any unused Contingency Reserve funds must be applied to reduce the mortgage principal. Such prepayment will not extend or postpone the due date of any monthly installment due under the Note and will not change the amount of such installments.

If the Contingency Reserve is established with the Borrower's own funds, the Borrower may receive a refund of any unused Contingency Reserve funds or may request the unused funds be applied to reduce the principal balance.

8.  The Borrower will complete all improvements on the property in accordance with the Work Write-Up or Work Plan, including architectural exhibits, as accepted by the Mortgagee.

9.  Changes in the architectural exhibits must be requested by the Borrower, either by a letter describing the changes or by submission of form HUD-92577, prior to the start of any work associated with the requested changes. The Mortgagee must issue an approval in writing before work can begin on the changes. Work must be 100% complete on each change order item before release of funds from the Rehabilitation Escrow Account.

10.  Borrower will cause all improvements to be made in a workmanlike manner and in accordance with all applicable statutes and regulations. All licenses, permits and privileges required by local governmental authorities to rehabilitate the property will be obtained by the Borrower or contractor.

11.  Representatives of the Mortgagee and of the Commissioner will have the right to enter upon the property at all times during the period of construction to determine whether the work conforms with this Agreement and to determine the amount of funds in the Rehabilitation Escrow Account to be released by the Mortgagee.

12.  Borrower will furnish such records, contracts, bills and other documents relating to the property and the improvements as the Mortgagee or the Commissioner may require.

13.  For a Borrower performing his/her own work under a Rehabilitation Self-Help Agreement, the Rehabilitation Escrow Account will include funds for labor and materials costs for each work item to be completed by the Borrower. The Borrower will be reimbursed for the actual cost of materials only. The Borrower cannot be reimbursed for labor. The funds resulting from the difference between the estimated and actual costs of materials, as well as the funds escrowed for labor costs, will remain in the Rehabilitation Escrow Account until all of the work is complete and may then be used for additional improvements to the property. No cash may be paid to the Borrower. Any funds for self-help items remaining in the Rehabilitation Escrow Account after completion of the rehabilitation must be used to reduce the principal balance.

14.  Without prior, written consent of the Mortgagee, no materials, equipment, fixtures or any part of the improvements financed with this loan will be purchased or installed subject to conditional sales contracts, security agreements, lease agreements or other arrangements whereby title is retained or the right is reserved or accrues to anyone to remove or repossess any item, or to consider it as personal property.

15.  The Borrower will cause either this instrument or the construction contract under which improvements are to be made to be filed in the public records, if the effect of recording will be to relieve the mortgaged property from mechanics' and materialmen's liens. The Mortgagee must obtain Lien Waivers, or equivalent, at the time of any disbursement of funds to ensure the validity of the first lien on the property. If all work items to be performed by a contractor have not been completed at the time of draw request, the Mortgagee must obtain a partial conditional Lien Waiver for the work items that have been completed for each draw request. Upon completion of the project, the Mortgagee will obtain a release of any and all liens arising out of the contract or submission or receipts or other evidence of payment covering all contractors, subcontractors or suppliers who could file a legal claim.

16.  Borrower must cause work to begin within 30 days following the date of this Agreement. Work must be performed with reasonable diligence; therefore, work is never to cease for more than 30 consecutive days. Should Borrower fail to comply with these terms, the Mortgagee may refuse to make any further disbursements under this Agreement, and any funds remaining in the Rehabilitation Escrow Account must be used to reduce the mortgage principal.

17.  In the event any Stop Notices, Notices to Withhold, Mechanic's Liens, or claims of lien are filed against the property, the Mortgagee, after five (5) days' notice to the Borrower of its intention to do so, may pay any and all of the liens or claims, or may contest the validity of any claim, paying all costs and expenses of contesting the same.

18.  Failure of the Borrower to perform under the terms of this Rehabilitation Loan Agreement will make the loan amount, at the option of the Mortgagee, due and payable.

19.  The Borrower understands that the mortgage payments (PITI) that were financed at closing are estimates and the Borrower will be responsible for paying the full amount of the mortgage payment, each and every month due, if a shortage occurs.

August 2015
Ellie Mae, Inc.

Page 2 of 3

GRLAFHA15  0815
GRLAFHA15 (CLS)



**LOAN #:**

20. The accepted Work Write-Up or Work Plan and architectural exhibits, if any, are incorporated in this Agreement.

21. Borrower must have the work completed within **SIX** months following the date of this Agreement.

22. Date work must be completed:  **April 11, 2019**

_10 - 11 -18_    (Seal)

ERIC SEME

Loan Officer

Signature of Mortgagee Representative    Date    Title of Mortgagee Representative
George A. Saadey Jr.

August 2016
Ellie Mae, Inc.

Page 3 of 3

GRLAFHA15  0816
GRLAFHA15 (CLS)

LOAN #:

## 203(k) Borrower's Acknowledgment

**U.S. Department of Housing and Urban Development**
Office of Housing / Federal Housing Commissioner

Condition of Property. I understand that the property I am purchasing is HUD approved and HUD does not warrant the condition or the value of the property. I understand the HUD plan review (where performed) and the appraisal are performed to determine compliance with the required architectural exhibits and to estimate the value of the property, but neither guarantees the house is free of defects. I understand I was responsible to have an independent consultant and/or a professional home inspection service perform an inspection of the property and the cost of the inspection was (or could be) included in the mortgage.

---

### Loan Requirements

• I understand at the time of the loan closing of an FHA-insured 203(k) Rehabilitation Loan, for which I have applied to my lender, the proceeds designated for the rehabilitation or improvement (including a contingency reserve, mortgage payments and any other fees, where applicable) are to be placed in an interest bearing escrow account. The Rehabilitation Escrow Account is not, nor will it be treated as an escrow for the paying of real estate taxes, insurance premiums, delinquent notes, ground rents or assessments. I hereby request the lender, after the Final Release Notice is issued, to:

☐ Pay the net interest income directly to me/us.

☒ Apply the net interest income directly to the mortgage principal balance for an equal amount of principal reduction.

☐ Other:

• I understand that the Rehabilitation Escrow Account will cease paying interest to me if (1) the loan payments are delinquent for more than 30 days; or (2) the completion date (or an approved extension) has expired. During this period, the interest will be paid down on the mortgage principal. I understand if I do draw up the delinquent or default status and/or the completion date has not expired or an extension has been approved, then the interest on the escrow account will begin again to be paid according to the request noted above.

• I understand no draws on the escrow account can be made until all permits have been issued by the local or state building departments, where required. I further understand I can only request monies for the actual cost of rehabilitation. If any cost savings result on any line item of the Draw Request, from HUD-9746-A, the amount saved must be used to: (1) Make further improvements to the property; (2) Pay for cost overruns in other line items of the Draw Request; or (3) Prepay the mortgage principal.

• I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner. If I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified. I understand there is a 10 percent holdback on each Draw Request to assure the work is properly completed and for lien protection.

• I understand I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association on any dispute.

• I understand if I am using the Escrow Commitment Procedure, I must sign form HUD-314. The funds deposited in an escrow, trust or special account will not be released until an assumption of the loan occurs by a creditworthy buyer or until the time allowed for such assumption has expired, thereby requiring the funds to be paid down on the mortgage principal.

• I understand if I change a contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed. If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered.

• I understand the lender or HUD does not provide a one-year warranty on the completed work on the property. I am responsible to obtain such warranty(s) from the contractor(s) and the warranty should be stated in the Homeowner-Contractor Agreement.

• I understand I am responsible to make the mortgage payments during the term of the loan, including the rehabilitation period, to ensure the property will not go into default. The construction on the home must start within 30 days; if the construction ceases for more than 30 days, the lender may consider the loan in default or the lender can use the escrow money to have the work completed. If the work stops or is not progressing as it should, or if the work does not comply with the accepted architectural exhibits, the lender may require additional compliance inspections to protect the security of the loan and I will be responsible to pay for the inspections and the cost of the inspection may be withheld at the next draw request.

• I understand no changes to the architectural exhibits can be made without the acceptance of the lender for HUD) on form HUD-92577. The contingency fund is set up for changes that affect the health, safety, or items of necessity of the occupants of the property. If the contingency reserve is insufficient, I must place additional monies into the account for payment upon acceptance of the change. Additional improvements can be made after it is determined no further health and safety items exist. A change order will be made to assure the monies are available to the contractor upon completion of the changed work.

• I understand if there are unused contingency funds, mortgage payments, inspection fees or other monies in the Rehabilitation Escrow Account after the Final Release is processed, the lender, in compliance with HUD regulations, must apply those funds to prepay the mortgage principal, provided those items are a part of the mortgage.

• I understand the lender may retain the 10 percent holdback, for a period not to exceed 35 days (or the time period required by law to file a lien, whichever is longer), to ensure compliance with state lien waiver laws or other state requirements. Upon completion of the work, I understand I will be provided: (1) The Final Draw Request; (2) The Final Release Notice; and (3) An accounting of the final distribution of all funds.

---

This statement must be delivered to you prior to closing the loan. Return one copy to your lender as proof you have read the entire document. Keep one copy for your records. You, the borrower(s), must be certain that you understand this information. Sign here only after you have read this entire document. Seek professional advice if you are uncertain.

| Borrower's Signature & Date: Eric Some | Co-Borrower's Signature & Date: |
|---|---|
| X  *Eric Some*  10-11-16 | X |

I, the lender, certify this information was delivered to the borrower(s) prior to the time of loan closing.
Lender's Signature & Date

X  _____  6/1/16

form HUD - 92700 - A (8/00) ref. Handbook 4240.4
Ellie Mae, Inc.

G203  1095
G203 (CLS)

LOAN #:

**Escrow Commitment Certification**

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

| Property Address: 10700 Clifton Boulevard Cleveland, OH 44102. | FHA Case No.: |
| --- | --- |

Instructions: The objective of the Section 203(k) program is to promote and facilitate the restoration and preservation of the Nation's existing housing inventory. This form, completely executed, must accompany the Uniform Residential Loan Application (URLA) and form HUD-92900-A, Addendum to URLA. Submit with form HUD-92900WS (Credit Analysis Worksheet) and form HUD-92700 (Maximum Mortgage Worksheet).

**Borrower's Certificate**

The undersigned, in order to induce the Secretary to issue an Escrow Commitment to insure a mortgage loan on the property described above, certifies to the Secretary and agrees that:

(1) I am or will be the owner of the dwelling.
   ☒ I propose to purchase the dwelling and intend to use the proceeds of the loan to *purchase* and rehabilitate the property.
   ☐ I am the owner of the property and intend to use the proceeds of the loan to *refinance* and rehabilitate the property.

(2) I will provide evidence that I have the ability to support the mortgage payments, complete the rehabilitation and market the property.

(3) I understand the seven (7) unit limitation rule will apply.

(4) I understand participation in this procedure will allow me to finance the purchase/refinance and rehabilitation of the property to the maximum owner-occupant loan amount.

(5) I intend to complete the rehabilitation project and to have a credit worthy owner/occupant assume the loan within eighteen (18) months of loan closing.

(6) The borrower's required investment plus any excess loan

proceeds will be deposited in an escrow, trust, or special account. The required escrow will be shown on form HUD-92700, 203(k) Maximum Mortgage Worksheet (line E.3).

(7) If the property is not sold prior to the due date of the 18th amortization payment of the mortgage to a purchaser who is acceptable to the Secretary and who will occupy the property, assume, and agree to pay the mortgage indebtedness, the amount held in escrow, trust, or special account will be applied in reduction of the outstanding principal amount of the mortgage as of the due date of the 18th amortization payment of the mortgage. The application of the escrow will be mandatory, will not affect the monthly payments to be made by the mortgagor as required by the mortgage, and will not be used as a "riding" prepayment.

(8) I understand that I cannot rent the property for periods less than 30 days and will ensure that the property is not used for hotel or transient purposes. For rental periods greater than 30 days, only a month-to-month lease can be entered into.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

ERIC SEME                         DATE

**Mortgagee's Certificate**

The undersigned, in order to induce the Secretary to issue an Escrow Commitment to insure a mortgage loan on the property described above, certifies to the Secretary and agrees that:

(1) An amount shown on form HUD-92700, 203(k) Maximum Mortgage Worksheet (line E.3), has been or will be deposited in an interest bearing escrow, trust or special account.

(2) If the mortgaged property is not sold prior to the date of the 18th amortization payment of the mortgage to a purchaser who is acceptable to the Secretary, who will occupy the property, assume and agree to pay the mortgage indebtedness, the amount held in escrow, trust, or special account will be applied in reduction of the outstanding principal amount of the mortgage as a mandatory prepayment as of the due date of the 18th amortization payment of the mortgage.

(3) If the property is not sold by the due date of the 18th

amortization payment, the Borrower will not be permitted to "ride" the prepayment by being relieved of the obligation of paying future monthly installments of escrow, principal and interest, and that the mandatory prepayment will serve solely to accelerate the maturity of the mortgage.

(4) Any portion of the funds held in escrow, trust or special account, not applied to the mortgage in accordance with the applicable regulations of the Federal Housing Administration will be deducted from the amount of insurance benefits to which the Lender would otherwise be entitled if a claim for insurance benefits is filed.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| Name of Lender: Union Capital Mortgage Corporation | Signature and Title of Officer: | Date: |
| --- | --- | --- |

Previous editions are obsolete. May be reproduced on office copiers.
form HUD-314 (8/95)
Ellie Mae, Inc.

GECC 0997
GECC (CLS)

LOAN #:

**203(k) Borrower's**
**Acknowledgment**

U.S. Department of Housing
and Urban Development
Office of Housing / Federal Housing Commissioner

Condition of Property: I understand that the property I am purchasing is not HUD approved and HUD does not warrant the condition or the value of the property. I understand the HUD plan review (where performed) and the appraisal are performed to determine compliance with the required architectural exhibits and to estimate the

value of the property, but neither guarantees the house is free of defects. I understand I was responsible to have an independent consultant and/or a professional home inspection service perform an inspection of the property and the cost of the inspection was (or could be) included in the mortgage.

**Loan Requirements**

• I understand at the time of the loan closing of an FHA-insured 203(k) Rehabilitation Loan, for which I have applied to my lender, the proceeds designated for the rehabilitation or improvement (including a contingency reserve, mortgage payments and any other fees, where applicable) are to be placed in an interest bearing escrow account. The Rehabilitation Escrow Account is not, nor will it be treated as an escrow for the paying of real estate taxes, insurance premiums, delinquent notes, ground rents or assessments. I hereby request the lender, after the Final Release Notice is issued, to:

☐ Pay the net interest income directly to me/us.
☒ Apply the net interest income directly to the mortgage principal balance for an equal amount of principal reduction.
☐ Other:

• I understand that the Rehabilitation Escrow Account will cease paying interest to me if (1) the loan payments are delinquent for more than 30 days; or (2) the completion date (or an approved extension) has expired. During this period, the interest will be paid down on the mortgage principal. I understand if I clear up the delinquent or default status and/or the completion date has not expired or an extension has been approved, then the interest on the escrow account will begin again to be paid according to the agreement above.

• I understand no draws on the escrow account can be made until all permits have been issued by the local or state building departments, where required. I further understand I can only request monies for the actual cost of rehabilitation. If any cost savings result on any line item of the Draw Request, form HUD-9746-A, the amount saved must be used to: (1) Make further improvements to the property; (2) Pay for cost overruns in other line items of the Draw Request; or (3) Prepay the mortgage principal.

• I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner, if I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified. I understand there is a 10 percent holdback on each Draw Request to assure the work is properly completed and for lien protection.

• I understand I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association on any dispute.

• I understand if I am using the Escrow Commitment Procedure, I must sign form HUD-514. The funds deposited in an escrow, trust or special account will not be released until an assumption of the loan occurs by a creditworthy buyer or until the time allowed for such assumption has expired, thereby

requiring the funds to be paid down on the mortgage principal.
• I understand if I change a contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed. If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered.
• I understand the lender or HUD does not provide a one-year warranty on the completed work on the property. I am responsible to obtain such warranty(s) from the contractor(s) and the warranty should be stated in the Homeowner-Contractor Agreement.
• I understand I am responsible to make the mortgage payments during the term of the loan, including the rehabilitation period, to ensure the property will not go into default. The construction on the home must start within 30 days; if the construction ceases for more than 30 days, the lender may consider the loan in default or the lender can use the escrow money to have the work completed. If the work stops or is not progressing as it should, or if the work does not comply with the accepted architectural exhibits, the lender may require additional compliance inspections to protect the security of the loan and I will be responsible to pay for the inspections and the cost of the inspection may be withheld at the next draw request.
• I understand no changes to the architectural exhibits can be made without the acceptance of the lender (or HUD) on form HUD-92577. The contingency fund is set up for changes that affect the health, safety, or items of necessity of the occupants of the property. If the contingency reserve is insufficient, I must place additional monies into the account for payment upon acceptance of the change. Additional improvements can be made after it is determined no further health and safety items exist. A change order will be made to assure the monies are available to the contractor upon completion of the changed work.
• I understand if there are unused contingency funds, mortgage payments, inspection fees or other monies in the Rehabilitation Escrow Account after the Final Release is processed, the lender, in compliance with HUD regulations, must apply those funds to prepay the mortgage principal, provided those items are a part of the mortgage.
• I understand the lender may retain the 10 percent holdback, for a period not to exceed 35 days (or the time period required by law to file a lien, whichever is longer), to ensure compliance with state lien waiver laws or other state requirements. Upon completion of the work, I understand I will be provided: (1) The Final Draw Request; (2) The Final Release Notice; and (3) An accounting of the final distribution of all funds.

This statement must be delivered to you prior to closing the loan. Return one copy to your lender as proof you have read the entire document. Keep one copy for your records. You, the borrower(s), must be certain that you understand this information. Sign here only after you have read this entire document. Seek professional advice if you are uncertain.

Borrower's Signature & Date:
Eric Seme

Co-Borrower's Signature & Date:

X ~~Eric Seme~~    10-11-16

X

I, the lender, certify this information was delivered to the borrower(s) prior to the time of loan closing.
Lender's Signature & Date:

X _____  6/11/16

form HUD-92700 - A (6/98) ref. Handbook 4240.4
Ellie Mae, Inc.

G203 1035
G203 (CLS)

**EXHIBIT B**

LOAN #:
MIN:
FHA Case No.

**NOTE**

October 11, 2018                          Mentor,                          Ohio
[Date]                                    [City]                           [State]

10700 Clifton Boulevard, Cleveland, OH 44102
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $259,447.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Union Capital Mortgage Corporation, an Ohio Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 4.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on **December 1, 2018.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied at its scheduled due date and will be applied to interest and any other items in the order described in the Security Instrument before Principal. If, on **November 1, 2048,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **7676 Reynolds Road**
**Mentor, OH 44060**
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $1,373.01.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and

MULTISTATE FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc.                                    Page 1 of 3                          FHA3200NOT  0216
                                                                                         FHA3200NOT (CLS)



LOAN #:

all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____  _____ (Seal)
ERIC SEME

Lender: Union Capital Mortgage Corporation
NMLS ID: 252726
Loan Originator: George A. Saadey Jr.
NMLS ID: 270721

[Sign Original Only]

MULTISTATE FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc.                                Page 2 of 3                    FHA3200NOT   0216
                                                                             FHA3200NOT (CLS)



LOAN #:

PAY TO THE ORDER OF:
WITHOUT RECOURSE
Union Capital Mortgage Corporation, an Ohio Corporation

BY: _____

Kim Schelgunov, Vice President

[Sign Original Only]

**MULTISTATE FIXED RATE NOTE** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**   Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc.                                    Page 3 of 3                                  FHA3200NOT  0216
                                                                                                FHA3200NOT (CLS)



EXHIBIT C

CUYAHOGA COUNTY
OFFICE OF FISCAL OFFICER - 18
MORT 10/11/2018 3:36:34 PM

**201810110552**

Return to: 181708
Progressive Land Title Agency, Ltd.
5000 Rockside Rd., Ste. 420
Independence, OH 44131

Title Order No.: 181708
Escrow No.: 181708
LOAN #:

─────────────[Space Above This Line For Recording Data]─────────────

**MORTGAGE**

FHA Case No.

MIN:

MERS PHONE #: 1-888-679-6377

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.

(A) "Security Instrument" means this document, which is dated **October 11, 2018,**      together with all Riders to this document.

(B) "Borrower" is  **ERIC SEME, AN UNMARRIED MAN.**

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is  **Union Capital Mortgage Corporation.**

Lender is  **an Ohio Corporation,**                                          organized and existing under the laws of **Ohio.**

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                **Page 1 of 12**                          OHEFHA15DE  0915
                                                                           OHEDEED (CLS)

**LOAN #:**

Lender's address is **7676 Reynolds Road, Mentor, OH 44060**

**(E)  "Note"** means the promissory note signed by Borrower and dated  **October 11, 2018.**
The Note states that Borrower owes Lender  **TWO HUNDRED FIFTY NINE THOUSAND FOUR
HUNDRED FORTY SEVEN AND NO/100\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** Dollars (U.S. **$259,447.00                          **)
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt
in full not later than **November 1, 2048.**

**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in
the Property."

**(G)  "Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and
all sums due under this Security Instrument, plus interest.

**(H)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider        ☐ Condominium Rider        ☐ Planned Unit Development Rider
☒ Other(s) [specify]
**Rehabilitation Rider, 1-4 Family Rider**

**(I)   "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable
final, non-appealable judicial opinions.

**(J)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association, home-
owners association or similar organization.

**(K)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(L)  "Escrow Items"** means those items that are described in Section 3.

**(M)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section
5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part
of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as
to, the value and/or condition of the Property.

**(N)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default
on, the Loan.

**(O)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under
the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its
implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As
used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed
in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related
mortgage loan" under RESPA.

**(Q)  "Secretary"** means the Secretary of the United States Department of Housing and Urban Develop-
ment or his designee.

**(R)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether
or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

OHIO—Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**        **Form 3036 1/01**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                        Page 2 of 12                                        OHEFHA15DE  0915
                                                                                                        OHEDEED (CLS)



**LOAN #:**

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
**County** of Cuyahoga
[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
APN #: 001-17-033

which currently has the address of   **10700 Clifton Boulevard, Cleveland,**

[Street] [City]

Ohio  **44102**        ("Property Address"):
      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date,

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                Page 3 of 12                      OHEFHA15DE   0915
                                                                                 OHEDEED (CLS)



LOAN #:

then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

OHIO–Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**     Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                              Page 4 of 12                    OHEFHA15DE   0915
                                                                            OHEDEED (CLS)



LOAN #:

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.        Page 5 of 12        OHEFHA15DE  0915
OHEDEED (CLS)



LOAN #:

under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.



**LOAN #:**

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all

OHIO - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**      **Form 3036 1/01**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.      **Page 7 of 12**      OHEFHA15DE   0915
OHEDEED (CLS)



**LOAN #:**

of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                    Page 8 of 12                    OHEFHA16DE  0915
                                                                  OHEDEED (CLS)



**LOAN #**

Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.               Page 9 of 12              OHEFHA15DE  0915
                                                            OHEDEED (CLS)



**LOAN #:**

**22. Grounds for Acceleration of Debt.**

(a) Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by falling to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) Sale Without Credit Approval. Lender shall, if permitted by applicable law (including Section 341(d) of the Garn–St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c) No Waiver. If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d) Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e) Mortgage Not Insured. Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, costs of title evidence.

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.            Page 10 of 12            OHEFHA15DE 0915
OHEDEED (CLS)



**LOAN #:**

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.

**25. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**26. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, Cuyahoga                      County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 26 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it. Provisions pertaining to releases are contained in the Rehabilitation Loan Rider, which is attached to this document and made a part hereof.

_____          10/11/18        (Seal)
ERIC SEME                                                                    DATE


State of _____OHIO_____
County of _____LAKE_____


The foregoing instrument was acknowledged before me this __11th__ DAY
__OF OCTOBER 2018__ (date) by ERIC SEME (name(s) of person(s) acknowledged).

JOHN SCHENKELBERG
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES:
1-29-19

_____
(Signature of Person Taking Acknowledgement)

(Title or Rank) _____NOTARY_____

(Serial Number, if any) _____N/A_____

My commission expires: _____1-29-2019_____


Lender: Union Capital Mortgage Corporation
NMLS ID: 252728
Loan Originator: George A. Saadey Jr.
NMLS ID: 270731


OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                   Page 11 of 12                     OHEFHA15DE  0915
                                                                                   OHEDEED (CLS)



LOAN #:

THIS INSTRUMENT WAS PREPARED BY:
UNION CAPITAL MORTGAGE CORPORATION
7676 REYNOLDS ROAD
MENTOR, OH 44060
440-585-5626

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                       Page 12 of 12                       OHEFHA15DE  0915
                                                                                         OHEDEED (CLS)





MIN:
FHA Case No.

## REHABILITATION LOAN RIDER

THIS REHABILITATION LOAN RIDER is made this **11th** day of **October, 2018,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **Union Capital Mortgage Corporation, an Ohio Corporation**

("Lender") of the same date and covering the Property described in the Security Instrument and located at:

**10700 Clifton Boulevard, Cleveland, OH 44102**
**[Property Address]**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Loan proceeds are to be advanced for the premises in accordance with the Rehabilitation Loan Agreement dated  **October 11, 2018,** between Borrower and Lender. This agreement is incorporated by reference and made a part of this Security Instrument. No advances shall be made unless approved by the Secretary of Housing and Urban Development or a Direct Endorsement Underwriter.

B. If the rehabilitation is not properly completed, performed with reasonable diligence, or is discontinued at any time except for strikes or lockouts, the Lender is vested with full authority to take the necessary steps to protect the rehabilitation improvements and property from harm, continue existing contracts or enter into necessary contracts to complete the rehabilitation. All sums expended for such protection, exclusive of the advances of the principal indebtedness, shall be added to the principal indebtedness, and secured by the Security Instrument and be due and payable on demand with interest as set out in the Note.

C. If Borrower fails to perform any obligation under the loan, including the commencement, progress and completion provisions of the Rehabilitation Loan Agreement, and such failure continues for a period of 30 days, the loan shall, at the option of Lender, be in default.

D. The Property covered by this Security Instrument shall include all of Borrower's interest in funds held by Lender in escrow under the Rehabilitation Loan Agreement.

FHA Multistate Rehabilitation Loan Rider - 10/95
Ellie Mae, Inc.                                  Page 1 of 2                    GRLR  0709
                                                                               GRLR (CLS)



LOAN #:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rehabilitation Loan Rider.

 _____ 10/11/18 (Seal)
ERIC SEME                                                            DATE

FHA Multistate Rehabilitation Loan Rider - 10/95
Ellie Mae, Inc.                          Page 2 of 2                GRLR  0709
                                                                    GRLR (CLS)

**LOAN #:**
**FHA Case No.:**
**MIN:**

## 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **11th** day of **October, 2018** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Union Capital Mortgage Corporation, an Ohio Corporation**

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at: **10700 Clifton Boulevard, Cleveland, OH 44102.**

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                                 Page 1 of 3                                    FHA15F14RDU   0815
                                                                                               GINVRLU (CLS)



LOAN #:

**E.   "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 18 is deleted.

**F.   BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G.   ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.   ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section **14**     of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.   CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

MULTISTATE 1-4 FAMILY RIDER–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                                                Page 2 of 3                                   FHA16F14RDU   0815
                                                                                                                          GINVRLU (CLS)



LOAN #:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.



ERIC SEME                                                                    10/11/18 (Seal)
                                                                                        DATE

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                                      Page 3 of 3                 FHA15F14RDU  0815
                                                                                GINVRLU (CLS)

# EXHIBIT "A"

## LEGAL DESCRIPTION

Case Number: 181708

Permanent Parcel No.: 001-17-033
Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Brooklyn Township Lot No. 10 and bounded and described as follows:

Beginning on the Northerly line of Clifton Road, N.W., as dedicated in Volume 39 of Maps, Page 14 of Cuyahoga County Records, at a point distant Westerly measured along said Northerly line, 815 feet from its intersection with the Westerly line of West 104th Street as dedicated in Volume 40 of Maps, Page 21 of Cuyahoga County Records;

Thence Northerly at right angles from the Northerly line of Clifton Road, N.W., 175 feet;

Thence Westerly parallel with the Northerly line of Clifton Road, N.W., 50 feet;

Thence Southerly 175 feet at right angles to the Northerly line of Clifton Road, N.W.;

Thence Easterly along the Northerly line of Clifton Road, N.W., 50 feet to the place of beginning and being further known as Sublot No. 101 in the Edgewater Land Company's proposed Subdivision of part of Original Brooklyn Township Lot Nos. 9, 10, 11 and 12, as appears by said plat, be the same more or less.

The following is provided as an accommodation for informational purpose only. No insurance is provided over the same:

Subject premises is commonly known as: 10700 Clifton Blvd, Cleveland OH 44102

# EXHIBIT D

**Homeowner / Contractor Agreement**

| | |
|---|---|
| Owner's Name: Erie Berns | Contractor's Name: Jeffrey Colvin |
| Co-Owner's Name: | Contractor Company Colvin Contracting, Inc. |
| Address (Street): 10700 Clifton Blvd | Address (Street): 6507 Marsol Rd Suite 126 |
| Address (City State Zip): Cleveland, OH 44102 | Address (City State Zip): Mayfield Heights, OH 44124 |
| Phone: | Phone: 216-337-2037 |
| FHA Case No: | License No. (if needed): |

THIS AGREEMENT, made this date ____10/1/2018____ between the above mentioned
Homeowner (Owner) and the Contractor, is for the renovation/construction of the property located at
____10700 Clifton Blvd, Cleveland, OH 44102____ that has been
approved for FHA mortgage insurance under section 203(k) of the National Housing Act, or Section 184
of the Housing and Community Development Act of 1992 or for the Conventional Renovation financing. The
Owner shall pay the Contractor the maximum sum of ____$83,036.89____ for the completion of
the work, including all sales tax due by law, together with such increases or decreases in the contract
price as may be approved in writing by the lender. The work will begin within 30 days of the loan closing
with the Lender and will be completed by this timeframe 6 months unless delayed beyond the contractors control.

The General Provisions listed below are made a part of this Agreement. The contract documents consist of the
architectural exhibits listed in the Construction or Renovation Loan Agreement between the Owner(s) and the Lender, or
as described below (or on an attached sheet):

1. Contract Documents: This Agreement includes all general provisions, special provisions and architectural exhibits that
were accepted by the lender. Work not covered by this agreement will not be required unless it is required by reasonable
inference as being necessary to produce the intended result. By executing this Agreement, the contractor represents that
he/she has visited the site and understands local conditions, including state and local building regulations and conditions
under which the work is to be performed.

2. Owner: Unless otherwise provided for in the Agreement, the owner will secure and pay for necessary easements,
exceptions from zoning requirements, or other actions which must precede the approval of a permit for this project. If
owner fails to do so then this contract is void. If the contractor fails to correct defective work or persistently fails to carry
out the work in accordance with the agreement or general provisions, the owner may order the contractor in writing to
stop such work, or a part of the work, until the cause for the order has been eliminated.

3. Contractor: The contractor will supervise and direct the work and the work of all subcontractors. He/She will use the
best skill and attention and will be solely responsible for all construction methods and materials and for coordinating all
portions of the work. Unless otherwise specified in the Agreement, the contractor will provide for and/or pay for all labor,
materials, equipment, tools, machinery, transportation, and other goods, facilities, and services necessary for the proper
execution and completion of the work. The contractor will maintain order and discipline among employees and will not
assign anyone unfit for the task. The contractor warrants to the owner that all materials and equipment incorporated are
new and that all work will be of good quality and free of defects or faults. The contractor will pay all sales, use and other
taxes related to the work and will secure and pay for building permits and/or other permits, fees, inspections and licenses
necessary for the completion of the work unless otherwise specified in the Agreement. The contractor will indemnify and
hold harmless the owner from and against all claim, damages, losses, expenses, legal fees or other costs arising or
resulting from the contractor's performance of the work or provisions of this section. The contractor will comply and
perform the work in accordance with all rules, regulations, laws, ordinances and orders of any public authority or HUD
inspector, Tribal inspector and/or Lender selected inspector bearing on the performance of the work. The contractor is
responsible for and indemnifies the owner against acts and omissions of employees, subcontractors and their employees,
or others performing the work under this Agreement with the contractor. The contractor will provide shop drawings,
samples, product data or other information provided for in this Agreement, where necessary.

4. **Subcontractor:** Selected by the contractor, except that the contractor will not employ any subcontractor to whom the owner may have a reasonable objection, nor will the contractor be required by the owner to employ any subcontractor to whom the contractor has a reasonable objection.

5. **Work By Owner or Other Contractor:** The owner reserves the right to perform work related to the project, but which is not a part of this Agreement, and to award separate contracts in connection with other portions of the project not detailed in this Agreement. All contractors and subcontractors will be afforded reasonable opportunity for the storage of materials and equipment by the owner and by each other. Any costs arising by defective or ill-timed work will be borne by the responsible party.

6. **Binding Arbitration:** Claims or disputes relating to the Agreement or General Provisions will be resolved by the Construction Industry Arbitration Rules of the American Arbitration Association (AAA) unless both parties mutually agree to other methods. The notice of the demand for arbitration must be filed in writing with the other party to this Agreement and with the AAA and must be made in a reasonable time after the dispute has arisen. The award rendered by the arbitrator(s) will be considered final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

7. **Cleanup and Trash Removal:** The contractor will keep the owner's residence free from waste or rubbish resulting from the work. All waste, rubbish, tools, construction materials, and machinery will be removed promptly after completion of the work by the contractor.

8. **Time:** With respect to the scheduled completion of the work, time is of the essence. If the contractor is delayed at anytime in the progress of the work by change orders, fire, labor disputes, acts of God or other causes beyond the contractor's control, the completion schedule for the work or affected parts of the work may be extended by the same amount of time caused by the delay. Extensions beyond 6 months are not allowed for the Streamline (K) Limited Repair program. The contractor must begin work no later than 30 days after loan closing and will not cease work for more than 90 consecutive days.

9. **Payments and Completion:** Payments may be withheld because of: (1) defective work not remedied; (2) failure of contractor to make proper payments to subcontractors, workers, or suppliers; (3) persistent failure to carry out work in accordance with this Agreement or these general conditions, or (4) legal claims. Final payment will be due after complete release of any and all liens

arising out of the contract or submission of receipts or other evidence of payment covering all subcontractors or suppliers who could file such a lien. The contractor agrees to indemnify the owner against such liens and will refund all monies including costs and reasonable attorneys' fees paid by the owner in discharging the liens. A 10 percent holdback is required by the lender to assure the work has been properly completed and there are no liens on the property. (Holdback not applicable to Streamline (K) Limited Repair program)

10. **Protection of Property and Persons:** The contractor is responsible for initiating, maintaining, and supervising all necessary or required safety programs. The contractor must comply with all applicable laws, regulations, ordinances, orders or laws of federal, state, county, tribal or local governments. The contractor will indemnify the owner for all property loss or damage to the owner

caused by his/her employees or his/her direct or subtier subcontractors.

11. **Insurance:** Insurance must be purchased and maintained until project completion. Proof of the insurance must be provided by either the contractor and/or the owner and validated by the Lender. The insurance includes:

A- Insurance necessary to protect from any damage to the owner(s) property resulting from the conduct of this contract.

B- Insurance necessary to protect from any claims under Workman's Compensation.

*Note: If applicable, Workman's Comp must be provided by the contractor. Workman's Comp insurance is not available for purchase by the Customer.*

12. **Changes in the Contract:** The owner may order changes, additions or modifications (using form HUD 92577) without invalidating this contract. Such changes must be in writing and signed by the owner and accepted by the lender. Not all change order requests may be accepted by the lender, therefore, the contractor proceeds at their own risk if work is completed without an

accepted change order.

13. Correction of Deficiencies: The contractor must correct promptly any work of his/her own or his/her subcontractors found to be defective or not complying with the terms of the contract.

14. Warranty: The contractor will provide a one-year warranty on all labor and materials used in the renovation of the property.

This warranty must extend one year from the date of completion of the contract or longer if prescribed by law unless otherwise specified by other terms of this contract. Disputes will be resolved through the Construction Industry Arbitration Rules of the American Arbitration Association.

15. Termination: If the owner fails to make a payment under the terms of this Agreement, through no fault of the contractor, the contractor may, upon ten working days written notice to the owner, and if not satisfied, terminate this Agreement. The owner will be responsible for paying the contractor for all work completed.

If the contractor fails or neglects to carry out the terms of the contract, the owner, after ten working days written notice to the contractor, may terminate this Agreement. The owner may finish the job by whatever reasonable method the owner deems expedient. If the cost of completion exceeds the contract balance, the difference, as well as reasonable attorneys' fees if necessary, will be paid to the owner by the contractor.

X _____ 10/1/18                    _____ 10-1-2018
Owner Signature and Date                        Contractor Signature and Date


_____
Owner Signature and Date

**EXHIBIT E**

Loan Number: ▇▇▇▇▇
**Recording Requested By:**
**Caliber Home Loans, Inc.**

**and When Recorded Mail To:**
**Caliber Home Loans, Inc.**
**13801 Wireless Way**
**Oklahoma City, OK 73134**

CUYAHOGA COUNTY
FISCAL OFFICE - 1
04/09/2020 11:24:08 AM
**202004090382**

*Above space is intentionally left blank for recording data.*

MERS MIN# ▇▇▇▇▇
MERS Phone Number: 1-888-679-6377

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, **Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns**, the undersigned holder of a Mortgage (herein "Assignor") whose address is P.O. Box 2026, Flint, MI 48501-2026, does hereby grant, convey, assign and deliver to **Caliber Home Loans Inc.**, whose address is **13801 WIRELESS WAY, OKLAHOMA CITY, OK 73134**, all its right, title and interest in and to said Mortgage in the amount of **$259,447.00**, recorded in the **State of Ohio, Cuyahoga County,** Official Records dated **October 11, 2018** and recorded on **October 11, 2018** as Instrument No. **201810110552.**

Executed by: **ERIC SEME, AN UNMARRIED MAN** (Original Mortgagor)

Original Mortgagee: **Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation., its successors and assigns**

Property Address:   **10700 Clifton Blvd, Cleveland, OH 44102**

        IN WITNESS WHEREOF, the undersigned, has caused this **Assignment of Mortgage** to be executed by its duly authorized officer.

Date:
        April 01, 2020

**Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns**

By: _____
**Edwin Otzoy, Assistant Secretary**

### NOTARY ACKNOWLEDGEMENT

State of **Oklahoma** County of **Oklahoma**

On    April 01, 2020        before me, **Stephanie Burdick**, a Notary Public, personally appeared **Edwin Otzoy, Assistant Secretary of Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

**Stephanie Burdick, Notary Public**          My commission expires: **08/24/2020**

Prepared by: **Nancy Ortiz**



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: SERVICE REQUEST**
**April 17, 2023 14:21**

By: WADE T. DOERR 0083430

Confirmation Nbr. 2831884

ERIC SEME                                          CV 23 978137

    vs.

                    **Judge:**  ASHLEY KILBANE

CALIBER HOME LOANS INC.

**Pages Filed:**  1

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

ERIC SEME

      Plaintiff

-vs

CALIBER HOME LOANS, INC.

      Defendant.

CASE NO.


JUDGE

PRAECIPE FOR SERVICE

TO THE CLERK:

Please serve Defendant with summons and complaint by US certified mail.

               Respectfully submitted,

               **_/s/ Wade T. Doerr_**
               Wade T. Doerr (0083430)
               Brouse McDowell LPA
               6550 Seville Dr., Ste B
               Canfield, OH 44406
               Tel: (234) 402-4055
               E-mail: wdoerr@brouse.com
               _Counsel for Plaintiff, Eric Seme_



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
June 30, 2023 16:10

By: WADE T. DOERR 0083430

Confirmation Nbr. 2898513

ERIC SEME                                CV 23 978137

     vs.

                                 **Judge:**  ASHLEY KILBANE

CALIBER HOME LOANS INC.

**Pages Filed:**  44

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **ERIC SEME**<br>10700 Clifton Blvd.<br>Cleveland, OH 44102 | CASE NO.  CV-23-978137 |
| Plaintiff, | JUDGE ASHLEY KILBANE |
| -vs- | **FIRST AMENDED COMPLAINT WITH JURY DEMAND**<br>INJUNCTIVE RELIEF AND MONEY DAMAGES |
| **CALIBER HOME LOANS, INC.**<br>c/o CT Corporation System<br>400 Easton Commons Way, Ste 125<br>Columbus, OH 43219 | |

**ERIC SEME**
10700 Clifton Blvd.
Cleveland, OH 44102

Plaintiff,

-vs-

**CALIBER HOME LOANS, INC.**
c/o CT Corporation System
400 Easton Commons Way, Ste 125
Columbus, OH 43219

**Also serve at:**

CALIBER HOME LOANS, INC.
1525 S Belt Line Rd
Coppell, TX 75019

-and-

**NEWREZ LLC dba Shellpoint Mortgage Servicing**
1100 Virginia Dr, Ste 125
Ft. Washington, PA 19034

**Also serve at:**

NewRez LLC
c/o Corporation Service Company
3366 Riverside Dr., Ste 103
Upper Arlington, OH 43221

Defendants.

CASE NO.  CV-23-978137

JUDGE ASHLEY KILBANE

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**
INJUNCTIVE RELIEF AND MONEY DAMAGES

- Breach of Loan Agreement
- Violation of Truth in Lending Act
- Violation of RESPA
- Violation of Ohio Consumer Sales Practices Act
- Tortious Interference with Contract

**COMPLAINT – INJUNCTIVE RELIEF AND MONEY DAMAGES**

1

Plaintiff, Eric Seme ("Seme" or "Borrower"), by the undersigned counsel, files the following First Amended Complaint (the "Complaint") to add defendant, NEWREZ LLC as successor by assignment to Caliber Home Loans, Inc., requesting Injunctive Relief and Money Damages, and state as follows:

PARTIES

1.      Plaintiff is an individual residing at 10700 Clifton Blvd., Cleveland, OH 44102.

2.      Defendant, Caliber Home Loans, Inc. ("Caliber" or "Lender"), is a loan servicing company conducting business in Ohio.

3.      Defendant Newrez LLC dba Shellpoint Mortgage Servicing ("NewRez" or "Lender"), is a loan servicing company conducting business in Ohio.  Upon information and belief, Newrez is the assignee of Caliber pursuant to a certain assignment of mortgage filed in the office of the Cuyahoga Fiscal Officer at AFN 202302060014 on February 6, 2023.  Exhibit F.

VENUE

4.      Venue is proper in Cuyahoga County because it is the location of the real property subject of this dispute and it is the county where the claim for relief arose. Civ. R. 3(C)(5) and (6).

FACTS AND BACKGROUND

5.      The foregoing paragraphs are incorporated herein.

6.      On October 11, 2018, Seme purchased a duplex to rehabilitate and renovate located at 10700-10702 Clifton Blvd., Cleveland, OH 44102 (the "Property") with a rehabilitation loan from Union Capital Mortgage Corporation (the "Loan").  Rehabilitation Loan Agreement attached as **Exhibit A**.  Note attached as **Exhibit B**.  Mortgage attached as **Exhibit C**.

2

7.     The renovation work was to be completed no later than April 11, 2019 by the terms of the Loan.  Exhibit A.

8.     The Loan was in part to purchase the Property for the amount of $165,000.00 and also to fund rehabilitation construction on the Property in the amount of $101,322.38, by future disbursements pursuant to section 203(k) of the National Housing Act.

9.     As part of the Loan, Seme contracted with a Lender-approved contractor, Colvin Contracting, Inc., of Cleveland, Ohio ("Contractor" or "Colvin") to perform the rehabilitation improvements to the Property estimated at under $90,000.00. **Exhibit D**.

10.     Lender provided its form of improvement contract (the "Improvement Contract") between Seme and Colvin as part of the Loan application, and Lender was responsible for disbursing payments from the Loan proceeds to Seme and the Contractor upon completion of various stages of the work.

11.     On or about December 1, 2018, Caliber gave notice that it became the new loan servicer replacing Union Capital Mortgage Corporation.

12.     At that time, Seme was having difficulty getting Contractor to show up and do any work because Contractor was demanding early disbursements of funds before he would proceed, contrary to the terms of the Loan.

13.     Shortly prior to December 4, 2018, Lender advised Seme to approve release of some of the funds from Lender and to have a check issued payable to both Seme and the Contractor, but to withhold the check from Contractor if he did not complete the work relating to the payment.

3

14.     On or around December 11, 2018, Lender approved a draw for $24,315.03 payable to Seme and Contractor, that was never cashed due to the dispute between Seme and the Contractor.

15.     Seme followed Lender's instructions and withheld the check from Contractor demanding that he perform the itemized work before Seme would release payment because otherwise Seme was advised that he would not be legally protected if Caliber did not perform.

16.     Seme complained to the Contractor concerning the quality of the work and lack of progress where work had stalled after the demolition stage.

17.     In response to Seme's complaints, and due to Seme's refusal to pay over funds for work not yet completed, Contractor stopped work on the Property in January 2019 and he then filed a mechanic's lien on the Property on February 6, 2019. Seme responded by terminating the Improvement Contract.

18.     At the time Contractor quit the project, the Property was uninhabitable such that Seme was neither able to move in or rent out the Property as originally planned.

19.     In February and March of 2019, Seme's counsel contacted Caliber requesting that another contractor be approved or alternatively that Seme be permitted to pay off the Loan with alternative borrowed funds, giving notice of rescission of the Loan.

20.     Upon information and belief, Lender obtained an assignment of the mortgage on the Property on April 1, 2020.  **Exhibit E**.

21.     Through counsel, Seme demanded a true payoff from Caliber reflecting the undisbursed funds on or about April 15, 2020, and again gave notice that the Loan was to be rescinded and paid from alternative funds.

4

22. In response, Caliber did not send a payoff, but instead ceased all communications with Seme and began sending mortgage statements to counsel.

23. On or about July 9, 2020, Seme again requested a payoff through counsel but received no response.

24. Meanwhile, the Lender would not approve a new contractor until the dispute with the existing Contractor was resolved, in violation of the self-help terms of the Loan, and Lender would not release any funds to Seme directly to complete the improvements on the Property.

25. Lender also demanded monthly payments to service the Loan as if the balance was in excess of $250,000.00, despite never releasing the construction funds to Seme which undisbursed funds exceeded $90,000.00.

26. Upon information and belief, Lender did not place the undisbursed funds in an interest-bearing escrow account conforming with the requirements of the Loan. Exhibit A.

27. After continued failure by Lender to provide a true payoff for the funds actually disbursed, or alternatively, to apply the undisbursed funds to the Loan and issue an accurate payoff, Seme's opportunity to borrow the funds to pay off the Loan lapsed.

28. Since Lender would not release the undisbursed portion of the Loan designated for improvement of the Property, to mitigate his damages, Seme took out credit card loans to finish one side of the duplex enough to be able to reside there so that he could stop paying rent elsewhere, even though residing in the rough space was a personal hardship on Seme and his family.

29. Seme filed a Notice to Commence Suit on March 16, 2021, prompting Contractor to sue on his mechanic's lien.

5

30.     The dispute between Colvin and Seme has been resolved, but Lender still holds undisbursed funds and will not provide Seme with either the funds spend on the renovation or a true payoff despite multiple requests from Seme and his counsel.

31.     During the litigation with Contractor, Lender advised Seme that it could not provide Seme with a true payoff and the only option that Seme had to resolve the Loan issues was to enter into a loan modification agreement that required Seme to repay all interest and fees and the undisbursed funds despite being unwilling or unable to disburse the funds to Seme for completion of the construction himself.

32.     On February 6, 2023, Newrez recorded a certain assignment of mortgage filed in the office of the Cuyahoga Fiscal Officer at AFN 202302060014. **Exhibit F**.

33.     Plaintiff did not receive any notice of the assignment of his mortgage servicing to Newrez as the new servicer.

34.     On or about June 28, 2023 Plaintiff requested a statement of interest on the undisbursed funds from Newrez by telephone, but after several misdirected calls through customer service and various departments Newrez was unwilling or unable to provide a response to the request.

COUNT ONE
(Lender's Breach of Contract – Injunctive Relief)

35.     The foregoing paragraphs are incorporated herein.

36.     Since the purpose of the Loan and related Improvement Contract was frustrated and it cannot be performed within the time permitted under its terms, Plaintiff seeks entry of a judgment for injunctive relief ordering the Lender to provide a true payoff statement of the actual money

6

disbursed, less late fees and penalties; and ordering Lender to accept payment for same over a three-year term or as otherwise permitted by law.

COUNT TWO
(Lender's Violations of TILA)

37.     The foregoing paragraphs are incorporated herein.

38.     Lender has violated the Truth in Lending Act ("TILA") at 15 USC 1601 et seq., by its conduct, including but not limited to:

a.     Failing to accurately disclose the Borrower's rights under the Loan, including the right to rescind;

b.     Failing to accurately calculate the APR and finance charges on the Loan, and the misapplication of the daily interest factor with respect to the Loan and the undisbursed funds;

c.     Applying penalties in excess of limits after Contractor's breach and interference with the Loan;

d.     Failing to provide a responsive resolution to Seme's construction difficulties caused by Contractor;

e.     Charging erroneous interest in excess of allowable amounts.

39.     As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and in Seme's efforts to complete the rehabilitation process with other funds, and Seme has incurred substantial attorneys' fees recoverable pursuant to 15 USC 1640.

7

40.     Since a portion of the Loan is for construction and rehabilitation of the Property, Seme is entitled to rescind the Loan as a result of Lender's conduct and a refund of all finance changes pursuant to 15 USC 1635.

## COUNT THREE
### (Lender's Violations of RESPA)

41.     The foregoing paragraphs are incorporated herein.

42.     Lender has violated the Real Estate Sales Practices Act ("RESPA") at 12 U.S.C. section 2607 through its conduct, including but not limited to:

    a.  Failing to provide an accurate payoff balance upon request in violation of 12 CFR 1026.36(c)(3) and 1024.35(b)(6);

    b.  Charging interest and penalties on funds not provided to Borrower in violation 12 CFR 1024.35(b)(5);

    c.  Failing to respond to loan servicing complaints pursuant to 12 CFR 1024.35; and

    d.  Failing to maintain an interest-bearing escrow account for the undisbursed funds in excess of $90,000.00 and failing to provide statements regarding same pursuant to *inter alia*, 12 CFR 1024.17.

43.     As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and to complete the rehabilitation process with other funds and has incurred substantial attorneys' fees.

## COUNT FOUR
### (Lender's Violations of Ohio CSPA)

44.     The foregoing paragraphs are incorporated herein.

45.     Lender has violated the Ohio Consumer Sales Practices Act ("CSPA") at R.C. 1345.02(F) through its conduct, including but not limited to:

8

a. Knowingly failing to comply with federal law concerning the Loan disclosures under TILA and RESPA;

b. Knowingly providing a disclosure that included a material misrepresentation;

c. Advising Seme to engage in conduct that resulted in the Contractor stopping work; and

d. Requiring Seme to enter into a loan modification on terms it knew were substantially one-sided in favor of Lender.

46.     As a result of Lender's conduct, Seme has suffered actual damages in excess of $25,000.00 in the attempt to resolve the dispute with the Contractor and to complete the rehabilitation process with other funds and has incurred substantial attorneys' fees.

COUNT FIVE
(Tortious Interference with Contract)

47.     The foregoing paragraphs are incorporated herein.

48.     Plaintiff originally submitted a bid specification (the "Bid Spec") to Colvin and other 203k qualified contractors inviting offers for the rehabilitation construction of the Property.

49.     Based on various responses, Plaintiff accepted Colvin's bid forming the contract for construction services.

50.     Lender interfered in the contract formed when Seme accepted a qualified bid from Colvin when Lender insisted upon its own form of contract between Seme and Colvin that did not fully represent the intentions of the parties.

51.     Lender's form contract was submitted with the Loan application for the rehabilitation construction of the Property. The form of contract changed the parties rights from the original accepted of the Bid Spec and made resolving the dispute more difficult for the parties.

9

52.     Lender again interfered in Plaintiff's contract with Colvin during the building process by telling Borrower to order a distribution check payable to both Seme and Colvin before the related work was performed, and to simply withhold the check if Colvin did not perform the work according to the disbursement approval, which advice was in violation of the terms of the Loan.

53.     Seme took Lender's advice, which aggravated the resolution of the dispute between Seme and Colvin, causing Colvin to walk off the job and file a mechanic's lien, and later to eventually sue Seme.

54.     Seme was unable to get another contractor approved by Lender pending the dispute with Colvin, causing Seme to have to mitigate damages by doing the work himself and live in the unfinished Property at great personal expense, loss, and hardship to Seme.

55.     Since Lender would neither release the funds to Seme for his self-help nor approve a new contractor, Seme took out unsecured credit and began to painstakingly renovate the property himself to a point where he could move into half of the duplex to mitigate his damages because he was otherwise paying rent to live elsewhere. Seme was still not able to rent out the other half of the Property as originally planned, resulting in substantial losses to Seme.

56.     During the litigation with Colvin, Seme and Colvin attempted early mediation which may have been successful but for Lender offering to pay Colvin from the undisbursed portion of the Loan for the unfinished work in dispute. Seme would have had to pay Lender for these funds despite the fact that Seme did not receive the benefit of the work they represented, but the offer emboldened Colvin to press on with his claim at considerable expense to Seme.

57.     The result was protracted litigation between Colvin and Seme, increasing the attorneys' fees, before the dispute ultimately was settled at Seme's expense.

10

58.     Lender interfered with Seme's contract with Colvin on at least the three occasions referenced above, resulting in personal loss and expense to Seme, for which he is entitled to reimbursement.

## COUNT SIX

### Violation of 15 USC 1641 by Newrez LLC

59.     The foregoing paragraphs are incorporated herein.

60.     Defendant, Newrez violated, inter alia, 15 USC 1641(g) by failing to provide notice of the change of mortgage servicer from Caliber to Newrez within 30 days of the assignment.

61.     Newrez did not provide a reasonable response to Plaintiff's request for a statement of interest on the undisbursed funds in violation of, inter alia, 12 CFR 1024.17.

WHEREFORE, Plaintiff prays for the following relief:

A. On Count One, judgment finding that Plaintiff is entitled to repay the money actually disbursed on the Loan without payment of penalties, interest, or fees and ordering Lender to provide a true statement of said balance owing and to accept payment therefore and satisfy the Loan and release the related mortgage upon payment thereof.

B. On Count Two, relief under TILA, granting Plaintiff recission of the Loan and permitting repayment of the portion of the Loan actually disbursed over three years without penalty or interest pursuant to 15 USC 1635.

C. On Count Two, relief under TILA, granting Plaintiff an award of actual damages in excess of $25,000 plus twice the amount of any finance charges plus noneconomic damages and attorneys' fees and all other damages allowable pursuant to 15 USC 1640.

D. On Count Three, relief under RESPA, granting Plaintiff an award of actual damages in excess of $25,000 plus twice the amount of any finance charges plus noneconomic

11

damages and attorneys' fees, noneconomic damages, and all other damages allowable pursuant to, *inter alia*, 12 USC 2605.

E. On Count Four, relief under CSPA, granting Plaintiff a recission of the Loan and award of money damages in favor of Plaintiff against Defendant in the amount of Plaintiff's actual damages, plus attorneys' fees and all other allowable damages.

F. On Count Five, judgment for Plaintiff finding that Lender tortiously, intentionally, and with reckless disregard for Seme's losses, interfered in Seme's contract with Colvin, and awarding Seme his actual out-of-pocket losses paid to renovate the Property including interest, costs, and attorneys' fees relating to the Colvin dispute, plus lost rentals of the Property, prejudgment interest, plus damages paid to Colvin, noneconomic and punitive damages and reasonable attorneys' fees for this action.

G. On Count Six, judgment for Plaintiff granting all of the foregoing relief against Newrez as assigned and relief pursuant to, inter alia, 15 USC 1641;

H. For such further relief that this court deems just at law or in equity.

JURY DEMAND

A jury is demanded with respect to all issues.

Respectfully submitted,

*/s/ Wade T. Doerr*
Wade T. Doerr (0083430)
Brouse McDowell LPA
6550 Seville Dr., Ste B
Canfield, OH 44406
Tel: (234) 402-4055
E-mail: wdoerr@brouse.com
*Counsel for Plaintiff, Eric Seme*

12

EXHIBIT A

LOAN #

# REHABILITATION LOAN AGREEMENT

This Agreement, including the provisions below is made this **11th** day of **October, 2018,** between the Borrower(s) **Eric Seme**

and the Mortgagee **Union Capital Mortgage Corporation an Ohio Corporation**

to establish the conditions under which the Mortgagee will advance the proceeds of a loan to be used to purchase and rehabilitate or refinance and rehabilitate the property described below. The property is located in the County of **Cuyahoga** State of **Ohio** and is described as: SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A". APN #: 001-17-033

1. The loan will be in the principal sum of **TWO HUNDRED FIFTY NINE THOUSAND FOUR HUNDRED FORTY SEVEN AND NO/100**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* Dollars ( **$259,447.00** ) to be advanced by the Mortgagee to the Borrower as provided in this Agreement and will be secured by a mortgage or deed of trust ("Mortgage"), which will be a first lien on the property.

2. Payments required under the mortgage or deed of trust must be made by the Borrower on the date specified, even though the proposed rehabilitation or improvement may not be completed, or the property may not be suitable for occupancy, on the anticipated date.

3. The Mortgagee intends to request the Assistant Secretary for Housing – Federal Housing Commissioner or the Secretary's Designee ("Commissioner") –to insure the mortgage under the provisions of Section 203(k) of the National Housing Act; therefore, Borrower agrees to conform to, and to cause improvements to be constructed in conformance with, all requirements of the Commissioner.

4. The Mortgagee will place the portion of the principal amount of the mortgage allocated to the total rehabilitation cost ( **$101,322.33** ), plus any reserves put up by the Borrower or others in cash, in a secured interest bearing account, trust or escrow for the benefit of the Borrower (hereafter called "Rehabilitation Escrow Account"). Mortgagee shall release Rehabilitation Escrow Account funds by check, payable to the Borrower and/or the contractor, upon satisfactory completion of the rehabilitation in accordance with the Work Write-Up or Work Plan, as evidenced by a compliance inspection or other authorized method, and when the repairs and improvements meet all federal, state and local laws, codes and ordinances, including required permits and inspections.

The Mortgagee or Commissioner may determine that additional compliance inspections are required throughout the rehabilitation period to ensure that the work is progressing in a satisfactory manner. Release of funds is not authorized on this type of inspection, and the Borrower is responsible for paying the inspection fee. The Mortgagee may require a property inspection if there have been no draw requests for more than 30 consecutive days.

5. If a Mortgage Payment Reserve is included in the Rehabilitation Escrow Account, the Mortgagee must make monthly mortgage payments directly from the Rehabilitation Escrow Account, provided the dwelling, or individual units for which the Mortgage Payment Reserve is established, cannot be occupied and the Final Release Notice has not been issued. Once the property, or individual unit, if applicable, is able to be occupied, application of the Mortgage Payment Reserves will cease. Mortgage Payment Reserves remaining in the Rehabilitation Escrow Account after the property is able to be occupied must be used to reduce the mortgage principal.

LOAN #:

6. The Interest accumulated in the Rehabilitation Escrow Account will be distributed as required by the 203(k) Borrower's Acknowledgement, form HUD 92700-A.

7. The principal amount of the loan specified in paragraph 1 may contain a Contingency Reserve. The Contingency Reserve may be used to make other improvements to the property after it is determined that it is unlikely that any health or safety deficiency will be discovered. The Borrower or Consultant, if there is one, must submit form HUD-92577 to the Mortgagee detailing the additional improvements being requested. The Mortgagee will inform the Borrower in writing of the approval or rejection of the request within five business days.

If the Contingency Reserve is financed, any unused Contingency Reserve funds must be applied to reduce the mortgage principal. Such prepayment will not extend or postpone the due date of any monthly installment due under the Note and will not change the amount of such installments.

If the Contingency Reserve is established with the Borrower's own funds, the Borrower may receive a refund of any unused Contingency Reserve funds or may request the unused funds be applied to reduce the principal balance.

8. The Borrower will complete all improvements on the property in accordance with the Work Write-Up or Work Plan, including architectural exhibits, as accepted by the Mortgagee.

9. Changes in the architectural exhibits must be requested by the Borrower, either by a letter describing the changes or by submission of form HUD-92577, prior to the start of any work associated with the requested changes. The Mortgagee must issue an approval in writing before work can begin on the changes. Work must be 100% complete on each change order item before release of funds from the Rehabilitation Escrow Account.

10. Borrower will cause all improvements to be made in a workmanlike manner and in accordance with all applicable statutes and regulations. All licenses, permits and privileges required by local governmental authorities to rehabilitate the property will be obtained by the Borrower or contractor.

11. Representatives of the Mortgagee and of the Commissioner will have the right to enter upon the property at all times during the period of construction to determine whether the work conforms with this Agreement and to determine the amount of funds in the Rehabilitation Escrow Account to be released by the Mortgagee.

12. Borrower will furnish such records, contracts, bills and other documents relating to the property and the improvements as the Mortgagee or the Commissioner may require.

13. For a Borrower performing his/her own work under a Rehabilitation Self-Help Agreement, the Rehabilitation Escrow Account will include funds for labor and materials costs for each work item to be completed by the Borrower. The Borrower will be reimbursed for the actual cost of materials only. The Borrower cannot be reimbursed for labor. The funds resulting from the difference between the estimated and actual costs of materials, as well as the funds reserved for labor costs, will remain in the Rehabilitation Escrow Account until all of the work is complete and may then be used for additional improvements to the property. No cash may be paid to the Borrower. Any funds for self-help items remaining in the Rehabilitation Escrow Account after completion of the rehabilitation must be used to reduce the principal balance.

14. Without prior, written consent of the Mortgagee, no materials, equipment, fixtures or any part of the improvements financed with this loan will be purchased or installed subject to conditional sales contracts, security agreements, lease agreements or other arrangements whereby title is retained or the right is reserved or accrues to anyone to remove or repossess any item, or to consider it as personal property.

15. The Borrower will cause either this instrument or the construction contract under which improvements are to be made to be filed in the public records, if the effect of recording will be to relieve the mortgaged property from mechanics' and materialmen's liens. The Mortgagee must obtain Lien Waivers, or equivalent, at the time of any disbursement of funds to ensure the validity of the first lien on the property. If all work items to be performed by a contractor have not been completed at the time of draw request, the Mortgagee must obtain a partial conditional Lien Waiver for the work items that have been completed for each draw request. Upon completion of the project, the Mortgagee will obtain a release of any and all liens arising out of the contract or submission or receipts or other evidence of payment covering all contractors, subcontractors or suppliers who could file a legal claim.

16. Borrower must cause work to begin within 30 days following the date of this Agreement. Work must be performed with reasonable diligence; therefore, work is never to cease for more than 30 consecutive days. Should Borrower fail to comply with these terms, the Mortgagee may refuse to make any further disbursements under this Agreement, and any funds remaining in the Rehabilitation Escrow Account must be used to reduce the mortgage principal.

17. In the event any Stop Notices, Notices to Withhold, Mechanic's Liens, or claims of lien are filed against the property, the Mortgagee, after five (5) days' notice to the Borrower of its intention to do so, may pay any and all of the liens or claims, or may contest the validity of any claim, paying all costs and expenses of contesting the same.

18. Failure of the Borrower to perform under the terms of this Rehabilitation Loan Agreement will make the loan amount, at the option of the Mortgagee, due and payable.

19. The Borrower understands that the mortgage payments (PITI) that were financed at closing are estimates and the Borrower will be responsible for paying the full amount of the mortgage payment, each and every month due, if a shortage occurs.

August 2015
Ellie Mae, Inc.

Page 2 of 3

GRLAFHA15  0815
GRLAFHA15 (CLS)



LOAN #:

20. The accepted Work Write-Up or Work Plan and architectural exhibits, if any, are incorporated in this Agreement.

21. Borrower must have the work completed within **SIX** months following the date of this Agreement.

22. Date work must be completed:  **April 11, 2019**

_____     10 - 11 - 18          (Seal)
ERIC SEME



Signature of Mortgagee Representative              Date        Title of Mortgagee Representative
George A. Saadey Jr.

Loan Officer

August 2016
Ellie Mae, Inc.

Page 3 of 3

GRLAFHA15  0616
GRLAFHA15 (CLS)

Electronically Filed 06/30/2023 16:10 / COMPLAINT / CV 23 978137 / Confirmation Nbr. 2898513 / CLJSZ

**LOAN #:**

**203(k) Borrower's Acknowledgment**

U.S. Department of Housing and Urban Development
Office of Housing / Federal Housing Commissioner

Condition of Property: I understand that the property I am purchasing is HUD approved and HUD does not warrant the condition or the value of the property. I understand the HUD plan review (where performed) and the appraisal are performed to determine compliance with the required architectural exhibits and to estimate the value of the property, but neither guarantees the house is free of defects. I understand I was responsible to have an independent consultant and/or a professional home inspection service perform an inspection of the property and the cost of the inspection was (or could be) included in the mortgage.

Loan Requirements

• I understand at the time of the loan closing of an FHA-Insured 203(k) Rehabilitation Loan, for which I have applied to my lender, the proceeds designated for the rehabilitation or improvement (including a contingency reserve, mortgage payments and any other fees, where applicable) are to be placed in an interest bearing escrow account. The Rehabilitation Escrow Account is not, nor will it be treated as an escrow for the paying of real estate taxes, insurance premiums, delinquent notes, ground rents or assessments. I hereby request the lender, after the Final Release Notice is issued, to:

☐ Pay the net interest income directly to me/us.
☒ Apply the net interest income directly to the mortgage principal balance for an equal amount of principal reduction.
☐ Other:

• I understand that the Rehabilitation Escrow Account will cease paying interest to me if (1) the loan payments are delinquent for more than 30 days; or (2) the completion date (or an approved extension) has expired. During this period, the interest will be paid down on the mortgage principal. I understand if I close up the delinquency or default status and/or the completion date has not expired or an extension has been approved, then the interest on the escrow account will begin again to be paid according to the terms noted above.

• I understand no draws on the escrow account can be made until all permits have been issued by the local or state building departments, where required. I further understand I can only request monies for the actual cost of rehabilitation. If any cost savings result or any line item of the Draw Request, form HUD-9746-A, the amount saved must be used to: (1) Make further improvements to the mortgage principal. I understand if I close up the delinquency or default status and/or the completion (2) Pay for cost overruns in other line items of the Draw Request; or (3) Prepay the mortgage principal.

• I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner. If I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified. I understand there is a 10 percent holdback on each Draw Request to assure the work is properly completed and for lien protection.

• I understand I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association on any dispute.

• I understand if I am using the Escrow Commitment Procedure, I must sign form HUD-314. The funds deposited in an escrow, trust or special account will be released until an assumption of the loan occurs by a creditworthy buyer or until the time allowed for such assumption has expired, thereby requiring the funds to be paid down on the mortgage principal.

• I understand if I change a contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed. If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered.

• I understand the lender or HUD does not provide a one-year warranty on the completed work on the property. I am responsible to obtain such warranty(s) from the contractor(s) and the warranty should be stated in the Homeowner-Contractor Agreement.

• I understand I am responsible to make the mortgage payments during the term of the loan, including the rehabilitation period, to ensure the property will not go into default. The construction on the home must start within 30 days; if the construction ceases for more than 30 days, the lender may consider the loan in default or the work does not comply with the accepted architectural exhibits, the lender may require additional compliance inspections to protect the security of the loan and I will be responsible to pay for the inspections and the cost of the inspection may be withheld at the next draw request.

• I understand no changes to the architectural exhibits can be made without the acceptance of the lender (or HUD) on form HUD-92577. The contingency fund is set up for changes that affect the health, safety, or items of necessity of the occupants of the property. If the contingency reserve is insufficient, I must place additional monies into the account for payment upon acceptance of the change. Additional improvements can be made after it is determined no further health and safety items exist. A change order will be made to assure the monies are available to the contractor upon completion of the changed work.

• I understand if there are unused contingency funds, mortgage payments, inspection fees or other monies in the Rehabilitation Escrow Account after the Final Release is processed, the lender, in compliance with HUD regulations, must apply those funds to prepay the mortgage principal, provided those items are a part of the mortgage.

• I understand the lender may retain the 10 percent holdback, for a period not to exceed 35 days (or the time period required by law to file a lien, whichever is longer), to ensure compliance with state lien waiver laws or other state requirements. Upon completion of the work, I understand I will be provided: (1) The Final Draw Request; (2) The Final Release Notice; and (3) An accounting of the final distribution of all funds.

This statement must be delivered to you prior to closing the loan. Return one copy to your lender as proof you have read the entire document. Keep one copy for your records. You, the borrower(s), must be certain that you understand this information. Sign here only after you have read this entire document. Seek professional advice if you are uncertain.

| Borrower's Signature & Date:<br>Eric Seme | Co-Borrower's Signature & Date: |
|---|---|
| X _Eric Seme_  10-11-16 | X |

I, the lender, certify this information was delivered to the borrower(s) prior to the time of loan closing.
Lender's Signature & Date

X _____  6/1/16

form HUD - 92700 - A (8/00) ref. Handbook 4240.4
Ellie Mae, Inc.

G203  1095
G203 (CLS)

LOAN #:

**Escrow Commitment Certification**

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

Property Address:  10700 Clifton Boulevard
Cleveland, OH 44102.

FHA Case No.:

Instructions: The objective of the Section 203(k) program is to promote and facilitate the restoration and preservation of the Nation's existing housing inventory. This form, completely executed, must accompany the Uniform Residential Loan Application (URLA) and form HUD-92900-A, Addendum to URLA. Submit with form HUD-92900WS (Credit Analysis Worksheet) and form HUD-92700 (Maximum Mortgage Worksheet).

**Borrower's Certificate**

The undersigned, in order to induce the Secretary to issue an Escrow Commitment to insure a mortgage loan on the property described above, certifies to the Secretary and agrees that:

(1) I am or will be the owner of the dwelling.
    ☒ I propose to purchase the dwelling and intend to use the proceeds of the loan to *purchase* and rehabilitate the property.
    ☐ I am the owner of the property and intend to use the proceeds of the loan to *refinance* and rehabilitate the property.

(2) I will provide evidence that I have the ability to support the mortgage payments, complete the rehabilitation and market the property.

(3) I understand the seven (7) unit limitation rule will apply.

(4) I understand participation in this procedure will allow me to finance the purchase/refinance and rehabilitation of the property to the maximum owner-occupant loan amount.

(5) I intend to complete the rehabilitation project and to have a credit worthy owner/occupant assume the loan within eighteen (18) months of loan closing.

(6) The borrower's required investment plus any excess loan

proceeds will be deposited in an escrow, trust, or special account. The required escrow will be shown on form HUD-92700, 203(k) Maximum Mortgage Worksheet (line E.3).

(7) If the property is not sold prior to the due date of the 18th amortization payment of the mortgage to a purchaser who is acceptable to the Secretary and who will occupy the property, assume, and agree to pay the mortgage indebtedness, the amount held in escrow, trust, or special account will be applied in reduction of the outstanding principal amount of the mortgage as of the due date of the 18th amortization payment of the mortgage. The application of the escrow will be mandatory, will not affect the monthly payments to be made by the mortgagor as required by the mortgage, and will not be used as a "riding" prepayment.

(8) I understand that I cannot rent the property for periods less than 30 days and will ensure that the property is not used for hotel or transient purposes. For rental periods greater than 30 days, only a month-to-month lease can be entered into.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

_____
ERIC SEME

10/11/18
DATE

**Mortgagee's Certificate**

The undersigned, in order to induce the Secretary to issue an Escrow Commitment to insure a mortgage loan on the property described above, certifies to the Secretary and agrees that:

(1) An amount shown on form HUD-92700, 203(k) Maximum Mortgage Worksheet (line E.3), has been or will be deposited in an interest bearing escrow, trust or special account.

(2) If the mortgaged property is not sold prior to the date of the 18th amortization payment of the mortgage to a purchaser who is acceptable to the Secretary, who will occupy the property, assume and agree to pay the mortgage indebtedness, the amount held in escrow, trust, or special account will be applied in reduction of the outstanding principal amount of the mortgage as a mandatory prepayment as of the due date of the 18th amortization payment of the mortgage.

(3) If the property is not sold by the due date of the 18th

amortization payment, the Borrower will not be permitted to "ride" the prepayment by being relieved of the obligation of paying future monthly installments of escrow, principal and interest, and that the mandatory prepayment will serve solely to accelerate the maturity of the mortgage.

(4) Any portion of the funds held in escrow, trust or special account, not applied to the mortgage in accordance with the applicable regulations of the Federal Housing Administration will be deducted from the amount of insurance benefits to which the Lender would otherwise be entitled if a claim for insurance benefits is filed.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

Name of Lender: Union Capital Mortgage Corporation

Signature and Title of Officer:

Date: 10/11/18

✗

Previous editions are obsolete. May be reproduced on office copiers.
form HUD-314 (8/95)
Ellie Mae, Inc.

GECC  0997
GECC (CLS)

LOAN #:

## 203(k) Borrower's Acknowledgment

**U.S. Department of Housing and Urban Development**
Office of Housing / Federal Housing Commissioner

Condition of Property: I understand that the property I am purchasing is not HUD approved and HUD does not warrant the condition or the value of the property. I understand the HUD plan review (where performed) and the appraisal are performed to determine compliance with the required architectural exhibits and to estimate the value of the property, but neither guarantees the house is free of defects. I understand I was responsible to have an independent consultant and/or a professional home inspection service perform an inspection of the property and the cost of the inspection was (or could be) included in the mortgage.

### Loan Requirements

• I understand at the time of the loan closing of an FHA-insured 203(k) Rehabilitation Loan, for which I have applied to my lender, the proceeds designated for the rehabilitation or improvement (including a contingency reserve, mortgage payments and any other fees, where applicable) are to be placed in an interest bearing escrow account. The Rehabilitation Escrow Account is not, nor will it be treated as an escrow for the paying of real estate taxes, insurance premiums, delinquent notes, ground rents or assessments. I hereby request the lender, after the Final Release Notice is issued, to:
☐ Pay the net interest income directly to me/us.
☑ Apply the net interest income directly to the mortgage principal balance for an equal amount of principal reduction.
☐ Other:

• I understand that the Rehabilitation Escrow Account will cease paying interest to me if (1) the loan payments are delinquent for more than 30 days; or (2) the completion date (or an approved extension) has expired. During this period, the interest will be paid down on the mortgage principal. I understand if I clear up the delinquent or default status and/or the completion date has not expired or an extension has been approved, then the interest on the escrow account will begin again to be paid according to the request above.

• I understand no draws on the escrow account can be made until all permits have been issued by the local or state building departments, where required. I further understand I can only request monies for the actual cost of rehabilitation. If any cost savings result on any line item of the Draw Request, form HUD-9746-A, the amount saved must be used to: (1) Make further improvements to the property; (2) Pay for cost overruns in other line items of the Draw Request; or (3) Prepay the mortgage principal.

• I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner, if I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified. I understand there is a ten percent holdback on each Draw Request to assure the work is properly completed and for lien protection.

• I understand I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association on any dispute.

• I understand if I am using the Escrow Commitment Procedure, I must sign form HUD-914. The funds deposited in an escrow, trust or special account will not be released until an assumption of the loan occurs by a creditworthy buyer or until the time allowed for such assumption has expired, thereby requiring the funds to be paid down on the mortgage principal.

• I understand if I change a contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed. If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered.

• I understand the lender or HUD does not provide a one-year warranty on the completed work on the property. I am responsible to obtain such warranty(s) from the contractor(s) and the warranty should be stated in the Homeowner-Contractor Agreement.

• I understand I am responsible to make the mortgage payments during the term of the loan, including the rehabilitation period, to ensure the property will not go into default. The construction on the home must start within 30 days; if the construction ceases for more than 30 days, the lender may consider the loan in default or the lender can use the escrow money to have the work completed. If the work stops or is not progressing as it should, or if the work does not comply with the accepted architectural exhibits, the lender may require additional compliance inspections to protect the security of the loan and I will be responsible to pay for the inspections and the cost of the inspection may be withheld at the next draw request.

• I understand no changes to the architectural exhibits can be made without the acceptance of the lender (or HUD) on form HUD-92577. The contingency fund is set up for changes that affect the health, safety, or items of necessity of the occupants of the property. If the contingency reserve is insufficient, I must place additional monies into the account for payment upon acceptance of the change. Additional improvements can be made after it is determined no further health and safety items exist. A change order will be made to assure the monies are available to the contractor upon completion of the changed work.

• I understand if there are unused contingency funds, mortgage payments, inspection fees or other monies in the Rehabilitation Escrow Account after the Final Release is processed, the lender, in compliance with HUD regulations, must apply those funds to prepay the mortgage principal, provided those items are a part of the mortgage.

• I understand the lender may retain the 10 percent holdback, for a period not to exceed 35 days (or the time period required by law to file a lien, whichever is longer), to ensure compliance with state lien waiver laws or other state requirements. Upon completion of the work, I understand I will be provided: (1) The Final Draw Request; (2) The Final Release Notice; and (3) An accounting of the final distribution of all funds.

This statement must be delivered to you prior to closing the loan. Return one copy to your lender as proof you have read the entire document. Keep one copy for your records. You, the borrower(s), must be certain that you understand this information. Sign here only after you have read this entire document. Seek professional advice if you are uncertain.

Borrower's Signature & Date:
**Eric Seme**

Co-Borrower's Signature & Date:

X  _Eric Seme_   10-11-18

X

I, the lender, certify this information was delivered to the borrower(s) prior to the time of loan closing.
Lender's Signature & Date:

X  _____  6/11/18

form HUD - 92700 - A (6/96)ref. Handbook 4240.4
Ellie Mae, Inc.

G203  1095
G203 (CLS)

EXHIBIT B

LOAN #:

MIN:

**NOTE**

FHA Case No.

October 11, 2018          Mentor,                              Ohio
[Date]                           [City]                              [State]

**10700 Clifton Boulevard, Cleveland, OH 44102**
[Property Address]

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. **$259,447.00**          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  **Union Capital Mortgage Corporation, an Ohio Corporation.**

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  **4.875 %.**
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS
**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the  **1st**          day of each month beginning on  **December 1, 2018.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and any other items in the order described in the Security Instrument before Principal. If, on **November 1, 2048,**          I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at  **7676 Reynolds Road**
**Mentor, OH 44060**
or at a different place if required by the Note Holder.
**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S.  **$1,373.01.**

### 4. BORROWER'S RIGHT TO PREPAY
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED
**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of  **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  **4.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and

MULTISTATE FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc.                                 Page 1 of 3                                    FHA3200NOT  0216
                                                                                                FHA3200NOT (CLS)



LOAN #:

all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:
If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



ERIC SEME _____ (Seal)

Lender: Union Capital Mortgage Corporation
NMLS ID: 252728
Loan Originator: George A. Saadey Jr.
NMLS ID: 270731

[Sign Original Only]

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc. 

Page 2 of 3

FHA3200NOT  0216
FHA3200NOT (CLS)

LOAN #:

PAY TO THE ORDER OF:
WITHOUT RECOURSE
Union Capital Mortgage Corporation, an Ohio Corporation

BY: _____
Kim Schelgunov, Vice President

[Sign Original Only]

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
Modified for FHA 9/16 (rev. 2/16)
Ellie Mae, Inc.
Page 3 of 3
FHA3200NOT   0218
FHA3200NOT (CLS)



EXHIBIT C

CUYAHOGA COUNTY
OFFICE OF FISCAL OFFICER - 18
MORT 10/11/2018 3:36:34 PM

**201810110552**

Return to: 181708
Progressive Land Title Agency, Ltd.
5000 Rockside Rd., Ste. 420
Independence, OH 44131

Title Order No.: 181708
Escrow No.: 181708
LOAN #:

———————————[Space Above This Line For Recording Data]————————————

**MORTGAGE**

FHA Case No.

MIN:

MERS PHONE #: 1-888-679-6377

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document
are also provided in Section 15.

**(A) "Security Instrument"** means this document, which is dated **October 11, 2018,**      together
with all Riders to this document.

**(B) "Borrower"** is  **ERIC SEME, AN UNMARRIED MAN.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has
an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is  **Union Capital Mortgage Corporation.**

Lender is  **an Ohio Corporation,**                                    organized and
existing under the laws of **Ohio.**

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                              Page 1 of 12                              OHEFHA15DE  0915
                                                                                      OHEDEED (CLS)



**LOAN #:**

Lender's address is **7676 Reynolds Road, Mentor, OH 44060**

**(E) "Note"** means the promissory note signed by Borrower and dated  **October 11, 2018.**
The Note states that Borrower owes Lender  **TWO HUNDRED FIFTY NINE THOUSAND FOUR
HUNDRED FORTY SEVEN AND NO/100** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * **** Dollars (U.S. **$259,447.00**                    )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt
in full not later than **November 1, 2048.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in
the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and
all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider      ☐ Condominium Rider      ☐ Planned Unit Development Rider
☒ Other(s) [specify]
   **Rehabilitation Rider, 1-4 Family Rider**

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable
final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association, home-
owners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(L)  "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section
5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part
of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as
to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default
on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under
the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its
implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As
used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed
in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related
mortgage loan" under RESPA.

**(Q) "Secretary"** means the Secretary of the United States Department of Housing and Urban Develop-
ment or his designee.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether
or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 2 of 12                            OHEFHA15DE  0915
                                                                                          OHEDEED (CLS)



**LOAN #:** '

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the **County**                       of  Cuyahoga

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".

APN #: 001-17-033

which currently has the address of   **10700 Clifton Boulevard, Cleveland,**

[Street] [City]

**Ohio  44102**                    ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date,

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                              Page 3 of 12                     OHEFHA15DE  0915
                                                                            OHEDEED (CLS)



LOAN #:

then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

OHIO–Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**     Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                        Page 4 of 12                    OHEFHA15DE   0915
                                                                                        OHEDEED (CLS)



LOAN #:

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 5 of 12                                    OHEFHA15DE  0915
                                                                                                   OHEDEED (CLS)



LOAN #:

under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

OHIO - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 6 of 12                        OHEFHA16DE  0915
                                                                                       OHEDEED (CLS)



Electronically Filed 06/30/2023 16:10 / COMPLAINT / CV 23 978137 / Confirmation Nbr. 2898513 / CLJSZ

LOAN #:

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all

OHIO - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                   Page 7 of 12                    OHEFHA15DE  0915
                                                                                  OHEDEED (CLS)



**LOAN #:**

of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays

OHIO –Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**      Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                          Page 8 of 12                    OHEFHA16DE  0915
                                                                         OHEDEED (CLS)



**LOAN #**

Lender all sums which then would be due under this Security Instrument and the Note as if no accelera-tion had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall con-tinue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the com-mencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institu-tion whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

19. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

20. **Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reim-burses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party ben-eficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesti-cides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazard-ous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                         Page 9 of 12                      OHEFHA15DE   0915
                                                                         OHEDEED (CLS)



**LOAN #: '**

**22. Grounds for Acceleration of Debt.**
**(a)** Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:
    (i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or
    (ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.
**(b)** Sale Without Credit Approval. Lender shall, if permitted by applicable law (including Section 341 (d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:
    (i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and
    (ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.
**(c)** No Waiver. If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.
**(d)** Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.
**(e)** Mortgage Not Insured. Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.
    If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.
    Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.
    Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

    **24. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, costs of title evidence.

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                               Page 10 of 12                      OHEFHA15DE  0915
                                                                    OHEDEED (CLS)



**LOAN #:**

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.

25. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

26. Certain Other Advances. In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, Cuyahoga                County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 26 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it. Provisions pertaining to releases are contained in the Rehabilitation Loan Rider, which is attached to this document and made a part hereof.

_____    __10/11/18___ (Seal)
ERIC SEME                                                        DATE

State of ___OHIO___
County of ___LAKE___

The foregoing instrument was acknowledged before me this __11th__ DAY __of OCTOBER 2018__ (date) by ERIC SEME (name(s) of person(s) acknowledged).

_____
(Signature of Person Taking
Acknowledgement)

JOHN SCHENKELBERG
NOTARY PUBLIC, STATE OF OHIO    (Title or Rank)    __NOTARY__
MY COMMISSION EXPIRES:
1-29-19    (Serial Number, if any)    __N/A__

My commission expires:    __1-29-2019__

Lender: Union Capital Mortgage Corporation
NMLS ID: 252728
Loan Originator: George A. Saadey Jr.
NMLS ID: 270731

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                         Page 11 of 12                         OHEFHA15DE  0915
                                                                             OHEDEED (CLS)



LOAN #:

THIS INSTRUMENT WAS PREPARED BY:
UNION CAPITAL MORTGAGE CORPORATION
7676 REYNOLDS ROAD
MENTOR, OH 44060
440-585-5626

OHIO -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3036 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 12 of 12                          OHEFHA15DE  0915
                                                                                          OHEDEED (CLS)





MIN:

FHA Case No.

# REHABILITATION LOAN RIDER

THIS REHABILITATION LOAN RIDER is made this **11th** day of **October, 2018,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **Union Capital Mortgage Corporation, an Ohio Corporation**

("Lender") of the same date and covering the Property described in the Security Instrument and located at:
**10700 Clifton Boulevard, Cleveland, OH 44102**
**[Property Address]**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Loan proceeds are to be advanced for the premises in accordance with the Rehabilitation Loan Agreement dated  **October 11, 2018,** between Borrower and Lender. This agreement is incorporated by reference and made a part of this Security Instrument. No advances shall be made unless approved by the Secretary of Housing and Urban Development or a Direct Endorsement Underwriter.

B. If the rehabilitation is not properly completed, performed with reasonable diligence, or is discontinued at any time except for strikes or lockouts, the Lender is vested with full authority to take the necessary steps to protect the rehabilitation improvements and property from harm, continue existing contracts or enter into necessary contracts to complete the rehabilitation. All sums expended for such protection, exclusive of the advances of the principal indebtedness, shall be added to the principal indebtedness, and secured by the Security Instrument and be due and payable on demand with interest as set out in the Note.

C. If Borrower fails to perform any obligation under the loan, including the commencement, progress and completion provisions of the Rehabilitation Loan Agreement, and such failure continues for a period of 30 days, the loan shall, at the option of Lender, be in default.

D. The Property covered by this Security Instrument shall include all of Borrower's interest in funds held by Lender in escrow under the Rehabilitation Loan Agreement.

FHA Multistate Rehabilitation Loan Rider - 10/95
Ellie Mae, Inc.                                            Page 1 of 2                                    GRLR  0709
                                                                                                          GRLR (CLS)



LOAN #:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rehabilitation Loan Rider.

 10/11/18 (Seal)

ERIC SEME                                                                                    DATE

FHA Multistate Rehabilitation Loan Rider - 10/95
Ellie Mae, Inc.                                             Page 2 of 2                    GRLR  0709
                                                                                          GRLR (CLS)

**LOAN #:**

FHA Case No.:

MIN:

## 1-4 FAMILY RIDER
(Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **11th** day of **October, 2018** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Union Capital Mortgage Corporation, an Ohio Corporation**

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at: **10700 Clifton Boulevard, Cleveland, OH 44102.**

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                    Page 1 of 3                    FHA15F14RDU   0815
                                                                GINVRLU (CLS)



Electronically Filed 06/30/2023 16:10 / COMPLAINT / CV 23 978137 / Confirmation Nbr. 2898513 / CLJSZ

**LOAN #:**

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 18 is deleteu.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section **14**    of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                                Page 2 of 3                         FHA16F14RDU   0815
                                                                                   GINVRLU (CLS)



**LOAN #:**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.



_____ _____ (Seal)
ERIC SEME                     DATE

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3170 1/01
Modified for FHA 6/2015
Ellie Mae, Inc.                      Page 3 of 3                      FHA15F14RDU   0815
                                                                     GINVRLU (CLS)

## EXHIBIT "A"

### LEGAL DESCRIPTION

Case Number: 181708

Permanent Parcel No.: 001-17-033

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Brooklyn Township Lot No. 10 and bounded and described as follows:

Beginning on the Northerly line of Clifton Road, N.W., as dedicated in Volume 39 of Maps, Page 14 of Cuyahoga County Records, at a point distant Westerly measured along said Northerly line, 815 feet from its intersection with the Westerly line of West 104th Street as dedicated in Volume 40 of Maps, Page 21 of Cuyahoga County Records;

Thence Northerly at right angles from the Northerly line of Clifton Road, N.W., 175 feet;

Thence Westerly parallel with the Northerly line of Clifton Road, N.W., 50 feet;

Thence Southerly 175 feet at right angles to the Northerly line of Clifton Road, N.W.;

Thence Easterly along the Northerly line of Clifton Road, N.W., 50 feet to the place of beginning and being further known as Sublot No. 101 in the Edgewater Land Company's proposed Subdivision of part of Original Brooklyn Township Lot Nos. 9, 10, 11 and 12, as appears by said plat, be the same more or less.

The following is provided as an accommodation for informational purpose only. No insurance is provided over the same:

Subject premises is commonly known as: 10700 Clifton Blvd, Cleveland OH 44102

# EXHIBIT D

### Homeowner / Contractor Agreement

| | |
|---|---|
| Owner's Name: Eric Serna | Contractor's Name: Jeffrey Colvin |
| Co-Owner's Name: | Contractor Company: Colvin Contracting, Inc. |
| Address (Street): 10700 Clifton Blvd | Address (Street): 6507 Marsol Rd Suite 125 |
| Address (City State Zip): Cleveland, OH  44102 | Address (City State Zip): Mayfield Heights, OH 44124 |
| Phone: | Phone: 216-337-2037 |
| FHA Case No: | License No. (if resident): |

THIS AGREEMENT, made this date _____ 10/1/2018 _____ between the above mentioned
Homeowner (Owner) and the Contractor, is for the renovation/construction of the property located at
_____ 10700 Clifton Blvd, Cleveland, OH  44102 _____ that has been
approved for FHA mortgage insurance under section 203(k) of the National Housing Act, or Section 184
of the Housing and Community Development Act of 1992 or for the Conventional Renovation financing. The
Owner shall pay the Contractor the maximum sum of _____ $83,036.89 for the completion of
the work, including all sales tax due by law, together with such increases or decreases in the contract
price as may be approved in writing by the lender. The work will begin within 30 days of the loan closing
with the Lender and will be completed by this timeframe 6 months unless delayed beyond the contractors control.

The General Provisions listed below are made a part of this Agreement. The contract documents consist of the
architectural exhibits listed in the Construction or Renovation Loan Agreement between the Owner(s) and the Lender, or
as described below (or on an attached sheet):
1. Contract Documents: This Agreement includes all general provisions, special provisions and architectural exhibits that
were accepted by the lender. Work not covered by this agreement will not be required unless it is required by reasonable
inference as being necessary to produce the intended result. By executing this Agreement, the contractor represents that
he/she has visited the site and understands local conditions, including state and local building regulations and conditions
under which the work is to be performed.
2. Owner: Unless otherwise provided for in the Agreement, the owner will secure and pay for necessary easements,
exceptions from zoning requirements, or other actions which must precede the approval of a permit for this project. If
owner fails to do so then this contract is void. If the contractor fails to correct defective work or persistently fails to carry
out the work in accordance with the agreement or general provisions, the owner may order the contractor in writing to
stop such work, or a part of the work, until the cause for the order has been eliminated.
3. Contractor: The contractor will supervise and direct the work and the work of all subcontractors. He/She will use the
best skill and attention and will be solely responsible for all construction methods and materials and for coordinating all
portions of the work. Unless otherwise specified in the Agreement, the contractor will provide for and/or pay for all labor,
materials, equipment, tools, machinery, transportation, and other goods, facilities, and services necessary for the proper
execution and completion of the work. The contractor will maintain order and discipline among employees and will not
assign anyone unfit for the task. The contractor warrants to the owner that all materials and equipment incorporated are
new and that all work will be of good quality and free of defects or faults. The contractor will pay all sales, use and other
taxes related to the work and will secure and pay for building permits and/or other permits, fees, inspections and licenses
necessary for the completion of the work unless otherwise specified in the Agreement. The contractor will indemnify and
hold harmless the owner from and against all claim, damages, losses, expenses, legal fees or other costs arising or
resulting from the contractor's performance of the work or provisions of this section. The contractor will comply and
perform the work in accordance with all rules, regulations, laws, ordinances and orders of any public authority or HUD
inspector, Tribal inspector and/or Lender selected inspector bearing on the performance of the work. The contractor is
responsible for and indemnifies the owner against acts and omissions of employees, subcontractors and their employees,
or others performing the work under this Agreement with the contractor. The contractor will provide shop drawings,
samples, product data or other information provided for in this Agreement, where necessary.

4. **Subcontractor:** Selected by the contractor, except that the contractor will not employ any subcontractor to whom the owner may have a reasonable objection, nor will the contractor be required by the owner to employ any subcontractor to whom the contractor has a reasonable objection.

5. **Work By Owner or Other Contractor:** The owner reserves the right to perform work related to the project, but which is not a part of this Agreement, and to award separate contracts in connection with other portions of the project not detailed in this Agreement. All contractors and subcontractors will be afforded reasonable opportunity for the storage of materials and equipment by the owner and by each other. Any costs arising by defective or ill-timed work will be borne by the responsible party.

6. **Binding Arbitration:** Claims or disputes relating to the Agreement or General Provisions will be resolved by the Construction Industry Arbitration Rules of the American Arbitration Association (AAA) unless both parties mutually agree to other methods. The notice of the demand for arbitration must be filed in writing with the other party to this Agreement and with the AAA and must be made in a reasonable time after the dispute has arisen. The award rendered by the arbitrator(s) will be considered final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

7. **Cleanup and Trash Removal:** The contractor will keep the owner's residence free from waste or rubbish resulting from the work. All waste, rubbish, tools, construction materials, and machinery will be removed promptly after completion of the work by the contractor.

8. **Time:** With respect to the scheduled completion of the work, time is of the essence. If the contractor is delayed at anytime in the progress of the work by change orders, fire, labor disputes, acts of God or other causes beyond the contractor's control, the completion schedule for the work or affected parts of the work may be extended by the same amount of time caused by the delay. Extensions beyond 6 months are not allowed for the Streamline (K) Limited Repair program. The contractor must begin work no later than 30 days after loan closing and will not cease work for more than 30 consecutive days.

9. **Payments and Completion:** Payments may be withheld because of: (1) defective work not remedied; (2) failure of contractor to make proper payments to subcontractors, workers, or suppliers; (3) persistent failure to carry out work in accordance with this Agreement or these general conditions, or (4) legal claims. Final payment will be due after complete release of any and all liens

arising out of the contract or submission of receipts or other evidence of payment covering all subcontractors or suppliers who could file such a lien. The contractor agrees to indemnify the owner against such liens and will refund all monies including costs and reasonable attorneys' fees paid by the owner in discharging the liens. A 10 percent holdback is required by the lender to assure the work has been properly completed and there are no liens on the property. (Holdback not applicable to Streamline (K) Limited Repair program)

10. **Protection of Property and Persons:** The contractor is responsible for initiating, maintaining, and supervising all necessary or required safety programs. The contractor must comply with all applicable laws, regulations, ordinances, orders or laws of federal, state, county, tribal or local governments. The contractor will indemnify the owner for all property loss or damage to the owner

caused by his/her employees or his/her direct or subtier subcontractors.

11. **Insurance:** Insurance must be purchased and maintained until project completion. Proof of the insurance must be provided by either the contractor and/or the owner and validated by the Lender. The insurance includes:

A- Insurance necessary to protect from any damage to the owner(s) property resulting from the conduct of this contract.

B- Insurance necessary to protect from any claims under Workman's Compensation.

*Note: If applicable, Workman's Comp must be provided by the contractor. Workman's Comp insurance is not available for purchase by the Customer.*

12. **Changes in the Contract:** The owner may order changes, additions or modifications (using form HUD 92577) without invalidating the contract. Such changes must be in writing and signed by the owner and accepted by the lender. Not all change order requests may be accepted by the lender, therefore, the contractor proceeds at their own risk if work is completed without an

accepted change order.

13. Correction of Deficiencies: The contractor must correct promptly any work of his/her own or his/her subcontractors found to be defective or not complying with the terms of the contract.

14. Warranty: The contractor will provide a one-year warranty on all labor and materials used in the renovation of the property.

This warranty must extend one year from the date of completion of the contract or longer if prescribed by law unless otherwise specified by other terms of this contract. Disputes will be resolved through the Construction Industry Arbitration Rules of the American Arbitration Association.

15. Termination: If the owner fails to make a payment under the terms of this Agreement, through no fault of the contractor, the contractor may, upon ten working days written notice to the owner, and if not satisfied, terminate this Agreement. The owner will be responsible for paying the contractor for all work completed.

If the contractor fails or neglects to carry out the terms of the contract, the owner, after ten working days written notice to the contractor, may terminate this Agreement. The owner may finish the job by whatever reasonable method the owner deems expedient. If the cost of completion exceeds the contract balance, the difference, as well as reasonable attorneys' fees if necessary, will be paid to the owner by the contractor.

X _____  10/11/8
Owner Signature and Date

_____  10-1-203
Contractor Signature and Date

_____
Owner Signature and Date

**EXHIBIT E**

Loan Number: ███████
**Recording Requested By:**
**Caliber Home Loans, Inc.**

**and When Recorded Mail To:**
**Caliber Home Loans, Inc.**
**13801 Wireless Way**
**Oklahoma City, OK 73134**

CUYAHOGA COUNTY
FISCAL OFFICE - 1
04/09/2020 11:24:08 AM
**202004090382**

*Above space is intentionally left blank for recording data.*

MERS MIN# ████████
MERS Phone Number: 1-888-679-6377

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, **Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns,** the undersigned holder of a Mortgage (herein "Assignor") whose address is P.O. Box 2026, Flint, MI 48501-2026, does hereby grant, convey, assign and deliver to **Caliber Home Loans Inc.,** whose address is **13801 WIRELESS WAY, OKLAHOMA CITY, OK 73134,** all its right, title and interest in and to said Mortgage in the amount of **$259,447.00,** recorded in the **State of Ohio, Cuyahoga County, Official Records dated October 11, 2018** and recorded on **October 11, 2018** as Instrument No. **201810110552.**

Executed by: **ERIC SEME, AN UNMARRIED MAN** (Original Mortgagor)

Original Mortgagee: **Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation., its successors and assigns**

Property Address:   **10700 Clifton Blvd, Cleveland, OH 44102**

    IN WITNESS WHEREOF, the undersigned, has caused this **Assignment of Mortgage** to be executed by its duly authorized officer.

Date:
    April 01, 2020

**Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns**

By: _____
**Edwin Otzoy, Assistant Secretary**

### NOTARY ACKNOWLEDGEMENT

State of Oklahoma County of Oklahoma

On   April 01, 2020        before me, **Stephanie Burdick,** a Notary Public, personally appeared **Edwin Otzoy, Assistant Secretary of Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for Union Capital Mortgage Corporation, its successors and assigns,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
**Stephanie Burdick, Notary Public**          My commission expires: **08/24/2020**

Prepared by: **Nancy Ortiz**

**EXHIBIT F**

Doc # 202302060014  Recorded:  02/06/2023  08:20 AM     Page 1 of 1

PPN:         202302060014 RELA
             02/06/2023 08:20 AM
AMT  $0.00   RCPT# 202302060000003
CONV $0.00   PAID BY mail

*Natasha Chambers*

CUYAHOGA COUNTY FISCAL OFFICE

Loan Number ▮▮▮▮▮▮▮

### ASSIGNMENT OF MORTGAGE

**SEND ALL OTHER BORROWER OR LOAN RELATED CORRESPONDENCE TO:** Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, SC 29603-0826, Toll-free Phone: (800) 365-7107

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **CALIBER HOME LOANS, INC., WHOSE ADDRESS IS C/O 1100 VIRGINIA DRIVE, FORT WASHINGTON, PA 19034, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING, WHOSE ADDRESS IS 1100 VIRGINIA DR STE 125, FORT WASHINGTON, PA 19034, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage executed by: **ERIC SEME** (current owner) and recorded in the Record of Mortgages **AFN 201810110552** in the office of the Recorder of **CUYAHOGA, Ohio.**

Parcel ID Number 001-17-033

Dated on   01 / 06 /20 23  (MM/DD/YYYY).

**CALIBER HOME LOANS, INC., by NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING, its Attorney-in-Fact**

By: *Mary Mojica*

Mary Mojica
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA    COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on   1 / 6 /20 23  (MM/DD/YYYY), by Mary Mojica as VICE PRESIDENT of NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING as Attorney-in-Fact for CALIBER HOME LOANS, INC., who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

*Julie Martens*

Julie Martens
Notary Public - STATE OF FLORIDA
Commission expires: 05/22/2026

JULIE MARTENS
NOTARY PUBLIC
STATE OF FLORIDA
COMM# HH 243030
EXPIRES: MAY 22, 2026

When Recorded Return To: Shellpoint Mortgage Servicing, C/O Nationwide Title Clearing, LLC 2100 Alt. 19 North, Palm Harbor, FL 34683

**Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

[POA9293] SPTDA 435169380 SHELLPOINT   DOCR T052301-08:50:37 [C-1] FRMOHXI

*D0099037834*



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
June 30, 2023 16:10

By: WADE T. DOERR 0083430

Confirmation Nbr. 2898513

ERIC SEME                                          CV 23 978137

     vs.

                             **Judge:**  ASHLEY KILBANE

CALIBER HOME LOANS INC.

**Pages Filed:**  1



## Common Pleas Court of Cuyahoga County, Ohio
## Nailah K. Byrd, Clerk of Courts

## INSTRUCTIONS FOR SERVICE

Eric Seme
_____
Plaintiff(s)

Vs.
Caliber Home Loans, Inc. et al
_____
Defendants(s)

Case Number <u>CV-23-978137</u>

Judge: <u>Kilbane</u>

Date: <u>06/30/2023</u>

## Method of Service Requested:

Certified Mail Service ☑ Ordinary Mail Service ☐

Personal Service by the Sheriff of _____ County ____

Residence Service by the Sheriff of _____ County ____

Personal Service By Process Server _____

Residence Service by Process Server _____

Civ.R. 4.7 Waiver Requested _____

## Name(s) and Address(es) of Parties to Serve:

Caliber Home Loans, Inc. c/o CT Corp. System, 400 Easton Common Way, Ste 125, Columbus, OH 43219

Caliber Home Loans, Inc., 1525 S Belt Line Rd, Coppell, Tx 75019

Newrez LLC dba Shellpoint Mortgage Servicing, 1100 Virginia Dr., Ste 1225, Ft Washington, PA 19034

Newrez LLC c/o Corporation Service Co., 3366 Riverside Dr., Ste 103, Upper Arlington, OH 43221

## Additional Instructions:

Serve all the above with summons and amended complaint

_____

Filing Party Name: <u>Wade T Doerr</u>        Supreme Court ID if applicable: <u>0083430</u>

Phone Number: <u>234.402.4055</u>

*For Use by Sheriff or Process Server Only*

Number of Service Attempts:

Address for Service if Different from address included above: _____