**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

Eric Seme,                                              Case No.  1:23CV1521

        Plaintiff,

        -vs-
                                 **JUDGE PAMELA A. BARKER**

Caliber Home Loans, Inc., et al.,

        **Defendants**                          **MEMORANDUM OPINION & ORDER**

        -vs-

Elizabeth Del Consuelo Escobar Garay,

        **Third-Party Defendant**

Currently pending is the Motion of Defendants Caliber Home Loans, Inc. ("Caliber") and Newrez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") (referred to collectively as "Defendants") for Summary Judgment.  (Doc. No. 44.)  Plaintiff Eric Seme ("Plaintiff" or "Seme") and Third-Party Defendant Elizabeth Del Consuelo Escobar Garay a.k.a. Elizabeth Seme ("Mrs. Seme") filed a Brief in Opposition on December 1, 2025 (Doc. No. 52), to which Defendants replied on January 12, 2026 (Doc. No. 56).

For the following reasons, Defendants' Motion for Summary Judgment is (1) GRANTED as to the claims in Seme's First Amended Complaint; and (2) GRANTED as to Defendant Shellpoint's Counterclaims for Judgment and Foreclosure.

**I.     Factual Background**

      **A.     Seme obtains a mortgage and FHA Section 203(k) Rehabilitation Loan to purchase a duplex**

In 2018, Seme became interested in purchasing a duplex located at 10700-10702 Clifton Boulevard in Cleveland, Ohio (hereinafter "the Property").  He intended to reside in one of the units in the duplex and rent the other.  (Deposition of E. Seme (Doc. No. 47-1) at Tr. 13; Seme Decl. (Doc. No. 50) at PageID# 1451.)  After consulting with a "loan broker," Seme decided to finance his purchase of the Property through the Federal Housing Administration ("FHA") Section 203(k) Rehabilitation Mortgage Insurance Program.  (*Id*.)

The Section 203(k) Rehabilitation Mortgage Insurance Program "allows homebuyers to finance the purchase of a home ... , combining the cost of renovations, repairs, or remodeling into a single loan."  *See* Dept. of Housing and Urban Development ("HUD"), FHA Consumer Fact Sheet 105 (Rev. 11/4/2024).  "A portion of the loan proceeds are used to pay the seller ..., and the remaining funds are placed in an escrow account and released when the rehabilitation is completed."  *See* www.hud.gov/hud-partners/single-family-mortgage-programs-203k.  As part of his Section 203(k) Loan, Seme was required to work with an "FHA approved 203(k) Consultant" chosen by the lender, who "visits the home with borrower and prepares a work write-up and cost estimate."[1]  *See* www.hud.gov/hud-partners/single-family-203k.  The record reflects that Seme's 203(k) Consultant was Bruce Haynes.  (Deposition of J. Colvin (Doc. No. 51-1) at Tr. 43; Doc. No. 50-10 at PageID#s

---

[1] The FHA explains the role of the Section 203(k) consultant as follows: "The Consultant plays a guiding role throughout the rehabilitation process, acting as the liaison between the homeowner, contractor(s), and lender.  The Consultant inspects the property and prepares a feasibility study, architectural exhibits, work write-ups, cost estimates, draw request inspections, and change orders; and ensures that all work is performed in compliance with FHA requirements.  Any Consultant who performs work on a 203(k) project must be listed on the FHA-approved 203(k) Consultant Roster."  FHA Fact Sheet 103 (Rev. 2/27/23).

2

1579-1580.) In addition, Seme's Section 203(k) Loan required the lender's pre-approval of both the contractor and the proposed scope of renovation. (Seme Decl. at PageID# 1451.)

In preparation for executing the loan documents, Seme prepared a "Bid Specification" for his proposed renovation of the Property (hereinafter referred to as the "Seme Bid Specification"). (Seme Decl. at PageID# 1452; Doc. No. 50-5.) In June and July 2018, Seme submitted his Bid Specification to "qualified Section 203(k) contractors," including Colvin Contracting, Inc. (hereinafter "Colvin Contracting"). (Seme Decl. at PageID# 1452; Colvin Depo. at Tr. 12-13, 23-24.) According to Colvin Contracting's owner, Jeff Colvin ("Colvin"), the cost to perform the work on the Seme Bid Specification (Doc. No. 50-5) would have been in the $140,000-$150,000-dollar range. (Colvin Depo. at Tr. 23-24.) Colvin responded on September 26, 2018 with an Invoice for substantially less ($83,841.89) that called for only that work necessary to make the duplex "livable." (*Id*. at Tr. 19, 25-26; Doc. No. 51-2 at PageID#s 2083-2085; Doc. No. 50-10 at PageID#s 1563-1565.) Colvin described this Invoice as his bid for the project (hereinafter referred as "the Colvin Bid"). (Colvin Depo. at Tr. 19.) In a section marked "Terms & Conditions," the Colvin Bid provides as follows: "100% Down for all permits and materials on completion due to the timeline of the project." (Doc. No. 50-10 at PageID# 1565.)

Seme's Section 203(k) Consultant, Bruce Haynes, reviewed and approved the work set forth in the Colvin Bid on September 24, 2018.[2] (Doc. No. 51-2 at PageID# 2086.) Seme and Colvin thereafter signed the Colvin Bid document itself on October 1, 2018. (Doc. No. 50-10 at PageID#s

---

[2] Mr. Haynes also approved the permits for the project in September 2018. (Colvin Depo. at Tr. 26-30; Doc. No. 51-4 at PageID# 2159.)

1563-1565.)   As discussed in more detail below, Seme and Colvin Contracting also purportedly executed a "Homeowner/Contractor Agreement" for the project on that same date.  (Doc. No. 50-4.)

On October 11, 2018, Seme executed a number of documents relating to his purchase of the Property. The lender at this time was Union Capital Mortgage Corporation (hereinafter "Union Capital").  (Doc. No. 45 at PageID#s 783-784, 788-798, 800-801, 807-809.)  First, Seme granted a Note in the original principal amount of $259,447.00, with a fixed interest rate of 4.875% per annum, in favor of Union Capital (hereinafter referred to as "the Note").  (Payne Aff. (Doc. No. 45) at ¶ 9, PageID# 779; Doc. No. 45 at PageID#s 783-784; Doc. No. 50-2.)   Second, Seme granted a Mortgage securing the amount due under the Note and encumbering the Property, together with a Rehabilitation Loan Rider and a 1-4 Family Rider (hereinafter referred to as "the Mortgage").  (Payne Aff. at ¶ 11, PageID# 779; Doc. No. 45 at PageID#s 788-805; Doc. No. 50-3.)  Third, Seme entered into an FHA Section 203(k) Rehabilitation Loan Agreement with Union Capital in connection with the Note and Mortgage (hereinafter referred to as the "Rehab Loan Agreement").  (Payne Aff. at ¶ 13, PageID# 779; Doc. No. 45 at PageID#s 807-809; Doc No. 50-1.)  Fourth, Seme signed a document entitled "203(k) Borrower's Acknowledgment" (hereinafter "Acknowledgment").  (Payne Aff. at  ¶ 14, PageID# 779; Doc. No. 45 at PageID#s 811-812.)   The Court will refer to these documents collectively as "Seme's Mortgage Loan Documents."

The terms of the Rehab Loan Agreement are particularly relevant to the instant dispute.  That Agreement provides (in relevant part) as follows:

> 1. The loan will be in the principal sum of TWO HUNDRED FIFTY NINE THOUSAND FOUR HUNDRED FORTY SEVEN AND NO/100 Dollars ($259,447.00) to be advanced by the Mortgagee to the Borrower as provided in this Agreement and will be secured by a mortgage or deed of trust ('Mortgage'), which will be a first lien on the property.

2. Payments required under the mortgage or deed of trust must be made by the Borrower on the date specified, even though the proposed rehabilitation or improvement may not be completed, or the property may not be suitable for occupancy, on the anticipated date.

\*\*\*

4. The Mortgagee will place the portion of the principal amount of the mortgage allocated to the total Rehabilitation cost ($101,322.38), plus any reserves put up by the Borrower or others in cash, in a secured Interest bearing account, trust or escrow for the benefit of the Borrower (hereafter called 'Rehabilitation Escrow Account'). Mortgagee shall release Rehabilitation Escrow Account funds by check, payable to the Borrower and/or the contractor upon satisfactory completion of the rehabilitation in accordance with the Work Write-Up or Work Plan, as evidenced by a compliance inspection or other authorized method, and when the repairs and Improvements meet all federal, state and local laws, codes and ordinances, including required permits and inspections.

\*\*\*

10.  Borrower will cause all improvements to be made in a workmanlike manner and in accordance with all applicable statutes and regulations.  All licenses, permits and privileges required by local governmental authorities to rehabilitate the property will be obtained by the Borrower or contractor.

\*\*\*

15.  The Borrower will cause either this instrument or the construction contract under which improvements are to be made to be filed in the public records, if the effect of recording will be to relieve the mortgaged property from mechanics' and materialmen's liens.  The Mortgagee must obtain Lien Waivers, or equivalent, at the time of any disbursement of funds to ensure the validity of the first lien on the property.  If all work items to be performed by a contractor have not been completed at the time of draw request, the Mortgagee must obtain a partial conditional Lien Waiver for the work items that have been completed for each draw request.  Upon completion of the project, the Mortgagee will obtain a release of any and all liens arising out of the contract or submission or receipts or other evidence of payment covering all contractors, subcontractors or suppliers who could file a legal claim.

16.  Borrower must cause work to begin within 30 days following the date of this Agreement. Work must be performed with reasonable diligence; therefore, work is never to cease for more than 30 consecutive days. Should Borrower fail to comply with these terms, the Mortgagee may refuse to make any further disbursements under

this Agreement, and any funds remaining in the Rehabilitation Escrow Account must be used to reduce the mortgage principal.

(Doc. No. 45 at PageID#s 807-808.)  In addition, the Rehab Loan Agreement provides that "Borrower must have the work completed within SIX months following the date of this Agreement," i.e., by no later April 11, 2019.  (*Id*. at PageID# 809.)

Also relevant is the Acknowledgment signed by Seme.  Relevant here, the Acknowledgment provides that:

- I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner.  If I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified. I understand there is a 10 percent holdback on each Draw Request to assure the work is properly completed and for lien protection.

- I understand that I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association on any dispute.

  ***

- I understand that if I change contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed.  If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered.

(Doc. No. 45 at PageID# 811.)  Like the Rehab Loan Agreement, the Acknowledgment provides that "[t]he construction on the home must start within 30 days; if the construction ceases for more than 30 days, the lender may consider the loan in default or the lender can use the escrow money to have the work completed."  (*Id.*)  Lastly, the Acknowledgment provides that the Rehabilitation Escrow Account will "cease paying interest to [Seme] if (1) the loan payments are delinquent for more than

30 days; or (2) the completion date (or an approved extension) has expired[,]" and that "[d]uring this period, the interest will be paid down on the mortgage principal." (*Id*.)

The terms of the Rehabilitation Loan Rider to the Mortgage are also relevant to the instant dispute.  In relevant part, the Rehabilitation Loan Rider provides as follows:

> ADDITIONAL COVENANTS. In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows:
>
> A. Loan proceeds are to be advanced for the premises in accordance with the Rehabilitation Loan Agreement dated October 11, 2018, between Borrower and Lender. This agreement is incorporated by reference and made a part of this Security Instrument. No advances shall be made unless approved by the Secretary of Housing and Urban Development or a Direct Endorsement Underwriter.
>
> B. If the rehabilitation is not properly completed, performed with reasonable diligence, or is discontinued at any time except for strikes or lockouts, the Lender is vested with full authority to take the necessary steps to protect the rehabilitation improvements and property from harm, continue existing contracts or enter into necessary contracts to complete the rehabilitation.  All sums expended for such protection, exclusive of the advances of the principal indebtedness, shall be added to the principal indebtedness, and secured by the Security Instrument and be due and payable on demand with interest as set out in the Note.
>
> C. If Borrower fails to perform any obligation under the loan, including the commencement, progress and completion provisions of the Rehabilitation Loan Agreement, and such failure continues for a period of 30 days, the loan shall, at the option of Lender, be in default.

(Doc. No. 45 at PageID# 800.)

Lastly, as noted *supra*, Plaintiff and Defendants agree that Seme entered into a separate contract with Colvin Contracting for renovation work at the Property.  (Seme Decl. at ¶ 8, PageID# 1452; Doc. No. 44 at PageID# 759.)  This contract is titled "Homeowner/Contractor Agreement" and

is dated October 1, 2018.[3]  (Doc. No. 50-4.)  It purports to be between Seme and Colvin Contracting. However, (and although not acknowledged or addressed by the parties), the Court notes that the "Homeowner/Contractor Agreement" attached to Seme's Declaration is signed only by Seme -- it is not signed by a representative of Colvin Contracting.  (*Id*. at PageID# 1484.)

As all parties proceed under the assumption that this Agreement is valid, the Court will briefly recite its key terms.  The purported "Homeowner/Contractor Agreement" provides that "Owner [i.e., Seme] shall pay the Contractor the maximum sum of $83,016.89 for the completion of the work, including all sales tax due by law, together with such increases or decreases in the contract price as may be approved in writing by the lender." (*Id*. at PageID# 1482.)  Consistent with the Rehab Loan Agreement, the Homeowner/Contractor Agreement further provides that "[t]he work will begin within 30 days of the loan closing with the Lender and will be completed by this timeframe **6 months** unless delayed beyond the contractor[']s control." (*Id*.) (emphasis in original). The Homeowner/Contractor Agreement further provides, in relevant part:

> **2. Owner**:  *** If the contractor fails to correct defective work or persistently fails to carry out the work in accordance with the agreement or general provisions, the owner may order the contractor in writing to stop such work, or a part of the work, until the cause for the order has been eliminated.
>
> **3. Contractor**: The contractor will supervise and direct the work and the work of all subcontractors.  He/She will use the best skill and attention and will be solely responsible for all construction methods and materials and for coordinating all portions of the work.  Unless otherwise specified in the Agreement, the contractor will provide for and/or pay for all labor, materials, equipment, tools, machinery, transportation, and other goods, facilities, and services necessary for the proper execution and completion of the work.  ***
>
> ***

---

[3] Seme avers that the lender "provided its form of improvement contract ... between me and Colvin as part of the Loan application."  (Seme Decl. at ¶ 8, PageID#1452.) Colvin likewise testified that the Homeowner/Contractor Agreement was drafted by "the bank."  (Colvin Depo. at Tr. 15-16.)

**6. Binding Arbitration**: Claims or disputes relating to the Agreement or General Provisions will be resolved by the Construction Industry Arbitration Rules of the American Arbitration Association (AAA) unless both parties mutually agree to other methods. The notice of the demand for arbitration must be filed in writing with the other party to this Agreement and with the AAA and must be made in a reasonable time after the dispute has arisen. The award rendered by the arbitrator(s) will be considered final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(*Id*. at PageID#s 1482-1483.) Lastly, the Homeowner/Contractor Agreement provides that "if the contractor fails or neglects to carry out the terms of the contract, the owner [i.e., Seme], after ten working days written notice to the contractor, may terminate this Agreement." (*Id*. at PageID# 1484.)

Union Capital subsequently assigned Seme's Mortgage Loan Documents to Defendant Caliber. (Payne Aff. at ¶ 16, PageID# 780; Doc. No. 45 at PageID# 819.) On October 24, 2018, Caliber sent correspondence to Seme, advising him that "[o]n 12/1/2018, the servicing of your mortgage loan will transfer from Union Capital Mortgage Corporation to Caliber Home Loans, Inc." (Payne Aff. at ¶ 18, PageID# 780; Doc. No. 45 at PageID# 847.) In this correspondence, Caliber advised Seme (among other things) that he had the right to submit a Notice of Error, Request for Information, or Qualified Written Request, to request that Caliber "research an error or dispute regarding the servicing of your mortgage, or to request information or documentation regarding your mortgage." (Doc. No. 45 at PageID# 849.) Caliber expressly instructed Seme that any such Notice of Error, Request for Information, or Qualified Written Request was required to be sent to the specific address set forth in that letter.[4] (*Id*.) ("You must use this address to assert an error or request information.").

---

[4] The address provided by Caliber for Seme to send any Notice of Error, Request for Information, or Qualified Written Request is Caliber Home Loans, Inc., Attn: Customer Advocacy and Response Team, P.O. Box 270415, Oklahoma City, Oklahoma 73137-0415. (Doc. No. 45 at PageID# 849.)

**B.      Renovation work begins at the Property but Seme becomes dissatisfied and withholds funds from Colvin Contracting after speaking with Caliber.**

Colvin Contracting began the renovation work at the Property in late October 2018.  (Colvin Depo. at Tr. 98-99.)  According to Colvin, there were problems from the very beginning because (1) Colvin expected that the duplex would be "cleaned out" beforehand but it was not; (2) the gas had been turned off and there turned out to be problems with the gas tanks; and (3) there were delays associated with the changeover from Union Capital to Caliber.  (Colvin Depo. at Tr. 31-32, 107, 109-110, 122.)  Colvin testified that resolving and addressing these issues created additional costs and set them back "almost a month."  (*Id*. at Tr. 32.)  Once the duplex was "cleaned out" and the gas tank problems had been resolved, Colvin testified that his crew (among other things) demoed the kitchens and bathrooms, removed carpet, drywalled, painted the downstairs, repaired the garage, and performed some masonry/tuckpointing work.  (*Id*. at Tr. 32-35, 38-39, 90, 111-116.)  Colvin further testified that he began having disagreements with Seme because Seme "started trying to change a whole bunch of stuff that had nothing to do with the contract" and "wanted things that [were] not in" Colvin's Bid, including cleaning out the duplexes prior to commencing the work, installing expensive kitchen fixtures that were not in the bid, painting the basement, etc.[5]  (*Id*. at Tr. 32-33, 35-36, 38, 52, 84-86, 87, 94, 97, 121-122, 126.)  According to Colvin, Seme "still wanted the $140,00 and $150,000 worth of work" set forth in Seme's Bid Specification, even though Seme and Colvin had only agreed to the $83,841.89 worth of work in the Colvin Bid.  (*Id*. at Tr. 23, 52, 87, 125-126.)

By contrast, Seme testified that the problems with the renovation project at the Property were all Colvin's fault.  Specifically, Seme avers that "Colvin demanded advances from the loan before

---

[5] Colvin also testified that Seme "interfered" with Colvin's work by having other contractors hired outside the contract present and working in the duplex while Colvin's crew was attempting to work.  (*Id*. at Tr. 42-43, 82-83.)

10

completion of the work, contrary to the loan covenants, which required the Contractor to advance costs and seek reimbursement only for completed work." (Seme Decl. at ¶ 12, PageID# 1452.) Seme further avers that, beginning on or about December 1, 2018, he "was having difficulty getting [Colvin] to show up and do any work because [he] was demanding early disbursements of funds before he would proceed." (*Id*. at ¶ 10, PageID# 1452.) Seme also avers that he "complained to [Colvin] concerning the quality of the work and lack of progress where work had stalled after the demolition stage." (*Id*. at ¶ 11, PageID# 1452.) Seme testified that he communicated with Caliber regarding his concerns about Colvin. (Seme Depo. at Tr. 27-31.)

Things came to a head around the time of the first "draw request" for the renovation of the work at the Property, which occurred in early December 2018.[6] Seme testified that he spoke with Caliber Project Analyst Sherry McFadden shortly before Mr. Haynes' inspection for the first draw request. (Seme Decl. at ¶ 13, PageID# 1452.) According to Seme, Ms. McFadden told him to sign the draw request form before it was filled in[7] and, then, "if any of the work they listed on [the draw

---

[6] The 203(k) Rehab Loan Program requires that renovation funds placed in escrow be released in "draws" as work passes inspection by the FHA 203(k) Consultant. Specifically, as explained on the HUD website, the "Repair/Improvements Stage" of the 203(k) Program proceeds as follows: "(1) Contractor obtains necessary permits prior to the start of the project; (2) Contractor completes the first phase of the project; (3) Borrower contacts the 203(k) Consultant to request an inspection for draw release; (4) Consultant and borrower inspect the work and Consultant certifies work is satisfactory; (5) Consultant and borrower sign the draw release and submit to lender for payment.; (6) Lender issues a two-party check made payable to borrower and contractor; [and] (7) This process continues until all work is completed." *See* www.hud.gov/hud-partners/single-family-203k.

[7] Seme directs this Court's attention to two documents relating to the first draw request. (Seme Decl. at ¶ 13, PageID# 1452-1453.) The first is a form entitled "Request for Acceptance of Changes in Approved Drawings and Specifications" (hereinafter "Request for Acceptance Form"). (Doc. No. 50-6 at PageID# 1534-1535.) The copy of the Request for Acceptance Form that is attached to Seme's Declaration is not filled out. (*Id*.) It is dated December 4, 2018 and contains the signatures of both Seme and Colvin (but not the signature of Mr. Haynes). (*Id*.) The second form is entitled "Draw Request HUD 203k" (hereinafter "Draw Request Form"). (Doc. No. 50-7 at PageID#s 1536-1537.) The Draw Request Form is filled out and is signed by Seme and Colvin on December 4, 2018, and by Mr. Haynes on December 5, 2018. (*Id*.)

11

request] wasn't totally complete at the time of the draw, that I would withhold the check ... until it was completed." (Seme Depo. at Tr. 18.)  In his Declaration, Seme explains further, as follows:

> Shortly before December 4, 2018, Caliber's representative Sherry McFadden proposed the idea of issuing a joint check payable to me and Colvin, but to withhold the check from Contractor if he did not complete the work relating to the payment and only to release it to Colvin after acceptable work was completed. This still required me to authorize payment of work that was not yet done. Caliber representatives assured me that Caliber would resolve the conflict with Colvin.

(Seme Decl. at ¶ 13; PageID# 1452.)

Meanwhile, Colvin testified that he prepared an invoice in the total amount of $25,918.70 for the work completed to that point[8] and submitted it to Mr. Haynes for purposes of the first draw request (hereinafter "Colvin's December 2018 Invoice").  (Colvin Depo. at Tr. 69-70; Doc. No. 51-3 at PageID# 2093.)  Colvin testified that he and Seme met with Mr. Haynes at the Property for an inspection that same day.  (*Id*. at Tr. 46-48, 78-80.)  Colvin testified that, after the inspection, Mr. Haynes filled out the "Draw Request HUD 203k" form (hereinafter "Draw Request Form") based on the information in Colvin's December 2018 Invoice[9] and then submitted it to Caliber.  (*Id*.)  Specifically, Colvin testified:

> Q:  Were you present with Bruce around 12/4, 12/5 when this was done at the property?
>
> A:  Yes.

---

[8] Colvin's December 2018 Invoice lists specific "line items" corresponding to the Draw Request Form (such as for masonry, garage, walks, windows, framing, decorating, plumbing, demo, etc.) and then indicates the percentage that each such line item has been completed.  For example, Colvin's December 2018 Invoice provides (in part) as follows: "Line Item 7 Walks 70% complete; Line Item 13 windows screens 100% complete," etc.  (Doc. No. 51-3 at PageID# 2093.)

[9] As set forth on the Draw Request Form, Mr. Haynes approved the $25,918.70 invoiced by Colvin, less a 10% holdback of $2,591.87, for a "total amount due borrower" of $23,326.83. (Doc. No. 50-7 at PageID# 1536-1537.) The record also reflects that Mr. Haynes filled out the Request for Acceptance Form that was signed by Seme and Colvin on December 4, 2018.  (Doc. No. 50-10 at PageID# 1584.)  In the completed Request for Acceptance Form, Mr. Haynes approved a payment of $1,098.00 for "additional cost for dumpsters."  (*Id*.)  Mr. Haynes signed the completed Draw Request and Request for Acceptance Forms on December 5, 2018.  (*Id*.)

Q:      Was it both days or one day?

A:      It was one day.  [Mr. Haynes] came out and me and Eric Seme met him at the house. We did the walkthrough.  He took pictures. He was there for the draw and then he left.  He said he had to finish doing his end as far as putting the numbers in and the percentages because he didn't do that then.  He just wanted to come look, take the pictures and make sure the work was done.  He made a list of what was done and asked was everything to his liking and had us both sign [the Draw Request Form] and then he left.

Q:      So he didn't sign until the next day?

A:      I guess once he finished his work and he did what he had to do.

Q:      Okay. So you're telling me that he was probably there on 12/4 and both you and Eric signed on 12/4?

A:      Yes.

Q:      And then he probably signed after he was done with his work on 12/5?

A:      Yes.

Q:      Okay.  And Eric was there when this all happened or part of the time?

A:      Yes.  He was a little late but he came.

(*Id*. at Tr. 47-48.)  *See also* Doc. No. 51-3 at PageID#s 2091-2092.  Later, Colvin again explained as follows:

Q:      Now, was the [Draw Request], was it totally completed except for the signatures?

A:      No.  No, it was not.  What [Mr. Haynes] did was he came out, he walked with me and Eric around the house, took pictures.  He asked Eric, Are you okay with this? Is this acceptable? Yes. Check. Is this acceptable? Is this okay? Yes. Check. So after he did that we signed the paperwork and then he went and put his findings and Eric's okays on the paperwork and then submitted it to the bank.

Q:      Okay. So Bruce wasn't done with the paperwork when you signed on the 4th and he finished it up on the 5th?

13

A:      Exactly.  Like I explained earlier.  **

(*Id*. at Tr. 80.)

On December 11, 2018, Caliber approved the Draw Request for $25,918.00 for "repairs" plus $1,098.00 for the "additional cost for dumpsters" on the Request for Acceptance Form, minus a 10% "retainage holdback," for a total of $24,315.03.  (Doc. No. 50-10 at PageID# 1586.)  Caliber then released a check for $24,315.03, made out jointly to Seme and Colvin Contracting.  (*Id*.)

Seme, however, refused to disburse the check after concluding that the completed Draw Request Form (as signed by Mr. Haynes on December 5, 2018) was "fraudulent" and "did not align with what [he] knew was going on at the property."  (Seme Depo. at Tr. 17, 31-32.)  Instead, Seme avers that he "followed [Caliber's] instructions and withheld the check from [Colvin]."  (Seme Decl. at ¶ 14, PageID# 1453.)  Seme further avers that he "demanded that [Colvin] perform the itemized work before I would release payment" because "[i]f I did otherwise, I was advised by Lender's representative that I would not be legally protected if Caliber did not perform."  (*Id*.)  When Seme refused to sign the check, Colvin stopped all work on the Property.  (Colvin Depo. at Tr. 52.)  Colvin testified that his last day of work on the Property was January 12, 2019.  (*Id*.)

Seme testified that he alerted Caliber regarding his concerns regarding the completed Draw Request Form that was signed by Mr. Haynes.  (Seme Depo. at Tr. 30-31.)  On January 30, 2019, Seme emailed Ms. McFadden, as follows:

> I know I have told you many times in person but I wanted to make sure it's in writing. I signed that draw request under what I now know to be false pretenses.  I have copious evidence of malfeasance by Jeff Colvin.  At this point [C]aliber [L]oans is constructively aiding and abetting this fraud.
>
> There must be some way to move on in circumstances such as these.  Insisting on a lien release before allowing further construction is causing me real financial damages.

14

> Please provide a path forward.  Please forward this to you[r] management and legal teams.

(Doc. No. 47-1 at PageID# 1443.)

On February 6, 2019, Colvin filed a Mechanic's Lien on the Property with the Cuyahoga County Fiscal Office in the amount of $28,649.20.  (Seme Decl. at ¶ 16, PageID# 1453; Colvin Depo. at Tr. 51; Doc. No. 51-3 at PageID# 2099.)  Seme responded by terminating the Homeowner/Contractor Agreement.  (Seme Decl. at ¶ 16, PageID# 1453.)

### C.      Seme retains counsel and stops paying the Mortgage.

Seme retained counsel.  On March 25, 2019, Seme's counsel (Attorney Nate Hall) emailed Ms. McFadden to inquire (1) how Seme could get a different contractor approved; and (2) whether Seme could perform the work himself instead.  (Doc. No. 50-10 at PageID#s 1894-1895.)  The following day, Caliber representative Kandice McPhail responded that, because Colvin Contracting had placed a lien on the property, "we will not be able to approve [a new] contractor."  (*Id.*)  Ms. McPhail also reminded Attorney Hall that the Homeowner/Contractor Agreement between Seme and Colvin Contracting included an arbitration provision.  (*Id.*)  Regarding whether Seme could perform the renovation work himself instead of hiring a new contractor, Ms. Phail noted that the HUD website references the possibility of executing a "Rehabilitation Self-Help Agreement" but stated that she would "need to confirm" whether Seme could complete this process.  (*Id.*)

On March 27, 2019, Attorney Hall expressed concern that "the loan documents require work to be completed [by] April 11, 2019, which is 15 days from today."  (*Id.* at PageID# 1894.)  Attorney Hall inquired as follows: "If my client cannot proceed with renovations using the 203k loan proceeds, what are the options in terms of reforming the loan down to just the purchase price, or alternatively, using the renovation funds to pay the balance down [?]"  (*Id.*)

When he did not receive a response, Attorney Hall sent a letter to Caliber's Legal Department on April 5, 2019.  (*Id*. at PageID#s 1890-1891.)  Therein, Attorney Hall represented, in relevant part:

After beginning work on the property, my client soon learned that Colvin was completing grossly substandard work, and was claiming completion of tasks that upon inspection, had not even been started. Colvin submitted draw requests for the substandard and incomplete work, in the amount of $28,649.20.  However, a consultant brought in by my client could verify that less than $2,000.00 of work was actually completed by Colvin.  Accordingly, my client refused to approve the draw requests.  However, Ms. McFadden advised my client, against his wishes, to approve the draw in full, but to have the check made out to both my client and Colvin.  After the check was issued, it became clear that Colvin was unwilling and unable to complete the work for which the draw request was made.  As a result, my client was forced to withhold payment to Colvin.  Colvin, in response, has filed a mechanic's lien on the property for the full $28,649.20.

\*\*\*

My client is currently in an untenable position thanks to Caliber's instructions to approve the draw request in favor of Colvin.  Caliber has indicated that work cannot proceed with a new contractor that my client seeks to retain, because that contractor has not been approved to complete work by Caliber.  At the same time, Caliber will not approve a new contractor until the lien is resolved, which in practical terms cannot happen without litigation given Colvin's current position.  When my client has inquired about resolving the lien, Caliber staff has requested "proof of arbitration process," and a copy of a "10 day letter sent to contractor advising of termination of contract agreement," without explanation for the request.  My client and I are unaware of any contract provision that requires either of these, or of the agreement that states Caliber will not approve new contractors because a negligent contractor has placed an unfounded lien on the property. Caliber has to date not provided copies of these contracts despite multiple requests.

The loan requires all renovations to be completed by April 11, 2019, which is 6 days from the date of this letter.  My client must complete work on the property, so he can move in and comply with the terms of the loan. In the interest of mitigating his and Caliber's potential damages, he has continued work on the property.

My client has accessed alternative unsecured financing to complete the work originally laid out in Calvin's bid and approved by Caliber. We have inquired with Ms. McPhail regarding the possibility of: 1) Executing a "Self Help Agreement," referenced in the Rehabilitation Loan Agreement, in order to return to compliance with said agreement's terms, 2) the possibility of reforming the loan down to the purchase price since the renovation funds will not be needed, or 3) using the

renovation funds to pay down the principle of the loan to the purchase price.  Caliber has provided no answer as to its willingness to entertain our proposal.

(*Id*. at PageID#s 1891-1892.)

Caliber National Operations Manager Craig Mellman responded via letter dated April 26, 2019.  (*Id*. at PageID#s 1899-1901.)  Therein, Mr. Mellman enclosed copies of Seme's Mortgage Loan Documents and the Homeowner/Contractor Agreement and asserted that:

Caliber's review found that this was a standard borrower-contractor dispute, involving the homeowner's dissatisfaction with the contractor's work. Instructions for dispute resolution are outlined in the documents provided herein. Mr. Seme was made aware of the procedures at the beginning of the loan process and consented in full via his signature on each document.

(*Id*.)  Regarding "the delays, cost overruns, or dissatisfaction with [Seme's] choice of contractor," Mr. Mellman noted that, in the Acknowledgment, Seme agreed that he "understand[s] [that] I am responsible to negotiate any and all agreements with the contractor(s) I select and that HUD suggests that the Agreement with the contractor should include a provision for binding arbitration with the American Arbitration Association for any dispute." (*Id*.)  Mr. Mellman also directed Seme's attention to the arbitration clause in the Homeowner/Contractor Agreement.  (*Id*.)  Lastly, in response to Seme's request that Caliber identify the contractual provision that provides that a new contractor cannot be approved while a lien is being resolved, Mr. Mellman pointed to Paragraph 15 of the Rehab Loan Agreement.[10]  (*Id*.)

---

[10] As noted *supra*, this Paragraph provides (in relevant part) that: "The Borrower will cause either this instrument or the construction contract under which improvements are to be made to be filed in the public records, if the effect of recording will be to relieve the mortgaged property from mechanics' and materialmen's liens. *The Mortgagee must obtain Lien Waivers, or equivalent, at the time of any disbursement of funds to ensure the validity of the first lien on the property. If all work items to be performed by a contractor have not been completed at the time of draw request, the Mortgagee must obtain a partial conditional Lien Waiver for the work items that have been completed for each draw request*." (Doc. No. 45 at PageID# 808) (emphasis added).

Seme avers that his counsel thereafter "demanded a true payoff from Caliber reflecting the undisbursed funds" on several occasions but that Caliber failed to respond.  (Seme Decl. ¶¶ 18, 19; PageID#s 1453-1454.)  The record, however, reflects that Caliber sent a letter to Seme on June 10, 2019, which provided the payoff on his mortgage "in response to [his] recent request."  (Doc. No. 50-10 at PageID#s 1597-1598.)  At this time, Caliber reported that the payoff amount for Seme's Mortgage was $259,998.19.  (*Id*.)

Seme failed to submit his monthly mortgage payment in November 2019.  On December 21, 2019, Caliber sent a letter to Seme advising him that his mortgage payment was past due.  (Doc. No. 50-10 at PageID# 1600.)  In addition, and on that same date, Caliber sent a letter to Seme, notifying him as follows:

> Your account is now past due, and we would like to remind you of certain 203(k)/Homestyle program participation guidelines that impact the Renovation project for your loan:
>
> · Payment default and disbursements: No disbursements in relation to the Renovation project will be made until the account is brought current.
>
> · Please alert the Contractor that no payments will be made for completed work if the account is in default.  Disbursements may resume once the account is brought current.
>
> · Renovation timeline: All work must be completed within six months of closing your loan. There are no extensions on the project timeline if the loan is in default. Extensions may be considered once the loan is brought current.
>
> · Work must begin within 30 days of the closing of your loan.  If work does not begin within this time, your loan may also be considered in default.

(Payne Aff. at ¶ 19, PageID# 780; Doc. No. 45 at PageID# 855).  Caliber sent similar letters to Seme in January 2020.  (Doc. No. 45 at PageID# 857; Doc. No. 50-10 at PageID# 1604.)

On February 20, 2020, Caliber sent a formal notice to Seme that he was "in default under the terms of the documents creating and securing your Loan ..., including the Note and Deed of

18

Trust/Mortgage/Security Deed ... for failure to pay amounts due." (Payne Aff. at ¶ 21, PageID# 780; Doc. No. 45 at PageID#s 861-863.) Two days later, a Caliber representative visited the Property to discuss loss mitigation options. (Payne Aff. at ¶ 24, PageID# 780; Doc. No. 45 at PageID#s 871-872.) According to the Field Visit Results form generated on that date, Seme was present during the site visit and the Property "appeared to be in good condition with no visible damage or required repairs." (Doc. No. 45 at PageID# 871.) On February 25, 2020, Caliber sent another letter to Seme advising him that his account was past due. (Payne Aff. at ¶ 22, PageID# 780; Doc. No. 45 at PageID# 866.)

On April 15, 2020, Seme's new counsel (Attorney Christopher Soukup) sent a letter to Caliber's Legal Department. (Doc. No. 50-10 at PageID# 1651.) Therein, Attorney Soukop wrote that: "My client was forced to proceed with the rehabilitation of the duplex with his own funds without any draws from the loans' rehabilitation fund. In the interim, monthly payments have been made, keeping the loan balance current. We suggest setting aside the rehabilitation portion of the loan as those monies have never been disbursed." (*Id*.)

On July 9, 2020, Seme (through counsel) faxed a "Payoff Request with authorization" to Caliber. (Doc. No. 50-10 at PageID# 1660-1661.) On July 13, 2020, Caliber sent a letter to Seme "in response to your recent request." (*Id*. at PageID# 1656.) Therein, Caliber advised Seme that the payoff on his mortgage loan was $267,184.24. (*Id*.) In that same letter, Caliber also advised that "[i]f you have 203K or renovation funds, insurance claims funds, or remaining escrow balance, these funds will be refunded 21 days after your loan is paid in full." (*Id*.)

On August 10, 2020, Caliber sent a letter to Seme, stating that it was "concerned about the default of your mortgage" and offering a list of loss mitigation programs.  (Doc. No. 50-10 at PageID# 1668.)  Caliber sent a similar letter to Seme on February 8, 2021.  (*Id*. at PageID# 1720.)

The record reflects Caliber sent payoff letters to Seme on June 11, 2021 and July 13, 2021.  (Doc. No. 50-10 at PageID#s 1768, 1776.)  According to these letters, Seme's payoff amount in June 2021 was $288,849.06. and his payoff amount in July 2021 was $290,148.47.  (*Id*.)

### D.     Colvin files suit in state court

Meanwhile, on March 16, 2021, Seme filed a "Notice to Lien Holder to Commence Suit" against Colvin Contracting in the Cuyahoga County Office of Fiscal Officers.  (Seme Dec. at ¶ 20, PageID# 1454; Doc. No. 47-1 at PageID# 1378.)

In response, on May 12, 2021, Colvin Contracting filed a Complaint in the Cuyahoga County Court of Common Pleas against (1) Seme; (2) Seme's wife, Elizabeth Del Consuelo Escobar Garay a.k.a Elizbeth Seme (hereinafter "Mrs. Seme"); (3) Caliber; and (4) "Unknown Tenant, if any of 10700-10702 Clifton Boulevard, Cleveland, Ohio."  *See Colvin Contracting, Inc. v. Seme, et al*., Cuyahoga County Court of Common Plea Case No. CV-21-947513 (hereinafter "Lien Litigation").  Therein, Colvin Contracting asserted claims for breach of contract, unjust enrichment, and foreclosure.  (*Id*.)  Colvin Contracting subsequently filed an Amended Complaint on November 18, 2021, in which it raised the same claims and added the Cuyahoga County Treasurer as a defendant.  (*Id*.)

Seme and Mrs. Seme (hereinafter "the Semes") filed an Answer, Counterclaim and Crossclaim.  (*Id*.)  In their Counterclaim, the Semes asserted claims against Colvin Contracting for breach of contract, violations of Ohio Rev. Code §§ 4722.01 *et seq*., and slander of title.  (*Id*.)  In

their Crossclaim, the Semes asserted claims against Caliber for breach of contract, interference with contract, and indemnity/contribution.  (*Id*.)

The state court docket sheet reflects that the parties engaged in written and deposition discovery through July 2022.  The parties then participated in a settlement conference on July 26, 2022, during which the Semes and Colvin Contracting settled all claims between them.  The Semes did not, however, reach a resolution as to their crossclaims against Caliber.

The state trial court conduced a pretrial conference on August 31, 2022.  The court noted that "Colvin Contracting and Seme are finalizing their settlement and will be submitting dismissals soon." (*Id*.)  The court further noted that "Seme and Caliber are working on a loan modification, which would resolve Seme's claims against Caliber."  (*Id*.)

Colvin Contracting and the Semes subsequently filed a Notice of Dismissal with prejudice, which the state trial court entered on October 11, 2022.[11]  (*Id*.)  On November 25, 2022, the state court issued a journal entry indicating that Seme and Caliber "remain engaged in loss mitigation and [Seme] is not prepared to prosecute his crossclaim at this time."  (*Id*.)  Thus, the state court dismissed Seme's crossclaim against Caliber without prejudice.  (*Id*.)

**E.      Shellpoint assumes Seme's Mortgage.  Seme completes renovation work at his own expense but does not pay the Mortgage.**

On November 8, 2022, Defendant Shellpoint sent a letter to Seme advising that, effective November 2, 2022, the servicing of his mortgage loan had transferred from Caliber to Shellpoint. (Payne Aff. at ¶ 25, PageID# 780; Doc. No. 45 at PageID#s 874-888.)  Shellpoint further advised that

---

[11] Seme avers that, as part of this settlement, he paid $8,000 to Colvin, which Colvin agreed to accept "in exchange for an apology."  (Seme Decl. at ¶ 22, PageID# 1454.)  He further avers that: "During the lien litigation, the Lender's counsel offered to disburse money from the Loan to pay Colvin $30,000 for the work they did not complete, which only emboldened Colvin's position."  (*Id*. at ¶ 21, PageID# 1454.)

21

"our records indicate that your January 1, 2020 payment is due" and that "as of the date of this letter, your principal balance is $255,197.31 and your escrow balance is -$25,254.12."  (Doc. No. 45 at PageID# 877.)  In addition, Shellpoint informed and instructed Seme (in relevant part) as follows:

> RESPA Section 6 and Section 12 give you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within five (5) business days of receiving your request.  A "qualified written request" is a written correspondence - other than writing on a payment coupon or other payment-related documents supplied by your servicer - that includes your name, account number, and reasons for the request. Send all qualified written requests to Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, SC 29603; or you can call 866-317-2347.
>
> No later than thirty (30) days (not including weekends and legal public holidays) after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute.
>
> ***
>
> Notice of Error or Information Request Address: You have certain rights under Federal law related to resolving errors in the servicing of your loan and requesting information about your loan.  If you want to request information about your loan or if you believe an error has occurred in the servicing of your loan and would like to submit an Error Resolution or Informational Request, please write to us at the following address: Shellpoint Mortgage Servicing P.O. Box 10826 Greenville, SC 29603.

(*Id*. at PageID#s 878-880.)

On April 6, 2023, Shellpoint sent a default letter to Seme.  (Payne Aff. at ¶ 26, PageID# 781; Doc. No. 45 at PageID#s 891-897.)  Therein, Shellpoint noted that Seme had failed to make any of his mortgage payments from January 1, 2020 through April 2023.  (Doc. No. 45 at PageID#s 891-892.)  Shellpoint notified Seme that he could cure the default on his mortgage by making a payment of $87,722.48 by May 11, 2023.  (*Id*.)

Meanwhile, and although he had not made a mortgage payment since December 2019, Seme avers that he and his wife nonetheless spent a considerable amount of their own funds to "restore

22

habitability" to the duplex and "mitigate damages."  (Seme Decl. at ¶¶ 25-27, PageID#s 1454-1455.) Specifically, Seme avers that, between January 2019 and May 2020, he incurred more than $100,000 in out-of-pocket expenses and credit card charges to renovate, repair, and improve the Property.  (*Id*.) Seme further avers that he has incurred "attorneys' fees of approximately $10,000 at the outset of the dispute with the lender, $25,000 in attorneys' fees to resolve the mechanic's lien foreclosure with the Contractor, and another $16,000 in attorney fees for this action, with such fees continuing to accrue." (*Id*. at ¶ 24, PageID# 1454.)

Lastly, Seme avers that, "on or about June 28, 2023, I requested a statement of interest on the undisbursed funds from [Shellpoint] by telephone, but after several misdirected calls through customer service and various departments [Shellpoint] was unwilling or unable to provide a response to the request."  (*Id.* at ¶ 30, PageID# 1456.)

## II.   Procedural History

On April 17, 2023, Seme filed a Complaint against Caliber in the Cuyahoga County Court of Common Pleas asserting the following claims:  (1) "Lender's Breach of Contract- Injunctive Relief;" (Count One) (2) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq*. (Count Two); (3) violations of the Real Estate Sales Practices Act ("RESPA"), 12 U.S.C. § 2607 (Count Three); (4) violations of the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code § 1345.02(F) (Count Four); and (5) tortious interference with contract (Count Five).  (Doc. No. 1-1 at PageID#s 18-59.)  *See also Seme v. Caliber Home Loans Inc*., Cuyahoga County Court of Common Pleas Case No. CV-23-978137.  According to the state court docket sheet, Seme did not perfect service of the Complaint on Caliber.

23

On June 30, 2023, Seme filed a First Amended Complaint in state court against Caliber and Shellpoint.  (Doc. No. 1-1 at PageID#s 63-106.)  Therein, Seme asserted the same five claims as set forth above and added a sixth claim against Shellpoint for violation of 15 U.S.C. § 1641.  (*Id*.)  Seme perfected service of the First Amended Complaint on Caliber and Shellpoint on July 10, 2023.  (Doc. No. 1 at PageID# 2.)   On August 4, 2023, Caliber and Shellpoint removed Seme's state court case to the instant Court on the basis of both diversity and federal question jurisdiction.  (Doc. No. 1.)

On September 22, 2023, Caliber and Shellpoint filed an Answer to Seme's First Amended Complaint.  (Doc. No. 12.)   In addition, Shellpoint filed Counterclaims against Seme and his "Unknown Spouse, if any" for Judgment and a Decree in Foreclosure.  (*Id*.)  In its Counterclaim for Judgment (Count One), Shellpoint alleges that "[t]here is due to Shellpoint from Plaintiff the outstanding principal balance of $255,197.31, plus interest on the outstanding principal balance at the rate of 4.87500% percent per annum from December 1, 2019, plus any late charges, advances made for the payment of taxes, assessments, insurance premiums, costs incurred in the enforcement of the Note, and costs incurred for the protection of the Property under Section 5301.233 of the Ohio Revised Code, less a credit in the amount of $96,088.89."  (*Id*. at PageID# 594.)  In its Counterclaim for Foreclosure (Count Two), Shellpoint alleges that Seme's Mortgage was assigned to Shellpoint on April 9, 2020 and February 6, 2023.[12]   (*Id*. at PageID# 595.)  Shellpoint alleges that it is "the mortgagee of record" and that "[t]he conditions in the Mortgage have been broken by reason of defaults under the terms of the Note and Loan Rehabilitation Agreement."  (*Id*.)

---

[12] The Exhibits attached to Shellpoint's Counterclaim reflect that the Mortgage was assigned from Union Capital to Caliber on April 9, 2020 and from Caliber to Shellpoint on February 6, 2023.  (Doc. Nos. 12-5, 12-6.)

24

Seme filed an Answer to the Counterclaims on October 13, 2023. (Doc. No. 13.) Subsequently, the parties submitted an Agreed Order substituting Mrs. Seme for the "Unknown Spouse, if any" named in Shellpoint's Counterclaim. (Doc. No. 28.) Mrs. Seme later filed an Answer to the Counterclaims. (Doc. No. 29.)

Meanwhile, the parties filed a Joint Motion for Referral to Mediation in September 2023. (Doc. No. 9.) The Court granted the Motion and referred the case to Magistrate Judge James Grimes to conduct mediation proceedings. (Doc. No. 10.) Magistrate Judge Grimes set a mediation conference for December 12, 2023, which was then reset for January 4, 2024. Judge Grimes conducted the mediation conference on January 4, 2024, but the parties were not able to reach an agreement. (Doc. No. 21.) Judge Grimes conducted further mediation proceedings on February 7, 2024 and later provided the parties with a "mediator's proposal," but the matter did not resolve.

On March 7, 2024, the Court conducted a Case Management Conference ("CMC"), at which various case management deadlines were set. (Doc. No. 26.) The non-expert discovery, expert discovery, and dispositive motions deadlines were extended five times at the parties' request. (Doc. Nos. 34, 36, 37, 39, 41.)

On September 29, 2025, Caliber and Shellpoint filed a Motion for Summary Judgment, in which (1) both Defendants seek judgment in their favor as to all of Seme's claims in the First Amended Complaint, and (2) Shellpoint seeks judgment in its favor as to its Counterclaims for Judgment and Foreclosure. (Doc. No. 44.) After receiving two extensions of time, the Semes filed a Brief in Opposition on December 1, 2025. (Doc. No. 52.) Caliber and Shellpoint filed a Reply Brief on January 12, 2026. (Doc. No. 56.)

### III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.  At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."

26

*Ask Chems*., 593 Fed. Appx at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc*., 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

### A.    Defendants' Motion for Summary Judgment as to Plaintiff's Claims

As noted above, in his First Amended Complaint, Seme asserts the following six claims:  (1) "Lender's Breach of Contract- Injunctive Relief;"  (Count One) (2) violations of TILA (Count Two); (3) violations of RESPA (Count Three); (4) violations of the OCSPA (Count Four); (5) tortious interference with contract (Count Five); and (6) violation of 15 U.S.C. § 1641 by Shellpoint.  (Doc. No. 1-1 at PageID#s 63-74.)  Defendants move for summary judgment in their favor with respect to each of these claims.  (Doc. No. 44.)  The Court will address each of Seme's claims separately below, beginning with his claim for tortious interference with contract.

### 1.    Tortious Interference with Contract (Count Five)

In Count Five, Seme alleges that Caliber tortiously interfered with his contract with Colvin Contracting in three ways.  (Doc. No. 1-1 at PageID#s 71-73.)  First, Seme alleges that "Lender interfered in the contract formed when Seme accepted a qualified bid from Colvin[,] when Lender insisted upon its own form of contract between Seme and Colvin that did not fully represent the intentions of the parties"  (*Id*.)  Second, Seme alleges that "Lender again interfered with Plaintiff's contract with Colvin during the building process by telling Borrower to order a distribution check payable to both Seme and Colvin before the related work was performed, and to simply withhold the check if Colvin did not perform the work according to the disbursement approval, which advice was

in violation of the terms of the Loan." (*Id*.) Third, Seme alleges that "[d]uring the litigation with Colvin, Seme and Colvin attempted early mediation which may have been successful but for Lender offering to pay Colvin from the undisbursed portion of the Loan for the unfinished work in dispute," which "emboldened Colvin to press on with his claim at considerable expense to Seme." (*Id*.) The Court will refer to the above claims, respectively, as Seme's First, Second, and Third Tortious Interference Sub-Claims.

In their Motion for Summary Judgment, Defendants argue that Seme's tortious interference sub-claims fail for multiple reasons. (Doc. No. 44 at PageID#s 771-774.) Defendants first assert that Shellpoint is entitled to judgment its favor on all three sub-claims because "all of the actions that are alleged to be 'interference' occurred prior to Shellpoint's servicing of the Mortgage Loan." (*Id*.) Regarding Seme's First Tortious Interference Sub-claim (i.e., allegedly requiring Seme and Colvin to enter into the Homeowner/Contractor Agreement), both Defendants Caliber and Shellpoint argue that they are entitled to judgment in their favor because "this part of the claim appears to pertain to actions that took place at the origination of the Mortgage Loan between Union Capital and Seme." (*Id*.) Defendants note that "[n]either Caliber nor Shellpoint were the original lenders, and the servicing of the Mortgage Loan did not formally transfer to Caliber until after Seme signed his agreement with Colvin." (*Id*.)

Even assuming that Caliber and/or Shellpoint could be held responsible for actions allegedly taken by Union Capital, Defendants maintain that they are entitled to judgment because "the alleged interference involves the original formation of the contract with Colvin." (*Id.*) In other words, Defendants maintain, Seme's First Tortious Interference Sub-claim fails because "Seme and Colvin agreed to the terms of their contract after the supposed requirements from Union Capital were

included."  (*Id.*)  Defendants further assert that this Sub-claim fails because Union Capital was justified in requiring language in the Homeowner/Contractor Agreement that "it believed would help protect its interest in the Property securing the Mortgage Loan."  (*Id.*)

Regarding Seme's Second Tortious Interference Sub-claim (i.e., allegedly telling Seme to "order a distribution check payable to both Seme and Colvin before the related work was performed and to simply withhold the check if Colvin did not perform the work"), Defendants argue that they are entitled to judgment because "Seme does nothing to show that Caliber **required** Seme to withhold the funds from Colvin."  (*Id.*) (emphasis in original).  Specifically, Defendants maintain that Seme cannot show that Caliber intentionally procured a breach of the Homeowner/Contractor Agreement because "Seme had the ability to perform under the contract with Colvin once Caliber provided him the check, and it was Seme's own decision to withholds those funds due to his dispute with Colvin."  (*Id.*)

Lastly, regarding Seme's Third Tortious Interference Sub-claim (i.e., allegedly offering to pay Colvin $30,000 from the undisbursed portion of the Loan as part of the Lien Litigation), Defendants argue that "Seme fails to show how this alleged interference by Caliber caused a breach in the agreement between Seme and Colvin, as the parties were already in ongoing litigation concerning the Contractor Agreement and the mechanic's lien."  (*Id.*)  Defendants further maintain that Caliber was "justified in taking actions to potentially resolve the mechanic's lien on the Property to protect its own interests."  (*Id.*)

In his Brief in Opposition, Seme does not acknowledge or address Defendants' argument that Shellpoint is entitled to judgment in its favor as to each of the Tortious Interference Sub-claims in Count Five because all of the actions that are alleged to be "interference" occurred prior to

Shellpoint's servicing of the Mortgage Loan. (Doc. No. 52 at PageID#s 2366-2370.) Seme also fails to acknowledge or address Defendants' arguments that both Caliber and Shellpoint are entitled to judgment in their favor as to Seme's First and Third Tortious Interference Sub-claims; i.e., Seme's claims that Defendants tortiously interfered by requiring Seme and Colvin to enter into the Homeowner/Contractor Agreement, and by offering to pay Colvin from the undisbursed portion of the Loan as part of the Lien Litigation. (*Id.*)

In light of Seme's lack of opposition, the Court finds that Seme has abandoned (1) all of his Tortious Interference Sub-claims against Shellpoint; and (2) his First and Third Tortious Interference Sub-claims against Caliber. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *Dulaney v. Flex Films (USA), Inc.*, 2021 WL 3719358 at * 5 (6th Cir. Aug. 23, 2021); *Brown v. VHS of Mich., Inc.*, 545 Fed. Appx 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Lisan v. Wilkie*, 835 Fed. Appx 831, 834–35 (6th Cir. 2020); *Alexander v. Carter ex rel. Byrd*, 733 Fed. Appx 256, 261 (6th Cir. 2018); *Nowlin v. Nova Nordisk Inc.*, 2018 WL 1805141 at *3 (6th Cir. Feb. 28, 2018); *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 Fed. Appx 567, 568 (6th Cir. 2015); *Hicks v. Concorde Career Coll.*, 449 Fed. Appx 484, 487 (6th Cir. 2011). Accordingly, the Court finds that Shellpoint is entitled to summary judgment in its favor with respect to Count Five of the First Amended Complaint. The Court further finds that Caliber is entitled to summary judgment its favor with respect to Seme's First and Third Tortious Interference Sub-claims.

The only remaining claim in Count Five, then, is Seme's Second Tortious Interference Sub-claim against Caliber; i.e., that Caliber tortiously interfered with Seme's contract with Colvin

Contracting by "telling [Seme] to order a distribution check payable to both Seme and Colvin before the related work was performed and to simply withhold the check if Colvin did not perform the work." (Doc. No. 1-1 at PgeID# 72.)  Seme opposes Caliber's argument that it is entitled to summary judgment with respect to this sub-claim.  (Doc. No. 52 at PageID#s 2366-2370.)  Specifically, Seme argues that there are genuine issues of material fact regarding whether Caliber intentionally procured a breach of his contract with Colvin Contracting by advising him to withhold the distribution check and, if so, whether Caliber was justified in doing so.  (*Id.*)  Seme maintains (in relevant part):

> Caliber's representative (Sherry McFadden) was involved in the dispute between Seme and Colvin. Her involvement went beyond directing Seme to the terms of the Loan and Rehabilitation Agreement and set off the chain-of-events that led to Colvin stopping work on the Property in January 2019, the filing of the mechanic's lien on February 6, 2019, and the subsequent litigation in Ohio state court.
>
> McFadden spoke with both parties, knew about Seme's problems with the project (since he called her about them and asked for options), provided responses to Seme's questions, and ultimately proposed the idea of issuing a joint check payable to Seme and Colvin, but to withhold the check from Contractor if he did not complete the work relating to the payment and only to release it to Colvin after acceptable work was completed. In fact, Seme was also told that, if any of the work listed on the draw request was not "totally complete at the time of the draw," he could withhold the check. (That belies Caliber's argument that it was Seme's decision to withhold the funds, not Caliber's).
>
> That led to the execution and submission of the Request for Acceptance of Changes in Approved Drawings and Specifications and Caliber's subsequent issuance of the joint check, which means it was payable to Colvin and Seme. Caliber invariably inserted itself into the contractual relationship between Colvin and Seme by issuing a check that was payable to both of them.
>
> When Seme followed those instructions by demanding that Colvin perform the itemized work before Seme released the payment, Colvin (who had begun the demolition work) abandoned the project and refused to release the Property to another contractor, thereby leaving Seme with two uninhabitable sides of a duplex that formerly had functioning kitchens and baths but then had none. Seme's testimony is supported by his contemporaneous documentation of McFadden's involvement and direction through his January 30, 2019 email to her.  Caliber points the finger at Seme for him withholding the payment to Colvin, but Caliber was involved.

(*Id*. at PageID#s 2366-2367) (internal citations to the record omitted).  Seme maintains that Caliber then made matters worse by refusing to approve a new contractor and refusing to release the loan proceeds to allow Seme to perform the work himself.  (*Id*. at PageID# 2368.)  Based on the above, Seme argues that "at the very least, if there is any question about what led to the breach, Caliber's involvement in it, and whether the evidence suggests that Caliber's involvement contributed to the breach of contract, then that is an issue of material fact that cannot be resolved by dispositive motion."  (*Id*. at PageID# 2369.)

Lastly, Seme asserts that Caliber cannot establish that it was justified in interfering in his contract with Colvin Contracting.  (*Id*.)  He argues that this is because "there was no ongoing litigation concerning the Homeowner/Contractor Agreement and the mechanic's lien when Caliber acted" and, even if there was, "Colvin did not file the mechanic's lien until *after* McFadden[] instructed Seme and issued the joint check that started the chain-of-events that led to that filing and the subsequent litigation."  (*Id*.)  In sum, Seme asserts that "McFadden's participation raises genuine issues of material fact both as to whether Caliber contributed to the alleged breach of contract by Colvin and whether those actions were improper, particularly if, as Caliber appears to argue, it was acting to protect its own interests."  (*Id*.)

In their Reply Brief, Defendants insist that it was Seme's decision (and Seme's decision alone) to withhold the funds from Colvin Contracting.  (Doc. No. 56 at PageID#s 2391-2396.)  Defendants further maintain that "even if Caliber's representative encouraged Seme to withhold the funds, Seme fails to explain how Caliber['s] actions – by providing a check made payable to Seme and Colvin, and then ultimately leaving it up to Seme as to whether he gave the check to Colvin— could constitute a tortious interference with the contract between Seme and Colvin."  (*Id*.)  Citing

32

Colvin's deposition testimony, Defendants assert that "it was the dispute between Seme and Colvin, and not any actions of Caliber, that resulted in the breakdown between Seme and Colvin."  (*Id*.) Lastly, to the extent Seme argues that Caliber's refusal to approve a new contractor after Colvin Contracting filed its Mechanic's Lien constitutes tortious interference, Caliber argues that this argument is without merit because Caliber's actions were expressly permitted under Sections 15 and 16 of the Loan Rehab Agreement.  (*Id*.)

To establish tortious interference with contract under Ohio law, a plaintiff must show: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages."  *NCR Corp. v. Korala Assocs., Ltd.,* 512 F.3d 807, 817 (6th Cir. 2008) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853 (1999)).  *See also US Herbs, LLC v. Riverside Partners, LLC,* 711 Fed. Appx. 321, 328 (6th Cir. 2017); *Wellington Corp. LLC v. Gennari Consulting, Inc.,* 631 F.Supp.3d 464, 477 (N.D. Ohio 2022); *BCG Masonic Cleveland, LLC v. Live Nation Entertainment, Inc*., 570 F.Supp.3d 552, 557 (N.D. Ohio 2021). *See also Kenty v. Transamerica Premium Ins. Co*, 650 N.E.2d 863, 866 (Ohio 1995) ("One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.")(quoting 4 Restatement (Second) of Torts § 766 (1979).)

Here, Caliber maintains that Seme has failed to come forward with sufficient evidence to show a genuine issue of material fact as to the third element of this claim, i.e., that Caliber

33

intentionally procured a breach of the contract between Seme and Colvin Contracting.[13] "'Intentional procurement' refers to conduct that causes the third party to breach the contract, or that leaves the third party with no choice but to breach the contract." *Union of Needletrades, Indus. and Textile Employees AFL-CIO v. American Capital Strategies, Ltd.,* 546 F.Supp.2d 546, 561 (S.D. Ohio 2008) (citing Restatement (Second) of Torts § 766 cmt. h.)  *See also Waldren v. Allstate Vehicle and Property Ins. Co.*, 2020 WL 5214608 at * 10 (S.D. Ohio Sept 1, 2020).  To establish this third element, a plaintiff "must either (1) prove that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) prove that the defendant knew that interference was certain or substantially certain to occur as a result of its actions." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1041 (Ohio App. 12th Dist. 2015).  *See also Waldren*, 2020 WL 5214608 at * 10; *Sparks v. Fitzhugh*, 2023 WL 6383814 at * 6-7 (N.D. Ohio Sept. 29, 2023).

For the following reasons, the Court finds that Seme has failed to come forward with sufficient evidence from which a reasonable jury could conclude that Caliber intentionally procured a breach of the contract between Seme and Colvin Contracting.  Even construing the evidence in a light most favorable to Seme, there is simply no evidence that Caliber instructed or otherwise required Seme to knowingly sign an inaccurate draw request form and then withhold the distribution check from Colvin Contracting until the work was completed to Seme's satisfaction.  Rather, the evidence shows that

---

[13] Caliber does not dispute that Seme has established the first and second elements of his Second Tortious Interference Sub-claim; i.e., the existence of a contract between Seme and Colvin Contracting and Caliber's knowledge of the same. As noted *supra*, however, the copy of the Homeowner/Contractor Agreement attached to Seme's Declaration (Doc. No. 50-4) contains only Seme's signature – it does not contain the signature of a representative of Colvin Contracting. Thus, the Court questions whether there is, in fact, sufficient evidence of a valid and enforceable Homeowner/Contractor Agreement between Seme and Colvin Contracting before this Court. However, throughout their summary judgment briefing, the parties do not question that both Seme and Colvin Contracting executed the Homeowner/Contractor Agreement.  For purposes of this Opinion only, therefore, the Court will do the same. Moreover, the Court notes that Colvin's Bid for the renovation work at the Property was signed and dated by both Seme and Colvin.

34

Seme reported his concerns about Colvin Contracting's work to Ms. McFadden and asked her for "options" regarding how to handle the situation.  (Seme Depo. at Tr. 27-31; Doc. No. 52 at PageID# 2366.)  According to Seme, Ms. McFadden then "***proposed the idea*** of issuing a joint check payable to [Seme] and Colvin, but to withhold the check from [Colvin] if he did not complete the work relating to the payment and only release it to Colvin after acceptable work was completed."  (Seme Decl. at ¶ 13, PageID# 1452) (emphasis added).  Seme himself acknowledges that Ms. McFadden's idea was just that -- an "idea" – and not an order, mandate, or requirement.  To the contrary, Ms. McFadden's proposed idea left the decision up to Seme whether to disburse the first draw request payment to Colvin Contracting.[14]  And it is undisputed that it was Seme who chose not to disburse the first draw request payment to Colvin Contracting—not Caliber.[15]

---

[14] Although not addressed by either party, the Court notes that Caliber cut the check for the first draw request only after its FHA 203(k) Consultant, Mr. Haynes, personally inspected the property and signed off on the work outlined in Colvin's December 2018 Invoice.  Moreover, as discussed *supra*, it is undisputed that Seme and Colvin were both present for Mr. Haynes' inspection.  Seme has not argued or come forward with any evidence that he expressed any concerns regarding the quality or degree of completion of Colvin's work to Mr. Haynes during the inspection.  Nor has Seme otherwise come forward with any evidence that, at the time of Mr. Haynes' inspection, he requested or urged Mr. Haynes not to sign off on any or part of the work set forth in Colvin's December 2018 Invoice.  Seme offers no explanation regarding his failure to do so.  The Court does note that Seme testified he was "told that it was standard procedure" for him to sign the Draw Request before it was filled in by Mr. Haynes and that he would have a chance to review the completed Draw Request Form before it was submitted to Caliber.  (Seme Depo. at Tr. 18.) Seme also testified that it "was his understanding" that it "was somewhat normal to list some things on the draw that ... were in the process to be completed."  (*Id*.)  However, this still does not explain why Seme apparently failed to raise his concerns directly to Mr. Haynes during the inspection, particularly given the degree to which he believes Colvin failed to complete the work set forth in Colvin's December 2018 Invoice.

[15] Notably, Seme made this decision despite expressly agreeing to the following provisions in the Borrower's Acknowledgment: (1) "I understand the contractor(s) is responsible to complete the work described in the architectural exhibits in a workmanlike manner.  If I agree the work has been properly completed, I will sign the Draw Request, form HUD-9746-A, thereby accepting the responsibility that the completed work is acceptable and payment is justified;" and (2) "I understand that if I change contractor for any reason, I may be obligated under the terms of the original contractor's agreement and I should seek legal advice before taking such action. If I disagree with the contractor regarding the acceptable completion of the work, I can request an inspection by the fee inspector to determine if the work has been properly completed.  If an agreement cannot be made with the contractor, the lender may hold the money until such time as an agreement is reached or an arbitrator's decision is rendered."  (Doc. No. 45 at PageID# 811.)

35

Moreover, Seme himself asserts that Colvin Contracting had already allegedly breached its contract with Seme *before* Ms. McFadden proposed that Seme withhold the first draw request payment.  Specifically, Seme testified that, in or around November 2018, he began "having difficulty getting [Colvin] to show up and do any work because [Colvin] was demanding early disbursements of funds before he would proceed."  (Seme Decl. at ¶¶ 10 -12, PageID# 1452.)  *See also* Seme Depo. at Tr. 28-29.  Seme further avers that, around this same time, he complained to Colvin about "the quality of the work and lack of progress."  (Seme Decl. at ¶ 11, PageID# 1452.)  Indeed, Seme testified that, it was *because of* Colvin's alleged failure to complete the work in a timely and/or workmanlike fashion that he (i.e., Seme) reached out Ms. McFadden for "options" just prior to the December 4, 2018 inspection by Mr. Haynes.  (*Id*. at ¶ 13, PageID# 1452.)  And, according to Seme, the reason he ultimately decided to follow Ms. McFadden's suggestion of withholding the first draw request payment was because Colvin Contracting had *already* breached its contract with Seme by failing to satisfactorily complete the work outlined in the Draw Request Form submitted by Mr. Haynes to Caliber.  In other words, the evidence shows that Seme's dispute with Colvin Contracting existed well prior to Ms. McFadden's proposal that he withhold the check, which refutes Seme's argument that it was Caliber that interfered with his contract with Colvin Contracting.

Seme argues, however, that his claim nonetheless survives because Colvin Contracting further breached its contract with Seme after Seme followed Ms. McFadden's suggestion and withheld the first draw request payment.  Specifically, Seme asserts that Ms. McFadden's advice "set off the chain of events that led to Colvin stopping work on the Property in January 2019, the filing of the mechanic's lien on February 6, 2019, and the subsequent litigation in Ohio state court."  (Doc. No. 52 at PageID# 2366.)  This argument is without merit.  The Court agrees with Caliber that there is no

genuine issue of material fact that Colvin's decisions to stop work and file a mechanic's lien were because of actions taken and decisions made by Seme – not Caliber.  Colvin testified that, even prior to the first draw request, he was having significant issues with Seme because Seme "started trying to change a whole bunch of stuff that had nothing to do with the contract" and "wanted things that [were] not in [Colvin's] original bid."  (Colvin Depo. at Tr. 32-36, 38, 52, 84-87, 97, 121-122, 126, 129.) For example, Colvin testified that: "[T]he issue we w[ere] having and the holdup was [Seme] was wanting things that wasn't in the contract that he was trying to get done or wanted me to do that was not in the budget or the contract.  *** And that's where it ultimately came to the point where I said, you know what, it's enough.  It's just enough." (*Id*. at Tr. 129.)  In particular, regarding Seme's decision to withhold the first draw request payment, Colvin testified:

> Q:    And the last thing you did on the 12th day of January -- what were you working on when you finished the project or when you stopped?

> A:    Well, we had finished up -- because we were still working. I mean, if you look at the text messages, you know, we hadn't stopped working even though we hadn't been paid.  So we were wrapping up his side -- the side he was going to live [in]. We w[ere] doing the electrical panels and doing some demo. Like I said, it was four years ago, I can't remember exactly what it was. At that point in time is when the check had c[o]me -- they had disbursed the check.  When he demanded some things that he wanted that weren't in the contract and when I disagreed, then he wouldn't sign the check.

> Q:    So was there a discussion of a change order or he just thought they were already in the contract?

> A:    Again, his spec sheet -- he's still on his spec sheet. He's not on what we agreed to and what he signed his name to.

> ***

> A:    Where I got irritated and said I'm not even doing the work is when he started talking like he's not going to pay me. He's going to give me what he wants.  So that's where the conflict came in at. And that's when Bruce Haynes and the bank got involved because I told him I can't work like this.

37

(*Id.* at Tr. 52, 85-86.)

In light of the above, the Court finds that the relationship between Seme and Colvin Contracting had already seriously deteriorated by the time of the first draw request, due to the escalating disagreements between Seme and Colvin regarding the scope of work and the quality of the work completed.  Because of these disagreements, Seme reached out to Ms. McFadden for ideas and advice on how to address his concerns about Colvin Contracting.  While Seme now maintains that Ms. McFadden's proposed idea of withholding the disbursement check was a bad one, the fact remains that it was up to Seme to decide how best to address his concerns about Colvin Contracting in light of the terms of both the Homeowner/Contractor Agreement and his Mortgage Loan Documents.  In the end, it was Seme (and Seme alone) that made the decision to withhold the distribution check and refuse to release any of the funds to Colvin Contracting.

Accordingly, and for all the reasons set forth above, the Court finds that Seme has failed to come forward with sufficient evidence to show that Caliber intentionally procured a breach of Seme's contract with Colvin Contracting.  Caliber is, therefore, entitled to summary judgment in its favor with respect to Seme's Second Tortious Interference Sub-Claim.[16]

### 2.    Breach of Contract (Count One)

In Count One, Seme alleges a claim for breach of contract.  (Doc. No. 1-1 at PageID#s 68-69.)  The entirety of Seme's claim is as follows: "Since the purpose of the Loan and related Improvement Contract was frustrated and it cannot be performed within the time permitted under its

---

[16] Because the Court finds that Seme has failed to come forward with sufficient evidence regarding the third element of his tortious interference claim (i.e., that Caliber intentionally procured a breach of Seme's contract with Colvin Contracting), the Court need not (and does not) address Caliber's arguments regarding the fourth element of Seme's tortious interference claim (i.e., lack of justification).

terms, Plaintiff seeks entry of a judgment for injunctive relief ordering the Lender to provide a true payoff statement of the actual money disbursed, less late fees and penalties; and ordering Lender to accept payment for same over a three-year term or as otherwise permitted by law." (*Id.*)

Defendants seek summary judgment in their favor with respect to this claim because "Seme fails to identify any specific terms of an agreement that were supposedly breached by Caliber or Shellpoint." (Doc. No. 44 at PageID#s 762-764.)  Defendants maintain that, to the extent Seme claims that Defendants breached the Mortgage Loan documents by failing to provide a "true payoff," Defendants are entitled to judgment in their favor because "Seme was already in material breach of the Mortgage Loan when he supposedly requested the payoff" in April 2020 and July 2020.  (*Id.*) Lastly, Defendants argue that, to the extent Seme is seeking specific performance, he is not entitled to this form of relief because he has failed to show that a remedy at law would be inadequate.  (*Id.*)

In response, Seme argues that his breach of contract claim "follows from his tortious interference claim." (Doc. No. 52 at PageID#s 2370.)  He maintains:

> There is no dispute that the loan documents specifically applied $101,322.33 of the Loan and Mortgage balance ($259,447) to the Property's rehabilitation and that not all of those funds for rehabilitation were disbursed, for, even as of the filing, Defendants' corporate designee attest[s] that there is a balance of $96,088.89 in the Rehabilitation Escrow Account.  ***
>
> [Shellpoint] and its predecessor Caliber have been sitting on the undisbursed funds and refusing to apply them back to the loan principal despite Seme's repeated requests to do so, since they refused to reimburse him for his self-help construction expenses and refus[ed] to allow him to engage another contractor to work under the Loan until the dispute with Colvin was resolved.  The only response from Defendants, as shown by their own payoff calculations, is that they will not apply them and that Seme is wrongfully responsible for every dollar, plus interest and penalties on the undisbursed funds, even though he has not been able to use the full amount of what for [sic] he is being charged.
>
> Defendants have consistently refused to reduce the principal balance by the unused amount of the Rehabilitation Balance, including after it has been shown that Seme

brought the Property into habitability.  And that violates the letter and spirit of the Rehabilitation Loan Agreement, of which Section 13 says that "[a]ny funds for self-help items remaining in the Rehabilitation Escrow Account after completion of the rehabilitation must be used to reduce the principal balance."

(*Id.* at PageID#s 2370-2371) (internal citations to the record omitted).  Seme insists that "[w]here, as here, the homeowner-borrower never accesses the rehabilitation funds for reasons that arguably include – and certainly involve genuine issues of material fact [regarding]– the servicer's actions that prevent the homeowner-borrower from accessing those funds and that contribute to the circumstances that put the homeowner-borrower in a position where the funds cannot be accessed, the homeowner-borrower should not be charged for monies that he never used."  (*Id.* at PageID#s 2371-2372.)

In sum, Seme appears to assert that Defendants breached the Mortgage Loan Documents by failing to provide a payoff statement that properly credits him with the "unused rehabilitation funds." (*Id.*)  And, although he acknowledges that "Shellpoint says that the principal should be adjusted by the balance in the escrow account,"[17] Seme maintains that Defendants "still calculated the interest, penalties, costs, late fees, and other charges on the larger balance."  (*Id.*)  Regarding Defendants' argument that they are entitled to judgment because Seme was already in material breach when he requested a "true" payoff statement, Seme maintains that "this ignores that ... Caliber breached its obligations under the Loan and fails to take into account Caliber's actions that led to the current situation."  (*Id.*)  Lastly, Seme asserts that this Court should reject Defendants' argument that his claim for specific performance fails because Seme has no remedy at law, because "this ignores Defendants' position ... that Seme does not have any remedy at law, including under RESPA."  (*Id.* at PageID# 2374.)

---

[17] In its Counterclaims for Judgment and Foreclosure, Shellpoint expressly notes that Seme should be credited the amount of $96,088.89; i.e., the amount of the undisbursed Section 203k rehab funds.  (Doc. No. 12 at PageID#s 595-596.)

40

In their Reply Brief, Defendants argue that "Seme has still failed to identify any specific breach of a contract by Caliber or Shellpoint, that he performed under the contracts related to the Mortgage Loan, or that he is entitled to any of the relief sought in the Amended Complaint." (Doc. No. 56 at PageID#s 2390, 2396.)  Defendants note that the only specific contract provision cited by Seme in his Brief in Opposition is Section 13 of the Rehab Loan Agreement. (*Id*.)  Defendants argue, however, that this Section is inapplicable because it relates to borrowers who (unlike Seme) have entered into Self-Help Agreements with the lender. (*Id*. at PageID# 2397.)  Defendants further assert that Seme's breach of contract claim fails because Caliber did, in fact, send multiple payoff letters to Seme in 2019 and 2020. (*Id*.)  Defendants again assert that, at the time of his alleged April 2020 and July 2020 payoff requests, Seme was in material breach for failure to pay his mortgage. (*Id*.)  Lastly, Defendants maintain that, under the express terms of the Note, Defendants properly calculated the interest and other charges based on the total amount of Seme's mortgage loan. (*Id*. at PageID# 2398.)

"Under Ohio law,[18] the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 Fed. Appx. 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp*., 678 F.3d 459, 465 (6th Cir. 2012)).  *See also Gerling & Associates, Inc. v. Odulair, LLC*, 2017 WL 2790669 at * 7 (S.D. Ohio June 28, 2017).  "As the Sixth Circuit has explained, 'it is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached.'" *Doe v. BMG Sports, LLC*, 584 F.Supp.3d 497, 507 (S.D. Ohio

---

[18] Section 15 of the Mortgage provides that "[t]his Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." (Doc. No. 45 at PageID# 795.)  As Seme's breach of contract claim is governed by state law and the Property is located in Cleveland, Ohio, this Court applies Ohio law.

2022) (quoting *Northampton Rest. Group, Inc. v. FirstMerit Bank, N.*A. 492 Fed. Appx. 518, 522 (6th Cir. 2012). *See also Foster v. Health Recovery Servs.*, 493 F.Supp.3d 622, 640 (S.D. Ohio 2020) (observing that "[t]he Sixth Circuit does not permit a party to allege, in a cursory manner, the existence of a contract without citing to specific language that was allegedly breached"); *BCG Masonic Cleveland, LLC.,* 570 F.Supp.3d at 560 (noting that a plaintiff who "fails to point to a specific contract provision that has been breached falls short" of establishing a breach of contract claim).

For the following reasons, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Seme's breach of contract claim.  As Defendants correctly note, the only contract provision cited by Seme in his summary judgment briefing is Section 13 of the Rehab Loan Agreement.  That Section provides as follows:

> **For a Borrower performing his/her own work under a Rehabilitation Self-Help Agreement**, the Rehabilitation Escrow Account will include funds for labor and material costs for each work item to be completed by the Borrower.  The Borrower will be reimbursed for the actual cost of materials only.  The Borrower cannot be reimbursed for labor. The funds resulting from the difference between the estimated and actual costs of materials, as well as the funds escrowed for labor costs, will remain in the Rehabilitation Escrow Account until all of the work is complete and may then be used for additional improvements to the property.  No cash may be paid to the Borrower.  **Any funds for self-help items remaining in the Rehabilitation Escrow Account after completion of the rehabilitation must be used to reduce the principal balance.**

(Doc. No. 45 at PageID# 808) (emphasis added).  By its express terms, however, Section 13 only applies to borrowers that have entered into a "Rehabilitation Self-Help Agreement" with the lender. Seme, however, has not argued (or come forward with any evidence) that he entered into a "Rehabilitation Self-Help Agreement" with Defendants relating to the Property.  Therefore, the Court agrees with Defendants that Section 13 of the Rehab Loan Agreement is inapplicable and cannot form

the basis of Seme's breach of contract claim.  And Seme fails to direct this Court's attention to any other provision in the Mortgage Loan Documents that required Defendants to provide a statement that calculated Seme's payoff amount by crediting his undisbursed Section 203k rehabilitation funds towards the principal amount of the loan.

The Court further notes that Caliber sent payoff letters to Seme on several occasions between 2019 and 2021, in which it expressly acknowledged and addressed the issue of unused Section 203k rehabilitation funds.  For example, in its June 10, 2019 payoff letter, Caliber advised Seme that his total payoff amount was $259,998.19 and explained that "[i]f you have 203K or renovation funds, these are not included in your payoff quote as a credit" but "will be issued in accordance with your agreement." (Doc. No. 50-10 at PageID# 1597.)  Caliber further noted that "any positive escrow balance is not part of this payoff calculation and any excess funds will be refunded once the loan is paid in full." (*Id.*)  Similarly, in its July 13, 2020 and June 11, 2021 payoff letters, Caliber advised Seme as follows: "If you have 203K or renovation funds .... or remaining escrow balance, these funds will be refunded 21 days after your loan is paid in full." (Doc. No. 50-10 at PageID#s 1656, 1768.)  Again, Seme cites no provision in any of the Mortgage Loan Documents indicating that this content in Defendants' payoff letters breached the parties' contract.

Accordingly, Seme's argument that Defendants breached the Mortgage Loan Documents because they failed to provide a "true" payoff statement (i.e., a statement that credited Seme's undisbursed Section 203k rehabilitation funds against the total principal amount of the loan) is without merit and denied.  The Court also rejects Seme's argument that Defendants breached the Mortgage Loan Documents by calculating interest, penalties, costs, late fees and/or other charges based on the total amount of Seme's loan (as opposed to an amount reduced by Seme's undisbursed

Section 203k rehabilitation funds).  Once again, Seme does not direct this Court's attention to any provision in the Mortgage Loan Documents that required Defendants to calculate interest, penalties, costs, late fees and/or other charges in the manner that Seme suggests.  Moreover, as Defendants correctly note, the Note signed by Seme expressly provides that interest and late charges are to be calculated based on the "Principal," which the Note defines as the full loan amount of $259,447.00.[19] (Doc. No. 45 at PageID# 783.)

In short, Seme has failed to identify any provision in any of his Mortgage Loan Documents that required Defendants to either (1) provide a statement that calculated his payoff amount by crediting his undisbursed Section 203k rehabilitation funds towards the principal amount of his loan; or (2) calculate interest, penalties, costs, late fees and/or other charges based on a reduced total that credited the amount of his undisbursed Section 203k rehabilitation funds.  And it is not this Court's function to scour through the record to attempt to find such a provision in the parties' contract and then develop an argument on Seme's behalf.  *See, e.g., Wellington*, 631 F.Supp.3d at 473 ("To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention.").

---

[19] Specifically, the Note provides, in relevant part, as follows: "1. In return for a loan that I have received, I promise to pay U.S. $259, 447.00 (this amount is called 'Principal'), plus interest to the order of the Lender. *** 2.  Interest will be charged on unpaid principal until the full amount of the Principal has been paid.  I will pay interest at a yearly rate of 4.875%. *** 6(A).  If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 4.000% of my overdue payment of principal and interest. *** (C) If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest I owe on that amount."  (Doc. No. 45 at PageID#s 783-784.)

Accordingly, and for all the reasons set forth above, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Seme's breach of contract claims in Count One.

### 3.    TILA (Count Two)

In Count Two, Seme alleges that Defendants violated TILA by (1) "failing to accurately disclose [his] rights under the Loan, including the right to rescind;" (2) "failing to accurately calculate the APR and finance charges on the Loan, and the misapplication of the daily interest factor with respect to the Loan and the undisbursed funds;" (3) "applying penalties in excess of limits after Contractor's breach and interference with the Loan;" (4) "failing to provide a responsive resolution to Seme's construction difficulties caused by Contractor;" and (5) "charging erroneous interest in excess of allowable amounts."  (Doc. No. 1-1 at PageID# 69.)  Seme further alleges that "[s]ince a portion of the Loan is for construction and rehabilitation of the Property, Seme is entitled to rescind the Loan as a result of Lender's conduct and a refund of all finance changes pursuant to 15 USC 1635."  (*Id.* at PageID# 70.)

Defendants argue that they are entitled to summary judgment on this claim because (1) any claim for damages under TILA is barred by the statute of limitations; and (2) the right of rescission under TILA does not apply to Seme's mortgage loan.  (Doc. No. 44 at PageID#s 764-766.)  In response, Seme acknowledges that "Defendants may be correct that there is not a right to rescission for a residential mortgage transaction under TILA."  (Doc. No. 52 at PageID# 2365) (citing *Girgis v. Countrywide Home Loans, Inc.*, 733 F.Supp.2d 835, 843 (N.D. Ohio 2010)).  Seme argues, however, that "that does not mean that a claim for damages is precluded when there is a mortgage transaction like the one at issue here."  (*Id.*)  Aside from this sole sentence, however, Seme fails to acknowledge

45

or address (at any point in his Brief in Opposition) Defendants' argument that his TILA damages claim is time-barred. (*Id.*) In their Reply Brief, Defendants thus assert that Seme has abandoned both his damages and rescission claims under TILA. (Doc. No. 56 at PageID#s 2391, 2401.)

The Court finds that Seme has abandoned his TILA claims as set forth in Count Two. As set forth above, Seme himself acknowledges that there is no right to rescission under TILA for a residential mortgage transaction such as the one at issue herein. And while Seme summarily asserts that his damages claim under TILA is not precluded, he fails to provide any explanation or argument (or cite any authority) supporting this assertion. Notably, Seme also fails, entirely, to address Defendants' argument that his TILA damages claims (as set forth in Count Two) are time-barred under 15 U.S.C. § 1640(e). (Doc. No. 44 at PageID# 764.)

In light of the above, the Court finds that Seme has abandoned his TILA damages and rescission claims set forth in Count Two. *See Nathan*, 992 F.3d at 564, n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin*, 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487. Accordingly, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Count Two of the First Amended Complaint.

### 4. RESPA (Count Three)

In Count Three, Seme alleges that Defendants violated RESPA by (1) "failing to provide an accurate payoff balance upon request in violation of 12 C.F.R. 1026.36(c)(3) and 1024.35(b)(6);" (2) "charging interest and penalties on funds not provided to [Seme] in violation 12 C.F.R. 1024.35(b)(5);" (3) "failing to respond to loan servicing complaints pursuant to 12 C.F.R. 1024.35;" and (4) "failing to maintain an interest-bearing escrow account for the undisbursed funds in excess

of $90,000.00 and failing to provide statements regarding same pursuant to inter alia, 12 C.F.R. 1024.17." (Doc. No. 1-1 at PageID# 70.)

Defendants argue that they are entitled to summary judgment in their favor with respect to Seme's RESPA claims because Seme has failed to show that he submitted a proper Notice of Error, Request for Information, or Qualified Written Request to Defendants. (Doc. No. 44 at PageID#s 767-768) (citing *Marais v. JPMorgan Chase Bank, N.A.*, 676 Fed. Appx. 509 (6th Cir. 2017)).  In addition, regarding Seme's claim that Defendants violated 12 C.F.R. § 1026.36(c)(3), Defendants assert that this claim fails because (1) Seme has failed to come forward with copies of any requests for a "true" payoff statement; and (2) even if he had made such a request, any alleged failure by Defendants to respond would be barred by the statute of limitations.[20]  (*Id*. at PageID# 766.)  Regarding Seme's claim that Defendants violated 12 C.F.R. § 1024.35(b)(5), Defendants maintain that there is no separate cause of action under that regulation for imposition of fees or charges.  (*Id.* at PageID# 768.) Lastly, regarding Seme's claim that Defendants violated 12 C.F.R. § 1024.17, Defendants assert that this claim fails because (1) there is no private right of action under that regulation; and (2) even if there were, it would be barred by RESPA's statute of limitations.  (*Id*. at PageID#s 768-769.)

In response, Seme argues generally that the arguments supporting his tortious interference and breach of contract claims also support his claims in Count Three.  (Doc. No. 52 at PageID# 2370.) Regarding his claim under 12 C.F.R. § 1026.36(c)(3), Seme again asserts that he requested "true" and "accurate" payoff statements from Defendants in 2019, 2020, and 2021 and that Defendants were

---

[20] As discussed *infra*, Defendants note that, although Seme's claim that Defendants violated 12 C.F.R. § 1026.36(c)(3) is set forth in his RESPA claim in Count Three, Section 1026.36 is actually a section of the regulations under TILA. (Doc. No. 44 at PageID# 766.)  Therefore, Defendants assert (and Seme does not contest) that any claim under this Section is governed by TILA's one-year statute of limitations.  (*Id.*)

47

required to provide such statements to him under that regulation.  (*Id*. at PageID# 2372.)  Seme maintains that Defendants failed to provide payoff statements that credited him for the "unused rehabilitation loans" and then asserts (summarily and without citation to authority) that "[t]herefore, Caliber's argument that the statute of limitations ran on Seme's claims must also fail."  (*Id*.)

Lastly, Seme does not dispute that he failed to submit a "proper" notice of error, request for information, or qualified written request to the "proper address."  (*Id.* at PageID# 2373.)  He maintains, however, that this is of no moment because "the record demonstrates that Caliber not only had Seme's requests but that it responded to them, so the argument that it did not get the requests at the correct address fails."  (*Id*.)  Seme cites no authority in support of his assertion that actual notice or receipt of a notice of error or qualified written request, is sufficient under RESPA.

In their Reply Brief, Defendants argue that "Seme's claim under RESPA fails because Seme still has not produced any notice of error, request for information, or qualified written request that was supposedly sent to Defendants."  (Doc. No. 56 at PageID# 2390-2391, 2399-2400.)

The Court will address each of Seme's claims in Count Three separately, below.

### a.      Violation of 12 C.F.R. § 1024.17

As an initial matter, the Court notes that Seme fails to acknowledge or address (at any point in his Brief in Opposition) Defendants' argument that they are entitled to judgment in their favor with respect to his claim that Defendants violated 12 C.F.R. § 1024.17.   Accordingly, the Court finds that Seme has abandoned this claim and Defendants are entitled to judgment in their favor with respect thereto.  *See Nathan*, 992 F.3d at 564, n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin*, 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487.

**b.  Violation of 12 C.F.R. § 1024.35**

The Court next addresses Seme's claim that Defendants violated RESPA by failing to "respond to loan servicing complaints" and/or "provide an accurate payoff balance upon request" in violation of 12 C.F.R. § 1024.35(b).  (Doc. No. 1-1 at ¶¶ 42(a),(b), (c); PageID# 70.)

RESPA is a consumer protection statute that regulates the real estate settlement process.  12 U.S.C. §§ 2601, *et seq*.  Congress intended RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."  12 U.S.C. § 2601(a).  "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's provisions was expanded in 1990 to encompass loan servicing."  *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013).  "As a remedial statute, RESPA is construed broadly to effectuate its purposes."  *Id.* at 719.  *See also Ryan v. Flagstar Bank, FSB*, 2023 WL 5610346 at * 3 (S.D. Ohio Aug. 30, 2023).

As relevant here, RESPA provides that a borrower may submit a "Qualified Written Request" ("QWR") to his/her loan servicer requesting "information relating to the servicing of such loan."  12 U.S.C. § 2605(e)(1)(A).  A QWR must identify the loan and include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).  A QWR that asserts an "error relating to the servicing of a mortgage loan" is called a "Notice of

Error" ("NOE").[21]  *See* 12 C.F.R. § 1024.35(a).  Notably, RESPA's implementing regulations provide

that a loan servicer may establish a specific address for a borrower to submit a NOE and/or QWR, as

follows:

> (c) Contact information for borrowers to assert errors.  A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in this section. The notice shall include a statement that the borrower must use the established address to assert an error.  If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b).  A servicer shall provide a written notice to a borrower before any change in the address used for receiving a notice of error.  A servicer that designates an address for receipt of notices of error must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.

12 C.F.R. § 1024.35(c).

RESPA places responsibilities on loan servicers to respond to certain QWRs and NOEs made

by borrowers that seek information or dispute charges.  12 U.S.C. § 2605(e).  Under RESPA, "[i]f

any servicer of a federally related mortgage loan receives a qualified written request from the

borrower (or an agent of the borrower) for information relating to the servicing of such loan, the

servicer shall provide a written response acknowledging receipt of the correspondence within 5 days

(excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within

such period."  12 C.F.R. § 2605(e)(1)(A).  Specifically, "a loan servicer must respond to a borrower's

QWR concerning her loan by: (1) making any necessary corrections in the borrower's account and

notifying the borrower of the corrections in writing; (2) [after conducting an investigation,] providing

the borrower with a written explanation stating the reasons why the servicer believes the borrower's

---

[21] Specifically, 12 C.F.R. § 1024.35(a) provides (in relevant part) as follows: "A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request."  12 C.F.R. § 1024.35(a).

account to be correct; or (3) providing a written explanation that includes information requested by the borrower or an explanation why such information cannot be obtained." *Best v. Ocwen Loan Servicing, LLC*, 2016 WL 10592245 at * 2 (6th Cir. Nov. 29, 2016) (citing 12 U.S.C. § 2605(e)). *See also Lawson v. Specialized Loan Servicing, LLC,* 2018 WL 7575708 at * 4 (6th Cir. Sept. 14, 2018); *Marais v. JPMorgan Chase Bank, N.A.*, 676 Fed. Appx. 509, 514 (6th Cir. 2017).[22]

Here, Seme asserts that Defendants violated RESPA by failing to respond to communications that Seme allegedly sent to Caliber, in which "Seme and his counsel repeatedly requested payoffs that accurately reflected that the rehabilitation funds had not been disbursed and should have been applied to the principal." (Doc. No. 52 at PageID# 2373.) Seme appears to assert that these communications and requests qualify as QWRs, NOEs, and/or requests for information, and that Defendants violated RESPA when they failed to accurately respond. (*Id.* at PageID#s 2373-2374.) Defendants argue that this claim fails because Seme has failed to provide any evidence that he sent a QWR, NOE, and/or request for information to Defendants at their "designated address." (Doc. No. 56 at PageID# 2400.)

For the following reasons, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Seme's RESPA claims. As discussed *supra*, on October 24, 2018, Caliber sent correspondence to Seme, in which it advised him (among other things) that he had the

---

[22] In addition, RESPA provides that a borrower may submit a written "request for information" to his/her loan servicer. 12 C.F.R. § 1024.36(a). As with QWRs and NOEs, RESPA likewise provides that loan servicers may establish a specific address for a borrower to submit a request for information relating to the servicing of his/her mortgage loan. *See* 12 C.F.R. § 1024.36(b). RESPA further provides that, within five days of receiving an information request from a borrower, the loan servicer shall provide a written response, in which the servicer either (1) provides the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or (2) conducts a reasonable search for the requested information and provides the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance. 12 C.F.R. §§ 1024.36(c), (d).

right to submit a NOE, QWR, or Request for Information to Caliber to "research an error or dispute regarding the servicing of your mortgage, or to request information or documentation regarding your mortgage."  (Doc. No. 45 at PageID# 849.)  Caliber expressly instructed Seme that any such NOE, QWR, or Request for Information was required to be sent to the specific address set forth in that letter, i.e. P.O. Box 270415, Oklahoma City, Oklahoma 73137-0415.  (*Id*.) ("You must use this address to assert an error or request information.").  Likewise, in November 2022 (when Shellpoint became Seme's mortgage servicer), Shellpoint sent a letter to Seme, directing him to "[s]end all qualified written requests to Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, SC 29603." (*Id*. at PageID#s 878-880.)  Shellpoint further advised Seme that "[i]f you want to request information about your loan or if you believe an error has occurred in the servicing of your loan and would like to submit an Error Resolution or Informational Request, please write to us at the following address: Shellpoint Mortgage Servicing P.O. Box 10826 Greenville, SC 29603."  (*Id*. at PageID# 880.)

Seme insists that he "requested" that Defendants provide a "true payoff" in 2019, 2020 and 2021, and that Defendants' alleged failure to accurately respond violates RESPA.  However, Seme fails to direct this Court's attention to any document in the record demonstrating that he sent a QWR, NOE, or request for information to the designated addresses provided by Caliber and/or Shellpoint.[23] As another district court in this Circuit has explained:

---

[23] In his Declaration, Seme avers that his counsel requested a "true" payoff from Caliber on April 15, 2020 and July 9, 2020.  (Seme Decl. at ¶¶ 18, 19.)  Seme does not direct this Court's attention to either of these requests in the record. However, the Court notes that the record contains a letter dated April 15, 2020 from Seme's counsel to Caliber requesting that Caliber consider a "loan buyout."  (Doc. No. 50-10 at PageID# 1651.) This April 15, 2020 letter was sent to Caliber's Legal Department at 1525 South Belt Line Road, Coppell, Texas 75109.  (*Id*.)  The record also contains a fax dated July 9, 2020 from Seme's counsel to Caliber which attaches an authorization form signed by Seme.  The fax cover sheet also requests that Caliber "please fax payoff quote to my attention."  (*Id*. at PageID# 1660.)  Assuming *arguendo* that these communications in fact constitute QWRs, NOEs, and/or requests for information under RESPA, it is clear from the face of these documents that neither was sent to Caliber's designated address, i.e. P.O. Box 270415, Oklahoma City, Oklahoma 73137-0415.

> It is well established that, when a loan servicer provides an address at which the servicer receives QWRs, debtors must submit their requests to that address in order to trigger RESPA response obligations. RESPA regulations explicitly state that "[a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to request information in accordance with the procedures in this section." 12 C.F.R. § 1024.36(b). **The Sixth Circuit has repeatedly held that if a debtor fails to send requests to a designated QWR address, the servicer has "no duty to respond."** *Dale v. Selene Financ[e] LP*, Case No. 16-4296, 2018 WL 2222598, at *1 (6th Cir. Mar. 16, 2018) (citing *Bivens v. Bank of Am.*, 868 F.3d 915, 919 ([11]th Cir. 2017)) (holding that summary judgment in favor of a servicer was warranted where the servicer "notified [the debtor] by mail of the address to send [QWRs]" and "[the debtor] sent his requests to a different address"); *Best v. Ocwen Loan Servicing, LLC*, Case No. 16-1217, 2016 WL 10592245, at *2 (6th Cir. Nov. 29, 2016) (citing *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141 (10th Cir. 2013); *Roth v. CitiMortgage, Inc.*, 756 F.3d 178 (2d Cir. 2014)) (holding, despite the fact that the debtor "inadvertently typed the wrong address on the mailing label" and the servicer received actual notice of the debtor's QWR, that "[a] servicer is not obligated to respond to QWRs sent to an address other than the designated QWR address").

*Maley v. Specialized Loan Servicing, LLC*, 2021 WL 1812698 at * 3 (E.D. Mich. May 6, 2021). *See also Lawson*, 2018 WL 7575708 at * 4 (in affirming dismissal of plaintiffs' RESPA claims, noting that "[t]here is no indication that the Lawsons ever mailed a [QWR]" to defendant's designated address and "as a result, [defendant] was not obligated to respond."); *Best*, 2016 WL 10592245 at * 2 (same); *Dale v. Selene Finance LP*, 2018 WL 2222598 at * 1 (6th Cir. March 16, 2018) (in affirming summary judgment in defendant's favor on plaintiff's RESPA claims, finding that "Selene notified Dale by mail of the address to send such requests, but he sent his requests to a different address. Selene therefore had no duty to respond.") (citing *Bivens v. Bank of Am., N.A.*, 868 F.3d 915, 919 (11th Cir. 2017)).

Seme argues (summarily and without citation to authority) that his RESPA claims nonetheless survive because it is clear that Caliber received Seme's requests and responded to them, "so the argument that [Caliber] did not get the requests at the correct address fails." (Doc. No. 52 at PageID# 2373.)  The Court finds this argument to be without merit.  "The Sixth Circuit has repeatedly held

that, under RESPA, a debtor must send QWRs to the servicer's designated address, even when the debtor communicates with the loan servicer in some other manner and even when the servicer has actual notice of the debtor's requests." *Maley*, 2021 WL 1812698 at * 4 (citing *Lawson*, 2018 WL 7575708 at *4; *Best,* 2016 WL 10592245 at *2). *See also Best v. Ocwen Loan Servicing*, 2016 WL 125875 at *3 (E.D. Mich. Jan. 12, 2016) ("[A servicer] did not subject itself to a RESPA duty when it actually received and responded to [a debtor's] correspondence."), *aff'd,* 2016 WL 10592245 (6th Cir. Nov. 29, 2016)

Here, it is uncontested that Caliber and Shellpoint both specifically identified designated addresses to which Seme was required to submit any QWRs, NOEs, and/or requests for information. It is also uncontested that Seme failed to do so.  Thus, Defendants' RESPA obligations were never triggered, and Defendants are entitled to judgment in their favor on Count Three as a matter of law.

### c.     Violation of 12 C.F.R. § 1026.36(c)

Lastly, Seme alleges that Defendants violated 12 C.F.R. § 1026.36(c) by "failing to provide an accurate payoff balance upon request."  (Doc. No. 1-1 at ¶ 42(a), PageID# 70.)  Although included in Seme's count for violations of RESPA (Count Three), Defendants correctly note that 12 CFR § 1026.36(c) is actually an implementing regulation of TILA.  (Doc. No. 44 at PageID# 766.)  This Section provides as follows:

> (3) Payoff statements. **In connection with a consumer credit transaction secured by a consumer's dwelling, a creditor, assignee or servicer, as applicable, must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date. The statement shall be sent within a reasonable time, but in no case more than seven business days, after receiving a written request from the consumer or any person acting on behalf of the consumer**. When a creditor, assignee, or servicer, as applicable, is not able to provide the statement within seven business days of such a request because a loan is in bankruptcy or foreclosure, because the loan is a reverse mortgage or shared appreciation mortgage, or because of natural disasters or other

> similar circumstances, the payoff statement must be provided within a reasonable time. A creditor or assignee that does not currently own the mortgage loan or the mortgage servicing rights is not subject to the requirement in this paragraph (c)(3) to provide a payoff statement.

12 C.F.R. § 1026.36(c)(3) (emphasis added). *See also* 15 U.S.C. § 1639g ("A creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower.")

As noted *supra*, Defendants assert that Seme's claim that Defendants violated 12 C.F.R. § 1026.36(c) by failing to provide a "true" payoff statement is time-barred by TILA's one year statute of limitations. (Doc. No. 44.) In response, Seme argues (summarily and without citation to authority) that, because Caliber failed to ever provide a payoff statement that credited him for his unused rehabilitation funds, "Caliber's argument that the statute of limitations ran on Seme's claims must also fail." (Doc. No. 52 at PageID# 2372.)

The Court finds that Seme's claim is time-barred. TILA requires those who extend loans to "provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 714 (6th Cir. 2013) (quoting *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, (1998)). "[A]ny action under [TILA] may be brought ... within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). *See also Derbabian v. Bank of America, N.A.*, 587 Fed. Appx. 949, 955 (6th Cir. 2014). "The limitations period for claims alleging violation of disclosure requirements begins running when the agreement is entered and the lender does not make the required disclosures." *Derbabian,* 587 Fed. Appx. at 955 (citing *Wike v. Vertrue, Inc.*, 566 F.3d

590, 593 (6th Cir. 2009)). *See also Khadher v. PNC Bank, NA*, 577 Fed. Appx. 470, 479 (6th Cir. 2014) (explaining that the "occurrence of the violation" is the date of the loan agreement).

Seme's claim is barred by the statute of limitations. The Mortgage Loan was obtained on October 11, 2018 and the Complaint was filed in this action on April 17, 2023 – more than four years after the statute of limitations had passed. Moreover, even if the Court were to run the statute of limitations runs from the date of Seme's last payoff request,[24] Seme's claim would still fail. The only payoff request to which Seme directs this Court's attention is a fax dated July 9, 2020. (Doc. No. 50-10 at PageID# 1660.) The Court first notes that Caliber did, in fact, respond to Seme's request within seven days, as required by 12 C.F.R. § 1026.36(c). Specifically, the record reflects that Caliber sent a letter to Seme dated July 13, 2020, which provided a payoff amount "in response to [Seme's] recent request." (Doc. No. 50-10 at PageID# 1656.) But even assuming that Caliber's July 13, 2020 payoff statement "doesn't count" because it was allegedly inaccurate (as claimed by Seme), the one-year statute of limitations for any TILA claim relating to Seme's payoff request expired on July 16, 2021.[25] As the Complaint in this action was filed over a year and a half later (on April 17, 2023), Seme's claim would nonetheless be time barred.

Accordingly, and in the absence of any meaningful opposition from Seme on this issue, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Seme's claim that Defendants violated 12 C.F.R. § 1026.36(c). Therefore, and for all the reasons set forth

---

[24] Although Seme does not raise this issue, the Court notes that the Sixth Circuit has approved the application of equitable tolling to the statute of limitations in TILA claims. *See Lester v. Wow Car Co., Ltd.*, 675 Fed. Appx. 588, 590 (6th Cir. 2017) (citing *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1039 (6th Cir. 1984)).

[25] Seme sent his payoff request to Caliber on July 9, 2020. Pursuant to 12 CFR § 1026.36(c), Caliber's response was due by no later than seven (7) days from the date of Seme's request, i.e., by July 16, 2020. One year from July 16, 2020 is July 16, 2021.

above, Defendants are entitled to summary judgment in their favor with respect to all of Seme's claims in Count Three of the First Amended Complaint.

### 5.  Ohio CSPA (Count Four)

In Count Four, Seme argues that Defendants violated the Ohio CSPA by (1) knowingly failing to comply with federal law concerning the Loan disclosures under TILA and RESPA; (2) knowingly providing a disclosure that included a material misrepresentation; (3) advising Seme to engage in conduct that resulted in the Contractor stopping work; and (4) requiring Seme to enter into a loan modification on terms it knew were substantially one-sided in favor of Lender.  (Doc. No. 1-1 at PageID#s 70-71.)

In their Motion, Defendants argue that they are entitled to summary judgment in their favor with respect to this claim because "Defendants' actions in their capacity as the servicers of the Mortgage Loan are not 'consumer transactions' under the OCSPA and Defendants are not suppliers under the OCSPA." (Doc. No. 44 at PageID# 770.)  Defendants further assert that, even if the OCSPA applied to the servicing of Seme's mortgage loan, his claims are barred by the statute of limitations. (*Id*.)  In response, Seme "acknowledges that the Ohio Supreme Court has held that mortgage servicing is not a consumer transaction and a mortgage servicer is not a supplier for purposes of the Ohio Consumer Sales Practices Act." (Doc. No. 52 at PageID# 2365.)

In light of the above, the Court finds that Seme has abandoned his Ohio CSPA claim.  *See Nathan*, 992 F.3d at 564, n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin*, 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487.  Defendants, therefore, are entitled to summary judgment in their favor with respect to Count Four of the First Amended Complaint.

### 6. Violation of 15 U.S.C. § 1641 by Shellpoint (Count Six)

Lastly, in Count Six, Seme alleges that Shellpoint violated 15 U.S.C. § 1641(g) by failing to provide notice of the change of mortgage servicer from Caliber to Shellpoint within 30 days of the assignment.[26] (Doc. No. 1-1 at PageID# 73.) Defendants argue that they are entitled to summary judgment in their favor with respect to this claim because "Shellpoint sent correspondence to Seme dated November 8, 2022, advising Seme that the servicing of his Mortgage Loan transferred to Shellpoint on November 2, 2022." (Doc. No 44 at PageID# 774.) Seme fails to acknowledge or address Defendants' argument in his Brief in Opposition. (Doc. No. 52.)

In light of the lack of opposition, the Court finds that Seme has abandoned his claim that Shellpoint violated 15 U.S.C. § 1641. *See Nathan*, 992 F.3d at 564, n.1; *Dulaney,* 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander*, 733 Fed. Appx at 261; *Nowlin*, 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks*, 449 Fed. Appx at 487. Defendants, therefore, are entitled to summary judgment in their favor with respect to Count Six of the First Amended Complaint

### 7. Conclusion

Accordingly, and for all the reasons set forth above, the Court finds that Defendants are entitled to summary judgment in their favor with respect to all of Seme's claims in the First Amended Complaint.

---

[26] Seme also alleges in Count Six that Shellpoint failed to provide a reasonable response to his request for a statement of interest on the undisbursed funds in violation of 12 C.F.R. § 1024.17. (*Id*.) As noted *supra,* Seme also raised this claim in Count Three. Defendants moved for summary judgment with respect to Seme's claim that Defendants violated this Section, and Seme failed to acknowledge or address Defendants' arguments at any point in his Brief in Opposition. Thus, and as stated *supra*, the Court finds that Seme abandoned any claims against Defendants under 12 C.F.R. § 1024.17, whether set forth in Count Three and/or Count Six. *See Nathan*, 992 F.3d at 564, n.1; *Dulaney*, 2021 WL 3719358 at * 5; *Brown,* 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Alexander,* 733 Fed. Appx at 261; *Nowlin,* 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks,* 449 Fed. Appx at 487.

**B.** **Defendants' Motion for Summary Judgment as to Shellpoint's Counterclaims**

Shellpoint also moves for summary judgment in its favor with respect to its Counterclaims against the Semes. (Doc. No. 44 at PageID#s 775-777.) As noted *supra*, on September 22, 2023, Shellpoint filed Counterclaims against the Semes for Judgment and a Decree in Foreclosure. (Doc. No. 12.) In its Counterclaim for Judgment (Count One), Shellpoint alleges that "[t]here is due to Shellpoint from Plaintiff the outstanding principal balance of $255,197.31, plus interest on the outstanding principal balance at the rate of 4.87500% percent per annum from December 1, 2019, plus any late charges, advances made for the payment of taxes, assessments, insurance premiums, costs incurred in the enforcement of the Note, and costs incurred for the protection of the Property under Section 5301.233 of the Ohio Revised Code, less a credit in the amount of $96,088.89." (*Id.* at PageID# 594.) In its Counterclaim for Foreclosure (Count Two), Shellpoint alleges that Seme's Mortgage was assigned to Shellpoint on April 9, 2020 and February 6, 2023. [27] (*Id.* at PageID# 595.) Shellpoint alleges that it is the "the mortgagee of record" and that "[t]he conditions in the Mortgage have been broken by reason of defaults under the terms of the Note and Loan Rehabilitation Agreement." (*Id.*)

In their Motion for Summary Judgment, Defendants argue that Shellpoint is entitled to judgment in its favor with respect to the above Counterclaims because "the undisputed evidence establishes that: (1) Shellpoint is the holder of the subject Note and assignee of the subject Mortgage signed by Seme, (2) the subject mortgage loan is in default, and (3) Shellpoint complied with any applicable conditions precedent to the enforcement of the Note and Mortgage." (Doc. No. 44 at

---

[27] As noted *supra*, the Exhibits attached to Shellpoint's Counterclaims reflect that the Mortgage was assigned from Union Capital to Caliber on April 9, 2020 and from Caliber to Shellpoint on February 6, 2023. (Doc. Nos. 12-5, 12-6.)

PageID#s 747, 775-777.)  In response, the Semes argue that "Shellpoint is not entitled to foreclose on the Property, in law and in equity."  (Doc. No. 52 at PageID#s 2374-2375.)

Under Ohio law, to prevail on a motion for summary judgment in a foreclosure action, "the plaintiff must prove: (1) it is the holder of the note and the mortgage, or is a party entitled to enforce them; (2) if the plaintiff is not the original mortgagee, the chain of assignments and transfers; (3) the mortgagor is in default; (4) all conditions precedent have been met; and (5) the amount of principal and interest due." *Trinity Financial Services v. Unknown Heirs of King*, 247 N.E.3d 943, 954 (Ohio App. 2nd Dist. 2024).  *See also Ocwen Loan Servicing, LLC v. Smith*, 2019 WL 5695855 at * 2 (S.D. Ohio Nov. 10, 2019); *Bridge v. Ocwen Federal Bank FSB*, 2013 WL 4784292 at *4 (N.D. Ohio Sept. 6, 2013); *JP Morgan Chase Bank, N.A. v. Chiappetta*, 2013 WL 821202 at * 8 (N.D. Ohio Feb. 4, 2013), *report and recommendation adopted by*, 2013 WL 821283 (N.D. Ohio March 4, 2013).  "It is well established under Ohio law that once a default in payment has been established under the terms of a promissory note, and the note has been accelerated, then the mortgagee is entitled to judgment." *National Credit Union, Admin. Bd. v. Zovkic*, 2015 WL 471590 at * 6 (N.D. Ohio Feb. 4, 2015) (cleaned up).  *See also Ocwen Loan Servicing, LLC*, 2019 WL 5695855 at * 3.

The Court will address each of the elements of Shellpoint's Foreclosure Counterclaim separately, below.

### 1. Holder of the Note and Chain of Assignments (Elements 1 and 2)

Defendants first argue that there is no genuine issue of material fact that Shellpoint is both the holder of the Note and the assignee of the Mortgage.  (Doc. No. 44 at PageID# 775-776.)  Citing the Affidavit of Shellpoint's representative and "authorized signer," Kevin Payne, Defendants maintain that Shellpoint has been in possession of the original Note since prior to the filing of Seme's original

Complaint.  (*Id.*) (citing Doc. No. 45.)  Defendants further maintain that Shellpoint is entitled to enforce the Mortgage as the current assignee and mortgagee of record.  (*Id.*)  In support of these assertions, Defendants direct this Court's attention to copies of the Note, Mortgage, and Assignments of Mortgage, which are attached as Exhibits to and authenticated by Mr. Payne's Affidavit.  (Payne Aff. (Doc. No. 45) at PageID#s 779-780; Doc. No. 45 at PageID#s 783-821.)

In their Brief in Opposition, the Semes do not dispute that Shellpoint is the current holder of the Note.  (Doc. No. 52 at PageID#s 2374-2375.)  Nor do the Semes challenge the chain of assignments.  (*Id.*)

"In order to have standing to bring a foreclosure action, the plaintiff must be the holder of the note and mortgage, or a party entitled to enforce the instrument."  *Ocwen Loan Servicing, LLC*, 2019 WL 5695855 at * 2.  *See also Bauman v. Bank of America, N.A.*, 808 F.3d 1097, 1099 (6th Cir. 2015) ("[A] party who seeks to foreclose on a mortgage must generally prove that 'it is the current holder of the note and mortgage.'") (quoting *BAC Home Loans Servicing, L.P. v. Kolenich*, 958 N.E.2d 194, 200 (Ohio App. 12th Dist. 2011)); *Deutsche Bank Natl. Trust Co. v. Holden*, 60 N.E.3d 1243, 1250 (Ohio 2016) (noting that a "creditor seeking to foreclose on the mortgage must prove that it was the person or entity entitled to enforce the note secured by the mortgage."); *Trinity Financial Services*, 247 N.E.3d at 955 ("In foreclosure actions, the real party in interest is the current holder of the note and mortgage.")   As one Ohio court recently explained, "'R.C. 1303.31(A) identifies three classes of persons who are 'entitled to enforce' an instrument, such as a note: (1) the holder of the instrument, (2) a nonholder in possession of the instrument who has the rights of a holder, and (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to R.C. 1303.38 or R.C. 1303.58(D).'"  *Trinity Financial Services*, 247 N.E.3d at 955 (quoting *Wells Fargo Bank, N.A.*

*v. TIC Acropolis, L.L.C.*, 2016 WL 197090 at * 5 (Ohio App. 2nd Dist. Jan. 15, 2016)). *See also Ocwen Loan Servicing, LLC*, 2019 WL 5695855 at * 2-3.

As noted above, here, the Semes do not contest that Shellpoint is the holder of the Note, or the chain of assignments documenting the transfer of the Mortgage to Shellpoint. Moreover, upon its own careful review of the record, the Court finds that Shellpoint has submitted sufficient evidentiary-quality evidence to satisfy the first and second elements of its Counterclaims for Judgment and Foreclosure. Specifically, Shellpoint has submitted authenticated copies of the Note and Mortgage, both of which relate to the Property and contain Seme's signature. (Payne Aff. (Doc. No. 45) at PageID#s 779-780; Doc. No. 45 at PageID#s 783-811.) Shellpoint has also submitted evidence that it currently holds the Note and Mortgage and that it was the holder of these documents when the instant action was filed. (Payne Aff. (Doc. No. 45) at PageID#s 779-780; Doc. No. 45 at PageID#s 819-821.)

Accordingly, and in light of the lack of opposition, the Court finds that there is no genuine issue of material fact that Shellpoint has established the first and second elements of its Counterclaims for Judgment and Foreclosure.

### 2. Default (Element 3)

Defendants further assert that Shellpoint has demonstrated the third element of its Foreclosure Counterclaim; i.e., that Seme is in default. (Doc. No. 44 at PageID# 776.) Defendants again direct this Court's attention to Mr. Payne's Affidavit, in which he (1) authenticates a Loan History Statement for Seme's Mortgage Loan; and (2) avers that this Statement "is part of the Mortgage Loan Business Records and shows that the Mortgage Loan is in default under the terms of the Note and Mortgage as a result of a payment default." (Payne Aff. (Doc No. 45) at PageID# 780; Doc. No. 45

at PageID#s 823-845.)  The Semes do not dispute that Seme is in default of his Mortgage.  (Doc. No. 52 at PageID#s 2374-2375.)

The Court finds that Shellpoint has submitted sufficient evidentiary-quality evidence demonstrating that Seme is in default of the Mortgage.  Specifically, the Loan History Statement submitted by Shellpoint (and authenticated by Mr. Payne) clearly shows that Seme is in default. (Payne Aff. (Doc No. 45) at PageID# 780; Doc. No. 45 at PageID#s 823-845.)  Accordingly, and in light of the lack of opposition, the Court finds that there is no genuine issue of material fact that Shellpoint has established the third element of its Counterclaims for Judgment and Foreclosure.

### 3.   Conditions Precedent (Element 4)

Defendants next assert that Shellpoint has demonstrated the fourth element of its Foreclosure Counterclaim; i.e., that it complied with all conditions precedent.  (Doc. No. 44 at PageID#s 776-777.)  Specifically, Defendants maintain that Mr. Payne's Affidavit "establishes that both Caliber and Shellpoint sent correspondence [to Seme] via first class mail, providing notice of the default, in accordance with the requirements of the Mortgage." (*Id*.) (citing Payne Aff. (Doc. No. 45) at PageID#s 780-781; Doc. Nos. 45 at PageID#s 855-897.)  The Semes do not dispute that Shellpoint has complied with all conditions precedent, including the condition precedent of providing notice of default.  (Doc. No. 52 at PageID#s 2374-2375.)

"The plaintiff in a foreclosure action must prove that all conditions precedent have been met to meet its burden of proof for summary judgment." *Trinity Financial Services*, 247 N.E.3d at 957 "Where prior notice of default and/or acceleration is required by a provision in a note or mortgage instrument, the provision of notice is a condition precedent." *Id*. (quoting *Wells Fargo Bank, N.A. v.*

*Scott*, 2015 WL 4873000 at * 4 (Ohio App. 2nd Dist. 2015)).  *See also Chiappetta,* 2013 WL 821202 at * 4.

Here, the Note and Mortgage both contain provisions requiring Defendants to provide notice of default, and the Mortgage contains an acceleration provision.[28]  (Doc. No. 45 at PageID#s 783-784, 797.)  Defendants have submitted evidence (authenticated by Mr. Payne) that both Caliber and Shellpoint sent letters to Seme notifying him that he was in default of his mortgage and advising him of his right to cure the default within 30 days.  (Doc. No. 45 at PageID#s 861-863, 891-895.)  These letters also expressly advised Seme that "failure to cure the default .... may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding where applicable, and sale of the property."  (*Id.*)  Seme does not dispute either that Defendants sent these letters or that he received them.

---

[28] Specifically, Paragraph 6(C) of the Note provides as follows: "**(C) Notice of Default**.  If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of the Principal which has not been paid and all the interest that I owe on that amount."  (Doc. No. 45 at PageID#s 783-784.)  Paragraph 22 of the Mortgage provides as follows: "**22. Grounds for Acceleration of Debt**. (a) Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if: (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument." (*Id*. at PageID# 797.)  Paragraph 24 of the Mortgage provides: "**24. Acceleration; Remedies**. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, costs of title evidence." (*Id*. at PageID# 797.)

Based on the above, and in the absence of any argument or evidence to the contrary, the Court finds that there is no genuine issue of material fact that Shellpoint has established the fourth element of its Counterclaims for Judgment and Foreclosure.

### 4. The Amount of Principal and Interest Due (Element Five)

Lastly, Defendants argue that Shellpoint has demonstrated the fifth (and final) element of its foreclosure claim, i.e., the amount of principal and interest. (Doc. No. 44 at PageID#s 776-777.) Specifically, Defendants maintain that Mr. Payne's Affidavit "establishes that the default has not been cured, and that the amount due and owing on the Mortgage Loan is the principal sum of $255,197.31, plus interest at the rate of 4.8750% per annum from December 1, 2019, together with any advances for taxes and insurance, costs, and all other expenditures recoverable under the Note and Mortgage, and/or Ohio law, and as otherwise adjusted by the balance in the Rehabilitation Escrow Account for the Mortgage Loan." (Payne Aff. (Doc. No. 45) at PageID# 781, Doc. No. 45 at PageID#s 823-845, 899-900.)

The Semes argue that Defendants have failed to satisfy this element of their foreclosure claim, arguing as follows:

> ... Shellpoint is not entitled to foreclose on the Property, in law and in equity. The Rehabilitation Loan Agreement clearly contemplates that anything left over not used for the Property's rehabilitation is applied to principal. That has not happened here. And that means that **the claim for money damages and the foreclosure flowing therefrom do not state a true balance owing on the Loan, including any interest that has been earned on the undisbursed funds and the charging of amortized interest on the undisbursed funds. Consequently, because that true number is not before the Court, the Court is not in a position to determine whether Seme's claim for money damages (in the affirmative) or setoff (in the defensive) equal or exceed what may actually be owed on the Loan, and not the inaccurate balance that Shellpoint has presented in support of its motion.**
>
> The matter is not as simple as Defendants present it. The underlying factual questions cannot be construed in Defendants' favor. Those facts, reasonably construed in

> Seme's favor, do not demonstrate that Defendants are entitled to summary judgment on their counterclaims.  In fact, those facts support the Seme's affirmative defenses of unclean hands, estoppel, and setoff.  Defendants' actions frustrated the purpose of the contract for which Defendants now seek to foreclose and on an amount that is fundamentally inaccurate.  The counterclaims cannot proceed until Seme's causes of action are resolved, and, as already noted, that cannot be done through summary judgment.

(Doc. No. 52 at PageID#s 2374-2375) (emphasis added).

In their Reply Brief, Defendants maintain that the above argument is without merit because "the Semes fail to identify any applicable sections of the loan documents that would require the funds to be applied to the principal balance at this time."  (Doc. No. 56 at PageID# 2403.)  Defendants further assert that the Semes have failed to come forward with any evidence to dispute the amounts set forth in Mr. Payne's Affidavit.  (*Id*.)

The Court agrees with Defendants.  As discussed at length *supra*, Seme has failed to direct this Court's attention to any provision in the Mortgage Loan Documents that requires Shellpoint to apply the unused Section 203k Rehabilitation Funds to the principal balance at this time.  Nor has Seme directed this Court's attention to any provision in the Mortgage Loan Documents that requires Shellpoint to calculate interest based on an amount other than the total Principal amount of the loan.  By contrast, Shellpoint has come forward with evidentiary-quality material substantiating the amount of principal due, the interest rate, and the date from which interest runs.[29]  *See First Horizon Home Loans v. Sims*, 2010 WL 764058 at  *4 (Ohio App. 12th Dist. March 8, 2010) (affirming trial court's

---

[29] Most notably, this includes Mr. Payne's Affidavit, in which he expressly avers as follows: "Because of the default under the terms of the Note and Mortgage, the entire balance of the Mortgage Loan is due and payable. The Payment History and the Mortgage Loan Business Records show that there is due on the Mortgage Loan the principal sum of $255,197.31, plus interest at the rate of 4.8750% per annum from December 1, 2019, together with any advances for taxes and insurance, costs, and all other expenditures recoverable under the Note and Mortgage, and/or Ohio law, and as otherwise adjusted by the balance in the Rehabilitation Escrow Account for the Mortgage Loan." (Doc. No. 45 at PageID# 781.)

foreclosure judgment entry which "provided for the principal amount due, as well as the interest rate, but did not include amounts for the additional allowances for late fees, advances made on appellants' behalf, or costs and expenses incurred for the enforcement of the note and mortgage.") (citing *Huntington National Bank v. Shanker*, 1998 WL 269091 at * 2 (Ohio App 8th Dist. May 21, 1998)). The Semes have not come forward with any evidence disputing these amounts.

The Court further notes that, in its Counterclaims, Shellpoint does, in fact, acknowledge and account for the fact that Seme's mortgage includes unused Section 203k rehabilitation funds. Specifically, Shellpoint seeks judgment against Seme in amount of the outstanding principal balance of $255,197.31 (plus interest at the rate of 4.875% per annum since December 2019, late charges, advances, and costs) "*less a credit in the amount of $96,088.89.*"  (Doc. No. 12 at PageID#s 595-596) (emphasis added).

For all the reasons set forth above, the Court finds that there is no genuine issue of material fact that Shellpoint has established the fifth element of its Counterclaims for Judgment and Foreclosure.  Accordingly, the Court finds that Shellpoint is entitled to summary judgment in its favor with respect to its Counterclaims for Judgment and Foreclosure (Counterclaims One and Two).

## V.      Conclusion

Accordingly, Defendants' Motion for Summary Judgment (Doc. No. 44) is (1) GRANTED as to the claims set forth in Seme's First Amended Complaint; and (2) GRANTED as to Shellpoint's Counterclaims for Judgment and Foreclosure.  By no later than July 24, 2026, the Court hereby ORDERS Defendants to submit (1) a Final Judicial Report for the Property at issue; and (2) a Proposed Judgment Entry and Decree of Foreclosure for the Court's approval and in full accordance with General Order 2006-16-6.

**IT IS SO ORDERED.**

Date:  July 10, 2026

 s/Pamela A. Barker
PAMELA A. BARKER
U. S. DISTRICT JUDGE